# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---------------------------------------------------------------

| | |
|---|---|
| **JOHN DOE,** | : |
| | :   **Civil Action No:** |
| | : |
| | :   **JURY TRIAL** |
| **Plaintiff,** | :   **DEMANDED** |
| | : |
| | : |
| -against- | : |
| | : |
| | : |
| **THE PENNYSYLVANIA STATE** | : |
| **UNIVERSITY, THE PENNSYLVANIA STATE** | : |
| **UNIVERISTY BOARD OF TRUSTEES, ERIC J.** | : |
| **BARRON,** individually and as agent for The | : |
| Pennsylvania State University, **PAUL APICELLA,** | : |
| individually and as agent for The Pennsylvania State | : |
| University, **KAREN FELDBAUM,** individually and as | : |
| agent for The Pennsylvania State University, | : |
| **KATHARINA MATIC,**individually and as agent for | : |
| The Pennsylvania State University | : |
| | : |
| | : |
| | : |
| **Defendants.** | : |

---------------------------------------------------------------

## COMPLAINT

Plaintiff  John Doe [1] (hereinafter referred to as "Plaintiff" or "John Doe"),

by his attorneys, Summers, McDonnell, Hudock and Guthrie, P.C., and Nesenoff

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed under Pseudonym, seeking permission of the Court to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein. Plaintiff refers to the female complainant in the underlying student disciplinary

& Miltenberg, LLP, files this Verified Complaint against Defendants, and in support thereof alleges as follows:

## I.   <u>THE NATURE OF THIS ACTION</u>

1.   This case arises out of the actions taken and procedures employed by Defendants concerning allegations made against Plaintiff which resulted in his suspension from The Pennsylvania State University ("Penn State" or "the University") as a result of false allegations of nonconsensual sexual activity with fellow Penn State student Jane Roe ("Jane Roe" or "the Complainant").

2.   Both John Doe and Jane Roe were first year students at Penn State and were enrolled in the prestigious accelerated pre-medical medical program affiliated with Sidney Kimmel Medical College at Thomas Jefferson University, which allows the student to complete B.S./M.D. degrees in seven years. Selection for the program is highly competitive.

3.   Students in the accelerated pre-medical program must take a specific and structured course schedule during their three years at Penn State prior to matriculating to Jefferson University. Any deviation from the schedule will prevent the student from being prepared to successfully take the MCAT exam, which is necessary for admission to the medical school. A suspension from the University would derail John Doe's ability to complete the pre-medical

---

proceeding as "Jane Roe".  As more fully set forth in the Motion, The University is fully aware of the actual identities of John Doe and Jane Roe and will not be prejudiced in any way by John Doe's use of those pseudonyms for public filings.

program and would undoubtedly terminate any possibility of John Doe attending Jefferson University or any other medical school and becoming a doctor.

4.　　The false allegations of sexual assault involving Jane Roe arose from her attempts to initiate sexual activity with John Doe, and his rejection of her attempts, on the afternoon of September 7, 2016 (the "Incident").

5.　　After their encounter, Jane Roe fabricated allegations in text messages that she sent to her roommate accusing John Doe of touching her inappropriately while they were in her dorm room during the afternoon of Sept. 7, 2016.

6.　　The roommate threatened Jane Roe, stating that if she did not report John Doe to the administrators, then she would. Together, Jane Roe and her roommate reported the false accusations against John Doe to their Resident Advisor, who was required to report the allegations to the Residence Life Coordinator and the University Police, who then issued a timely warning about a Forcible Sex Offense and informed the Title IX Office.

7.　　At the insistence of her parents, Jane Roe responded to attempts by the University Police to contact her and she met with them on September 10, 2016 to repeat her false allegations against John Doe. Jane Roe's parents repeated the false allegations by sending texts to the parents of other pre-medical students threatening harm to John Doe.

8.　　On September 12, 2016, John Doe received an email from the Title

IX Coordinator requiring his presence at a meeting that afternoon to discuss a report of an incident that "may implicate the University's policy against sexual and gender-based harassment and misconduct." John Doe was not notified of the details of the incident, nor was he informed that he could bring an advisor to the meeting. Ultimately, John Doe would be found responsible because "he chose not to share his version of the incident until after he knew what the specific allegations were."

9.    On September 21, 2016, Jane Roe met with the Title IX Office Investigator. She stated that she would not provide a verbal account of her allegations, but instead would submit a written account at a later date. However, after promising on several occasions to do so, Jane Roe failed to provide any written account of the Incident, nor was she willing to provide a verbal statement of what she claimed had occurred in the text messages she had sent to her roommate.

10.    In fact, Jane Roe failed to provide any verbal or written statement for the Title IX Investigator throughout the entire nine-month investigation; however, the Title IX Office continued its unwarranted pursuit into the unsubstantiated allegations against John Doe with a full-scale University Police and Title IX investigation in which Jane Roe refused to take part.

11.    Jane Roe's refusal to detail the allegations against John Doe resulted in a massively unfair and biased investigation against the accused male

based on absolutely no evidence.

12.     A lengthy nine-month investigation by the Title IX and Student Conduct Offices ensued, which included multiple interviews with John Doe by the Investigator, university police and student conduct Case Manager, in addition to written statements and evidence provided by John Doe. Hundreds of pages of documentation for the investigation were compiled by the Title IX Office.

13.     Although John Doe would meet with Title IX and Office of Student Conduct administrators and staff regarding the alleged Incident numerous times, it was not until his last meeting with the Associate Director of the Office of Student Conduct, held on May 1, 2017, that he was informed that the student conduct procedures had been revised and reissued nearly six months prior. The revised policy and procedures had significant changes to the protocol for cases of sexual misconduct that directly impacted John Doe.

14.     On May 11, 2017, John Doe was issued a charge of Non-consensual Penetration: Digital, with Sanctions of Conduct Suspension through Fall 2017 and required Educational Programming and/or Counseling for readmission. John Doe refused to accept the baseless charge and resulting Sanctions. He informed the University he would contest the charge and requested a hearing.

15.     Finally, on June 6, 2017, a hearing was held before a panel that included three faculty and staff. Inexplicably, after a nine-month investigation into allegations of sexual assault that resulted in a lengthy investigation report,

the Hearing Panel had absolutely no questions to ask the Investigator or to ask John Doe.

16.     John Doe had been told by the Investigator and the Associate Director of Student Conduct that when he met with the Hearing Panel he could discuss information which he had previously submitted in his statements but had been redacted by Penn State in the final investigation report. The Chair of the Hearing Panel instructed John Doe to address the Panel to "say whatever you want;" however, when John Doe began to speak he was silenced because what he started to say was not contained in the investigation report.  The Chair stated that what John Doe had to say was not relevant or considered new evidence, and so he was told he could not continue to speak. Ultimately, it was the lack of this information that was used against John Doe in the Hearing Panel's determination of his responsibility.

17.     On June 9, 2017, following a cursory hearing during which Jane Roe's inconsistencies and contradictions were not challenged by the Hearing Panel but accepted as true, John Doe received a letter from the Associate Director of Student Conduct notifying him of the Decision that he had been found responsible for violating the University's Code of Conduct. The Sanction was increased to include:  (i) suspension through the semester Fall 2017; (ii) required counseling evaluation/assessment under the direction of the Office of Student Conduct; (iii) loss of on-campus living privileges; and (iv)

recommended loss of participation in the Penn State Jefferson pre-med/medical program for as long as Jane Roe is a participant in the program. The Sanction had been increased from the original recommendation by the Associate Director of Student Conduct to include the loss of on-campus living privileges and recommended loss of participation in the pre-medical program.

18.    On June 16, 2017, John Doe submitted a timely appeal to the Decision, citing the lack of due process and a multitude of procedural errors by Penn State that resulted in the erroneous outcome and flawed Decision.

19.    On June 27, 2017, the Assistant Vice President and Associate Dean of Undergraduate Education and Professor of Art Education, and Women's Studies issued a perfunctory one-page form letter denying John Doe's appeal.

20.    As a result of Defendants' actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages and economic injuries and most critically, the loss of his admission to medical school as a pre-medical student in the Jefferson University program, permanently denying him a career as a physician.

21.    Throughout the investigative process, Penn State defendants failed to abide by Penn State's own guidelines and regulations and acted in direct violation of federal and/or state law.

22.    A non-exhaustive list of Penn State Defendants' wrongful actions included the following: (i) Defendants failure to conduct a thorough and

impartial investigation; (ii) Defendants failure to notify John Doe that the Student Code of Conduct and Procedures had been revised during the investigation process; (iii) Defendants failure to prevent and respond to retaliation against John Doe; (iv) Defendants failure to utilize the preponderance of the evidence standard in determining John Doe's responsibility; and (v) Defendants failure to provide exculpatory evidence and improperly excluded relevant information to the hearing panel.

23. Furthermore, (vi) Defendants evidenced a gender bias against John Doe as the male accused throughout the investigative and hearing process; (vii) Defendants made assessments of credibility and evidentiary weight with respect to each party without any logical basis or rationale; (viii) Defendants denied John Doe of the opportunity to present and question all relevant witnesses; (ix) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; and (x) the unwarranted and unduly severe Sanction was arbitrarily assessed and increased.

24. When Penn State subjected John Doe to disciplinary action, they did so in an arbitrary and capricious way without substantiation and with an anti-male discriminatory bias in violation of Title IX.

25. Penn State failed to adhere to its own policies and regulations which resulted in a fatally flawed proceeding. The procedural violations that permeated Penn State's disciplinary process, combined with a discriminatory bias against

males and the underlying motive to protect Penn State's already tarnished reputation and financial wellbeing led to an erroneous finding of sexual misconduct against John Doe.

26.     John Doe has been greatly damaged by the actions of Defendants: his education and career prospects have been severely compromised as he will be unable to gain admission to the Jefferson University medical school, or to any other medical school because of the disciplinary mark on his record, let alone obtain a medical license in the unlikely event that he was able to obtain admission to a medical school. John Doe will be barred from admission to any institution of similar standing to complete his undergraduate education or to obtain gainful employment with the permanent notation of the erroneous finding on his academic record. As a result of Defendants' actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, and economic injuries in addition to the loss of educational and career opportunities.

27.     Defendants conducted a fatally flawed proceeding, afflicted by an anti-male discriminatory bias, resulting in an erroneous outcome and severe and unwarranted damages to Plaintiff.

## THE PARTIES

28.     Plaintiff John Doe is a natural person, citizen of the United States and citizen of the state of California. During the events described herein, Plaintiff was a

student at Penn State and resided in University housing in State College, Pennsylvania.

29.    Defendant The Pennsylvania State University is a public land-grant research-intensive university with campuses throughout Pennsylvania. The flagship University Park campus attended by Plaintiff is located in State College, Pennsylvania.

30.    Defendant The Pennsylvania State University Board of Trustees ("Defendant Penn State Board of Trustees") "is the corporate body established by the charter with complete responsibility for the government and welfare of the University and all the interests pertaining thereto including students, faculty, staff and alumni." https://trustees.psu.edu

31.    Defendant Eric J. Barron, ("Defendant Barron" or "the President") is the President of Defendant Penn State and he may be contacted at a Defendant Penn State e-mail listed on Defendant Penn State's website. Defendant Paul Apicella ("Defendant Apicella" or "the Title IX Coordinator") is Title IX Coordinator at Penn State and he may be contacted at a Defendant Penn State email listed on Defendant Penn State's website. Defendant Karen Feldbaum ("Defendant Feldbaum" or "the Associate Director of Student Conduct" or "the Case Manager") is Associate Director of Student Conduct at Penn State. Defendant Feldbaum can be contacted at a Defendant Penn State email listed on Defendant

Penn State's website. Defendant Katharina Matic ("Defendant Matic" or "the Investigator") is Senior Compliance Specialist at Penn State. Defendant Matic can be contacted at a Defendant Penn State email listed on Defendant Penn State's website.

32.    Plaintiff John Doe, Jane Roe (or "the complainant") and Defendantsare sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

33.    This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendant are citizens of different states; and (iii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

34.    This Court has personal jurisdiction over Defendant Penn State on the grounds that it is conducting business within the Commonwealth of Pennsylvania.

35.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Penn State is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.    **Background: The Department of Education's Office for Civil Rights'
      April 2011 "Dear Colleague Letter"**

36.    On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S.
Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and
universities (hereinafter referred to as the "Dear Colleague Letter"). The Dear
Colleague Letter provides a necessary set of background facts to this action.

37.    The Dear Colleague Letter advised that, in order to comply with Title
IX, colleges and universities must have prompt procedures to investigate and
resolve complaints of sexual misconduct. Most notably, the Dear Colleague Letter
required schools to adopt a relatively low burden of proof referred to as the
preponderance of the evidence standard – "more likely than not" -- in cases
involving sexual misconduct, including assault. Several colleges had been using
the "clear and convincing" standard and some, like Stanford University, applied
the criminal standard, "beyond a reasonable doubt."  The Dear Colleague Letter
stated that schools should "minimize the burden on the complainant," transferring
alleged perpetrators, if necessary, away from shared courses or housing. The Dear
Colleague Letter, while not completely ignoring due process concerns, suggested
that schools should focus more on victim advocacy. The Dear Colleague Letter
stated that schools should give both parties the right to appeal a decision, which
amounts to double jeopardy for an accused student. After the Dear Colleague

Letter was published, many schools revised their sexual assault and sexual harassment policies and procedures, to ensure compliance with Title IX, under a threat of rescission of federal funding.

38.   The Obama Administration, through the DOE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

39.   Catherine Lhamon, former Assistant Secretary of the Department of Education ("Assistant Secretary Lhamon") delivered what has continued to be treated as marching orders by colleges and universities:

(a)   In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

(b)   In June 2014, Assistant Secretary Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at

the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.

(c)     In July 2014, Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

(d)     Assistant Secretary Lhamon was quoted in the Los Angeles Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," Los Angeles Times, August 17, 2015.

40.     To support making the Dear Colleague Letter binding, the OCR hired hundreds more Investigators to ensure Title IX enforcement. The Federal Government is currently investigating approximately 339 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown, Columbia and Cornell Universities, Dartmouth College, Johns Hopkins University, the University of Chicago, Penn State, and many other top state universities. The Department of Education has also negotiated settlements and voluntary resolutions with many schools.

41.     Colleges and universities, including Defendant Penn State, are fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds that a Title IX violation has occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of

schools; if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

42.     In July 2016, Vice President Joseph Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

43.     To revoke federal funds -- the ultimate penalty -- is a powerful tool because institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

44.     The DOE and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales

16

are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

45.     On November 3, 2016, the DOE announced that it would levy an historic fine of $2.4 million against Penn State for failure to comply with the Jeanne Clery Act after a review was prompted due to the university's handling of sexual misconduct incidents. "The Department is required by law to conduct periodic reviews of an institution's compliance with the Clery Act. These reviews may be initiated when a complaint is received, a media event raises concerns, a

school's independent audit identifies areas of noncompliance, or other reasons."

according to the press release by U.S. Department of Education, *U.S. Department*

*of Education Levies Historic Fine Against Penn State Over Handling of Sexual*

*Misconduct Incidents*, Nov. 3, 2016

46.     In response to pressure from the OCR, DOJ, and the White House,

educational institutions, like Defendant Penn State, have limited procedural

protections afforded to male students, like John Doe, in sexual misconduct cases.

## II.     Agreements, Representations, Covenants & Warranties Between Plaintiff and Penn State

47.     Plaintiff emigrated to the United States in 2002 and became a citizen

in 2010. He grew up in Cupertino, California attending a highly competitive high

school. John Doe was a top ranked student in his senior class and also a member of

the varsity swim team, selected for the a cappella choir and he devoted over 300

hours of his time to community service during high school.

48.     Plaintiff was accepted for admission by a number of prestigious

colleges and universities. He elected to attend Penn State because he had been

admitted to the university's seven-year premedical medical program that upon

successful completion of three years at Penn State would allow him to matriculate

into medical school at Thomas Jefferson University.

49.     Plaintiff successfully completed his freshman year at Penn State with

a 3.92 G.PA. In May 2016, he received a letter from the Director of the General

Chemistry labs commending him on his academic performance.  The professor wrote, "An 'A' is the highest allowable grade at Penn State University. But, if it were allowed, we would have issued you an 'A+' because your scores exceeded those of most of the 'A' students in [the chemistry] course."

50.     Plaintiff was selected for a prestigious medical internship at Stanford University during the summer 2017 following his freshman year at Penn State.

51.     Other than the alleged Incident in September 2016, Plaintiff never had any disciplinary problems, whether at Penn State or at any other academic institution.

52.     Prior to becoming the victim of unlawful, targeted, biased, arbitrary and capricious disciplinary actions at the hands of Penn State administrators, Plaintiff had a spotless academic record and a stellar reputation in the Penn State community.

### The Afternoon of September 7, 2016  (the "Incident")

53.     John Doe and Jane Roe first became friends when they met as admitted students to the pre-medical program in June 2016.  Jane Roe contacted John Doe during the summer leading into their freshman year to encourage him to switch his courses so he could be in her classes. He declined, but remained friendly towards Jane Roe.

54.     On August 22, 2016 classes began at Penn State. Jane Roe and John Doe saw each other frequently on campus, and John Doe grew to care about Jane Roe as a friend.  He was always respectful towards her. However, despite Jane Roe telling John Doe that she had a boyfriend, Jane Roe began making multiple physical advances on John Doe, in private, and comments about preferring him over her boyfriend – which were never encouraged or reciprocated by John Doe.

55.     On the evening of September 6, 2016, Jane Roe walked back from class with John Doe to his dorm room. Together they watched an episode of a television show, with Jane Roe leaning back on John Doe's bed to put her head on his chest. Jane Roe told John Doe an analogy about how her current boyfriend was like the law firm you have had for a long time but now she wanted to switch to a new law firm – John Doe.  After she left, Jane Roe messaged John Doe to meet in the morning to walk to class.

56.     On September 7, 2016, Jane Roe arranged to be with John Doe on three separate occasions. First, Jane Roe sent the message to John Doe the previous evening asking him to walk to class together that morning, which they did.

57.     Second, at approximately 11:00 a.m., Jane Roe sent another message to John Doe asking him to come to her dorm room to study.  John Doe agreed and when he arrived at her dorm room Jane Roe was alone. John Doe sat in a chair, however Jane Doe took his hand to pull him toward the bed. John Doe sat on the

edge of the bed with his feet on the floor.  He mentioned that he had plans to meet his friend for lunch.

58.     Jane Roe began to hug him and she swung her feet around to put her legs over his lap. Next Jane Roe moved onto John Doe's lap, leaned in and with her hands around his neck she began to kiss him. John Doe was shocked. He pushed her off of his lap, grabbed his things, and left for class. Jane Roe quickly grabbed her bag and followed John Doe to class.

59.     They both arrived at class and sat in the front row with an empty seat between them. Jane Roe then messaged John Doe on Facebook saying, "wtf now you won't even talk to me?" John Doe was completely astonished by what Jane Roe had done and did not want to continue the discussion as he was trying to focus on the class. He noticed at times that she kept messaging her friends back home on Facebook, like she often did, while sniffling and sobbing.

60.     After class had ended, at approximately 1:10 p.m., John Doe rushed ahead because he had not eaten and he wanted to get lunch, however Jane Roe yelled his name and came running toward him.  Jane Roe began questioning him about "Why did you leave a buffer seat?"   She behaved very sad, and although he wanted to get lunch because he was hungry, Jane Roe insisted that John Doe come to her dorm so she wouldn't feel sad.

61.     This was the third time Jane Roe was seeking to be with John Doe on that day. John Doe went with Jane Roe to her dorm and this time her roommate was in the room. The roommate was sitting on her bed, while her fan was on the chair John Doe was sitting in earlier that afternoon. Jane Roe physically signaled John Doe to sit on her bed once again by patting on her bed, and so he did, while placing both his feet on the floor. Jane Roe sat next to John Doe on her bed.  The three students talked together until approximately 2:10 p.m. when the roommate left for class.

62.     After the roommate left, John Doe started to pack up for his Sociology class. Jane Roe insisted that he stay and once again she swung her legs over him and put both of her hands around his neck. Jane Roe began to pout, saying "Oh you don't love me. Oh, just go ahead, I'll just sit her crying and being sad. You love sociology more than me."

63.     Jane Roe then started to taunt John Doe, saying "Oh try to get me off you. Let's see what you can do," when he tried to get her off of his lap to go to class. John Doe felt very uncomfortable and tried to gently push Jane Roe off his lap, but she would not move. He began to get frustrated with her and tried pushing her off  by pushing against her chest area, specifically above where her bra would be, with both hands, but it was useless because Jane Roe kept hugging him and had a strong firm hold around his neck.

64. Every time John Doe attempted to push Jane Roe off of his lap she said, "That makes me want you even more." Jane Roe continued, "If you wanna go to Sociology, carry me to Sociology with you." Astonished, John Doe pleaded for her to let him leave because the time was now past the start of his class.

65John Doe again pushed Jane Roe back, and this time she began to fall backwards off his lap toward the floor. John Doe reached behind Jane Roe to catch her because he did not want her to fall and get hurt. He touched her bare back, just above the waistband of her shorts and caught her.

66. Jane Roe finally agreed to stand up and let John Doe leave. She offered to walk downstairs with him, but he left abruptly because he was late for class. Jane Roe later sent John Doe a Snapchat saying, "Maybe we shouldn't hangout anymore" to which he replied, "I was thinking the exact same thing." Jane Roe replied, "I'm really sorry for being so confusing."

67. After this exchange, John Doe sent Jane Roe a message asking her to bring his water bottle because he had forgotten it in her room. She did not respond. After Sociology had ended, at approximately 3:35 p.m., John Doe went to his seminar class which Jane Roe also attended. They did not speak, however John Doe thought Jane Roe seemed normal and not unfriendly towards him.

68. John Doe learned, after the investigation report had been completed, that Jane Roe had sent her roommate text messages on September 7, 2016 at

approximately 5:00 p.m. stating, " so after you left [John Doe] liked tried to make a move and a like kiss me and I swerved and that was fine" and "he put his hand on my leg and then like down you know" and "I was like um, please stop, no, I tried to move his hand, but his hand was like around my waistband, and he was like what can you do, try to stop me, and yeah, and then he had sociology so he left."

69.     Jane Roe stated in her texts that John Doe had only touched her waistband and then he left for class, as John Doe had stated during the investigation. Jane Roe's roommate, however, immediately replied with several expletives and "You need to report him" to which Jane Roe replied, " ik [I know] him well enough."   The roommate asked if he had touched her. Now Jane Roe claimed, "he jammed his finger inside and now its kinda bleeding a little." The roommate responded, "we need to report him" and Jane Roe replied, "idk [I don't know] I just really wanna forget about it."

70.     At this point, the roommate threatened Jane Roe by replying, "That is called sexual assault and he needs to be reported. If you don't report him I will' and "u need to tell someone…like an administrator."

71.     On the following day, September 8, 2016, John Doe realized that Jane Roe had blocked him on all social media. Later that evening, they had English class together and would usually walk back together to get dinner, but this time Jane Roe left the classroom and raced ahead without John Doe.

72.     On September 8, 2016, at 11:00 p.m. the University Police came to John Doe's dorm room to deliver a No Contact Order forbidding him to have any contact with Jane Roe.   Shortly after this, Jane Roe tried to reconnect with John Doe by adding him back on her Snapchat account.

73.     The No Contact Order, *i.e.*, Notification of Administrative Directive, was issued only to John Doe, the accused male, and not mutually to Jane Roe, who sought to reconnect with John Doe on Snapchat and as the accuser whose parents began to retaliate against John Doe. The outdated July 2011 No Contact Order form instructed John Doe not to contact Jane Roe via social media including "but not limited to Facebook, Myspace, Twitter or any other electronic network."

### The Investigation

74.     On September 12, 2016, John Doe received an email from the Title IX Coordinator requiring his presence at a meeting that afternoon to discuss a report of an incident that "may implicate the University's policy against sexual and gender-based harassment and misconduct." John Doe was not notified of the details of the incident, nor was he informed that he could bring an advisor to the meeting.

75.     The Title IX Coordinator stated that he knew John Doe had a previously scheduled meeting with his academic advisor that afternoon and so he,

the Title IX Coordinator, had moved the meeting to the Title IX office with the agenda now focusing on the alleged "incident."

76.    John Doe attended the meeting alone and was informed that he would be removed from his current English course, Biology course and Biology lab and reassigned to other sections because Jane Roe was in the same classes. With a presumption that the accused must be guilty, Penn State penalized John Doe by requiring a review of his course schedule in order to remove him from any class that he had in common with Jane Roe, without his approval. Approximately two weeks later, during an interview with a Detective from University Police, John Doe was asked why he had "so readily agreed" to switch classes - a continuing presumption of his guilt as the male accused.

77.    The Title IX Coordinator handed John Doe a copy of document listing his procedural rights as a respondent in a student conduct matter.

78.    On September 21, 2016 John Doe received an email from the Sr. Title IX Compliance Specialist (the "Investigator") who requested a meeting for the following day. She did not state the purpose of the meeting nor did she state that John Doe could bring an advisor to the meeting.

79.    September 23, 2016, John Doe met with the Title IX Investigator for their first meeting to review Penn State protocol.  The Investigator informed John Doe that Jane Roe would be submitting a written statement and that John Doe

would have the opportunity to read the statement and respond.  The Investigator stated that she would "strive to complete the investigation in 30 days" and that if he were found responsible, Penn State policy was "more educational than punitive."  The Investigator gave John Doe a sheet of paper with his procedural rights and resources.

80.    John Doe was told by the Investigator that he could find the Code of Conduct and Student Conduct Policy and Procedures online. The document online on September 23, 2016 was identified as the "Code of Conduct and Student Conduct Procedures, Revised 4/25/2016".

81.    During the September 23, 2016 meeting, John Doe reported that there had been a breach of confidentiality by Jane Roe's parents who had sent threatening messages about John Doe to a group chat of the parents of the pre-medical program students.

82.    Despite the foregoing, the University allowed Jane Roe's parents to retaliate with threats against John Doe. Penn State specifically had failed to advise Jane Roe's father, who served as her advisor, of Penn State's policy and rules regarding confidentiality and non-retaliation.  Jane Roe's father openly notified parents of students in the pre-med program using a group chat text that one of the students in the group had committed "forcible sex offenses" against another pre-med student. He also sent threatening texts stating, "the assaulter is son of one of

the family on this forum" and "the assaulter needs to be in prison" where "he gets raped by someone else" and "we will reveal name of the assaulter here and anywhere we feel fit including if possible newspapers."  With one unfounded accusation, John Doe had been presumed guilty and subject to a process which failed to afford him confidentiality or protection from retaliation.

83.    On September 28, 2016, John Doe again met with the Investigator. She informed him that Residence Life had gone to Jane Roe's room to meet with her and her roommate on the evening of September 7, 2016.  Residence Life had written an incident report in which Jane Roe had stated that  John Doe had "attempted to kiss her, that she was afraid to scream, that there was touching of a hand up under her clothes and that she might be bleeding a bit." John Doe thought that perhaps he may have scratched Jane Roe's back when he caught her from falling. The Investigator read only these vague allegations from the report to John Doe. She provided no further information.

84.    John Doe was astonished and deeply disturbed by what he had heard. He told the Investigator everything he knew – that Jane Roe had attempted to kiss him in the morning, that she had tried again in the afternoon, that he had rebuffed her advances and that Jane Roe had initiated all of their physical contact.

85.    On September 30, 2016, John Doe was interviewed by the University Police. The two female detectives were aggressive in their questioning. They took

turns asking, "have you ever seen her naked?" and "Has she ever undressed in front of you?" and "why did you agree so easily to switch your classes?". John Doe told the detectives all the information he had provided to the Investigator.

86.     On October 5, 2016, John Doe met with the Investigator for the third time. Again, he requested that she provide him with information regarding the allegations. The Investigator replied that Jane Roe had still not submitted a written statement nor had she agreed to an interview. However, the Investigator said she had spoken with the Title IX Coordinator and based upon the incident report from Residence Life, Jane Roe was alleging that John Doe was responsible for nonconsensual digital penetration.   This was John Doe's seventh contact by university administrators regarding the alleged incident, and yet it was the first time he was hearing about the allegations that had been documented in the September 7, 2016 incident report.

87.     On October 6, 2016, John Doe submitted a written statement to the Investigator detailing the events of September 7, 2016, even though he had never been provided with a statement of the allegations by the Complainant.

88.     On October 21, 2016, John Doe had his fourth meeting with the Investigator. Jane Roe had continued to refuse to provide a written statement; however, the Investigator had spoken with her. This time, Jane Roe had claimed that John Doe "had his hand on her inner thigh." John Doe denied the accusation.

89.   On November 16, 2016, John Doe had his fifth meeting with Investigator. John Doe, through his advisor, noted that he had fully cooperated during numerous interviews with the Investigator even though he had never been provided with a statement of the allegations by the Complainant. The process had exceeded the 60-day timeline recommended by Title IX guidance; in fact, the lengthy investigation pursued by Penn State in absence of participation by the Complainant was undoubtedly becoming a quest by the Investigator to find evidence to support the allegations against the accused, and not a search for the truth.

90.   On December 16, 2016, John Doe was allowed to see the preliminary investigation report for a limited time in the Investigator's office under her supervision. He could take notes but was not allowed to have a copy of the report. It was the first time John Doe saw the Incident Reports by Residence Life and the university police, dated September 2016, which were the basis for the allegations against him.

91.   The preliminary investigation report stated that the allegations were based upon Jane Roe's verbal statements made to her Resident Advisor and to the university police, and their unverified incident reports were submitted as Jane Roe's formal Title IX complaint.   Although the Title IX Coordinator and the

Investigator had these reports since September 7, 2016, they withheld the information from John Doe until after the investigation report had been completed.

92.    John Doe was not provided with either the incident report from residence life or the university police report until after he had been interviewed by the Investigator five times and after the preliminary investigation report had been completed, severely limiting his ability to respond to and prepare a defense against the unknown accusations by Jane Roe.

93.    The preliminary investigation report revealed that several of the witnesses who had been contacted were reluctant to be interviewed. The witnesses were all pre-medical students in the same program. Upon information and belief, the parents of the pre-medical students, who were part of the group chat that had received the threatening messages from Jane Roe's parents, had forbidden their children to become involved in the investigation.

94.    Specifically, one witness, who was a friend to both John Doe and Jane Roe, had told John Doe that Jane Roe had confided in her that she had romantic feelings for John Doe and the witness knew that Jane Roe had pursued a physical relationship with John Doe. Nonetheless, that witness refused to be interviewed because her parents did not want her to be involved in the investigation.

95.    Jane Roe's roommate, who had been interviewed, stated that, "[Jane Roe] told her the night before [the incident] that she felt she really liked John Doe

in a more intense way."  Furthermore, she had stated that Jane Roe had a boyfriend "but [Jane Roe] had feelings, she herself was confused and asked [the roommate] 'am I cheating on my boyfriend with John Doe?'".

96.     The preliminary investigation report revealed that Jane Roe had lied to the University police on September 10, 2016 when she stated that "she wasn't interested in [John Doe] other than as a friend."  Later, in a follow-up interview with the Investigator on February 1, 2017, Jane Roe admitted that she was flirtatious with John Doe and also that she had made the law firm analogy about preferring him to her boyfriend.

97.     John Doe submitted a response to the preliminary investigation report on January 3, 2017.

98.     On January 13, 2017, he again met with the Investigator to review the revised investigation report. He told the Investigator that he disagreed with the numerous redactions that had been made in the report.

99.     Nonetheless, on January 18, 2017, the Investigator informed Plaintiff that the investigation report was complete and had been forwarded to the Case Manager, the Associate Director of Student Conduct. Plaintiff reiterated in an email that he disagreed with the numerous redactions and that his disagreement should be noted.

100.   On January 20, 2017, the Associate Direct of Student Conduct notified Plaintiff the there were still a "few key points to clarify" and that she would be in touch when she was ready to meet with him.   There was no contact with Plaintiff again from anyone in the Title IX or Student Conduct offices until March 2, 2017.   The Investigator said the report was not complete but had been revised yet again.

101.   On March 21, 2017, Plaintiff reviewed another draft of the investigation report under the Investigator's supervision, and Plaintiff submitted another response.

102.   Finally, on May 1, 2017, John Doe met with the Case Manager, the Associate Director of Student Conduct, for an administrative hearing.

103.   On May 10, 2017, John Doe was notified that the Case Manager had determined, "that it is reasonable to believe a code of conduct violation has occurred. As such, I have issued the following charge and sanctions: 02.03 / Nonconsensual Penetration: Digital or with an Inanimate Object.   Conduct Suspension through FA2017.  Educational Program and/or Counseling required for readmission determine by assessment."   John Doe refused to accept the false charge and accompanying Sanction.

104.   On May 17, 2017, John Doe submitted a written response to refute the charge and sanction. John Doe adamantly denied the allegations, stating that he

had endured nine months of an investigation in which he had not been fully informed of the details of the false allegations.

105.   Significantly, John Doe stated that he was directed to find a copy of the "Office of Student Code of Conduct and Student Conduct 4/25/2016" procedures online at the September 23, 2016 meeting with the Investigator; however,  although he would meet with administrators and staff regarding the alleged incident more than a dozen times during the investigation, it was not until the last May 1, 2017 meeting with the Case Manager that John Doe was informed that the procedures had been revised and reissued nearly 6 months prior on November 3, 2016.

106.   No administrator or staff informed John Doe that significant changes had been made to the Student Conduct Procedures during the 9 months John Doe had been under investigation, including omission of the 60-day timeline for completion of investigations as provided by the 2011 "Dear Colleague Letter" for Title IX guidance.

107.   Upon matriculation to Penn State, the University had provided to John Doe at New Student Orientation online access to the University's Undergraduate Advising Handbook which included policies and procedures. Upon information and belief, at John Doe's matriculation, the online Office of Student Conduct

"Code of Conduct and Student Conduct Procedures" had been the "4/25/16" version of the code, policy and procedures.

108.   The newly revised Office of Student Conduct Procedures dated November 6, 2016 had significant policy and procedural changes including but not limited to:

109.   Revision of the term "Title IX".  The new 11/3/16 policy stated, "G. The term "Title IX" refers to Title IX of the Education Amendment of 1972 and the related regulations and guidance, specifically as they relate to sexual harassment, gender discrimination and harassment, sexual assault and sexual violence.  Special procedures exist (Section V, D) for cases involving potential Title IX violations." The new definition included dating violence, domestic violence and stalking.

110.   Deletion in the new 11/3/16 policy of "The term "University community member" [which] includes any person who is a student, faculty member, staff member, or other person employed by the University."

111.   The term "Investigator" was redefined in the new 11/3/16 policy as any University official who is assigned by the Senior Director or Title IX Coordinator to conduct investigations in cases involving allegations of student misconduct. Notably, the Investigator in John Doe's case was assigned by the Title

IX Coordinator in September 2016 under the previous policy which did state that the Title IX Coordinator could assign the Investigator.

112.   The Title IX Decision Panel was redefined and the definition broadened from the 4/25/16 policy to the new 11/3/16 policy to state: "The terms "Title IX Decision Panel" and "Title IX Administrative Hearing Officer" or, collectively, "Title IX Hearing Authority" are defined as a specific group of faculty and staff authorized by the Senior Director to review cases alleging Title IX violations that have been assigned to them, to determine whether a student has violated the Student Code of Conduct, and to assign sanctions in response to violation(s).

113.   The definition for the term "witness" was revised in the new 11/3/16 policy to include the stipulation that, "The Senior Director (or designee), AHO, UCB Chair, Investigator, or Title IX Hearing Authority may exclude witnesses if they are deemed duplicative, irrelevant, or inappropriate."   Here, the University arbitrarily made policy changes regarding witnesses while the investigation of John Doe was ongoing and failed to inform him.

114.   The Code of Conduct and Student Conduct Procedures revised 4/25/16 which were in effect when John Doe met with the Title IX Coordinator on September 12, 2016 stated: "When a University conduct process is initiated for a case involving a potential Title IX violation, the following procedures will be

followed in a timely manner, typically within 60 days of receipt of the complaint of misconduct. Alternatively, if the Senior Director determines that the investigative model articulated in Section D, 2 should be utilized to manage the case, he will refer the case to that process."   Penn State revised the policy and procedures on 11/3/16, during John Doe's investigation, to eliminate the 2011 DCL guidance for a timely, 60 day process, and further to remove the Investigative Model procedures. The revised 11/3/16 procedures to stated: "The University's Office of Sexual Misconduct Prevention and Response (OSMPR) has responsibility for investigating allegations of Title IX violations. The OSMPR will typically investigate such allegations utilizing the process articulated at http://titleix.psu.edu. When information regarding a Title IX allegation is referred to the Office of Student Conduct and a conduct process is initiated, the following process will occur," which then detailed a revised process.

115. Revisions to the procedures that occurred during John Doe's investigation included that, "If the Senior Director or designee, in consultation with the Title IX Coordinator, determines that it is appropriate and necessary, additional investigation prior to the determination of charges and sanctions will occur." Here, consultation by the Title IX Coordinator was added in the 11/3/16 procedures revision, and although John Doe was never informed of this, the Title IX

Coordinator was consulted during his investigation regarding redactions to the investigation report and whether additional investigation was necessary.

116.   Significantly, the new procedures stated, "If the acquired information reasonably supports a Code of Conduct violation, the Case Manager will recommend charges and sanctions, and the Complainant and Respondent will be given the opportunity to provide a written response within 5 business days." This stage in the process had been previously included in the Investigative Model of the 4/25/16 procedures. John Doe chose to submit his objections and nearly half of his written response was redacted. This missing redacted information was ultimately cited by the hearing panel as not having been disclosed by John Doe in their rationale for finding John Doe responsible.

117.   Critically, the new policy redefined the protocol for a hearing to include new levels of hearings: "If the respondent contests the charges, the matter will be forwarded to a Title IX Administrative Hearing or a hearing before a Title IX Decision Panel. The Title IX Administrative Hearing is an informal hearing and will be conducted by an Administrative Hearing Officer (AHO) appointed by the Senior Director.  An Administrative Hearing will typically be utilized in cases that will not result in sanctions ranging from Suspension to Expulsion and where there are no allegations of physical or sexual violence or nonconsensual penetration. The Title IX Decision Panel (Panel) hearing will be utilized in cases in which there

is a potential that the respondent may be suspended or expelled from the University and/or where there are allegations of physical or sexual violence or nonconsensual penetration."   John Doe had been relegated to the most serious hearing panel to consider the false allegations against him; a hearing panel whose only choices were suspension, expulsion or acquittal.  This was not the policy in effect and that was presented to John Doe by the Title IX Coordinator when he was informed of his procedural rights on September 12, 2016.

118.   Both the 4/25/16 and 11/3/16 procedures stated, "The respondent and the complainant will each have the option to personally address the hearing authority in person, so that they may highlight the information that they feel is most relevant to the hearing authority's deliberation."  Notably, the procedures did not state that the respondent must highlight information from the investigation report; the procedures allow the respondent to highlight information they feel is most relevant to the hearing authority's deliberation. Despite this, John Doe was silenced at the hearing when he attempted to talk about the procedural errors committed by Penn State that had impacted his investigation and adjudication.

119.   During the hearing the hearing chair had instructed John Doe that, "the next stage in the proceedings will be to highlight to the panel what they believe to be the major points in the investigation packet. As a reminder, information should be limited to packet." John Doe was deprived of his right to

defend himself when the hearing chair ignored Penn State procedures by limiting John Doe's testimony.

120.  The procedures stated that, "Each party will have the option to observe the other's interaction with the hearing authority through remote video or audio access, if reasonably practicable."  While Jane Roe participated in the hearing via web camera and the entire hearing panel could view her, she refused to allow John Doe to see her while she gave her testimony, to which the University agreed, while allowing Jane Roe to view John Doe during the hearing.

121.  The procedures stated, "Proposed questions will be submitted to the hearing authority, which will review the proposed question(s) for relevance and appropriateness before they are posed to the other party." John Doe submitted more than twenty questions for the complainant and the hearing panel rejected all but three questions, stating that John Doe's questions were not relevant or pertained to new evidence.

122.  One of the three questions asked led to this response: Did you later tell the campus police that [John Doe] had tried to kiss you once? Jane Roe had replied, "I might have told them the wrong thing."  Jane Roe said she had received emails from the police but "I never reached out to correct them."

123.  Five questions were submitted – and rejected by the Hearing Chair – regarding a medical examination which Jane Roe had reported to the investigator

and this information regarding a medical examination was included in the investigation report.  After eight months of investigation, in April 2017, the Investigator informed John Doe that Jane Roe's parents had recently stated that Jane Roe had gone for a medical examination only days after the alleged incident. Jane Roe refused to provide any documentation or report of such a physical examination or the results of a medical examination to the University.

124.   The Investigator sent emails to Jane Roe requesting that she submit the medical report but she did not respond to the emails. The following questions were submitted by John Doe to the hearing panel to clarify the information in the investigation report that Jane Roe had gone for a medical examination due to the alleged incident, followed by the Hearing Chair's response as his reason for rejecting the question: (1) When and where did you have a medical examination? NOT RELEVANT (2) You were examined to see if there was any evidence of non-consensual penetration by [John Doe]. Is this correct? NOT RELEVANT (3) You received the results of that medical examination, in a report or records, right? NEW EVIDENCE (4) Before you were examined, you explained to someone there what happened and why you wanted a medical examination, is this correct?  NEW EVIDENCE (5) And you provided information about whether you had any medical conditions and whether you are taking any medications? NEW EVIDENCE.

125.   The Hearing Chair rejected all five questions regarding the medical report and turned to address the following remarks to Jane Doe regarding John Doe's submitted questions: "We understand you already went for a medical exam and we also understand that a medical exam is not going to determine whether it was consensual or nonconsensual activity in any case, so that's not relevant. Again, that's new information so not considering."

126.   Incredulously, the Hearing Chair stated that the hearing panel had determined without evidence that they had unilaterally accepted Jane Roe's testimony that the sexual "activity" had in fact occurred, that Jane Roe had in fact obtained a medical examination, and moreover, that <u>the hearing panel had determined without evidence that the results of the medical examination would be inconclusive</u>.

127.   The hearing chair repeatedly stated that the medical report, which Jane Roe had introduced as evidence, was not relevant or was new information. In fact, the existence of the medical report was discussed during the investigation and was included in the investigation report.  John Doe had asked for a copy of the report and was informed that the complainant had refused to provide it. The medical report was not new information and it was certainly relevant. The determination by the hearing chair to limit John Doe's questions, to declare that the unseen report existed and that the medical report was inconclusive was an

egregious violation of procedures that detrimentally affected the outcome for John Doe.

128.   Following the rejection of almost all of John Doe's submitted questions, the Hearing Chair asked if the Investigator and hearing panel members had any questions they wanted to ask John Doe. There were none.

129.   Following the hearing panel's silence, the Chair stated, "I just want to clarify the allegations…no kissing, touching, fondling at all?"  To which John Doe responded, "and no penetration." Importantly, the Chair had improperly required John Doe to respond to the Jane Roe's original allegations which were not included in the formal charge letter. Moreover, the Chair had not stated the charge of nonconsensual penetration, for which John Doe had been formally charged and was the purpose for the hearing.  John Doe had to correct the Chair so that he could formally and adamantly deny the charge of nonconsensual penetration for the record. The improper protocol by the Chair resulted in a Hearing Panel that was instructed to consider the wrong charges during the hearing.

130.   The hearing concluded with the Hearing Chair allowing Jane Roe to address the hearing panel during which she made argumentative statements, objections, statements of opinion and directed the Hearing Panel to disregard statements John Doe had made. The Chair allowed Jane Roe to speak but did not

provide an equal opportunity for John Doe to make a closing statement. Indeed, the

procedures did not state that a closing statement was permissible by either party.

## COUNT I
### 42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process

131.   Plaintiff repeats and re-alleges each and every allegation hereinabove

as if fully set forth herein.

132.   The Fourteenth Amendment to the United States Constitution

provides that no state shall "deprive any person of life, liberty, or property,

without due process of law."   In this case, Defendant is a state actor subject to the

Fourteenth Amendment.

133.   Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress.
> . . .

42 U.S.C. § 1681

165.   Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681)

("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of
> sex, be excluded from participation in, be denied the
> benefits of, or be subjected to discrimination under

> any education program or activity receiving Federal
> financial assistance.

20 U.S.C. § 1681.

134.   A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

135.   A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

136.   Plaintiff's constitutionally protected property interest in his continued enrollment at Penn State and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by Penn State.

137.   Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between Penn State and Plaintiff.

138.   It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

139.   A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

140.   As a result, if Plaintiff as a Penn State student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Penn State used.

141.   Penn State, as a land grant university established by the Commonwealth of Pennsylvania has a duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

142.   Plaintiff had obeyed all institutional rules when he was wrongly suspended from Penn State.

143.   Under both federal and state law, Plaintiff had a constitutionally protected property interest in continuing his education at Penn State.

144.   Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff.

145.   Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

146.   In the course of such investigation and adjudication, Defendant flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness by employing a process in which there was a hearing in name only.   There was no cross-examination, no sworn testimony, no access for the respondent even to see the Investigator's report, no provision to respondent of the evidence that supposedly supported the false allegations and thus no adequate ability to prepare a defense to them, no presumption of innocence but rather a presumption that the female's accusations are true, no reasoned consideration of evidence as required by a burden of proof, no requirement for evidence to be stated in support of conclusions and thus an effective discretion to engage in discriminatory decision-making and a prejudiced ability for the respondent to prepare and submit an appeal.

147.   Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997).   Yet, in a case where Penn State relied upon a credibility assessment, there was for all intents and purposes no hearing and thus no cross-examination was available and no sworn testimony was taken in violation of due process of law.   *Plaintiff v.*

*University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

148.   The Individuals Defendants discharged their responsibilities in University Title IX adjudications that involved a conflict of interest contrary to a Fourteenth Amendment interest in a fair process. The Individual Defendants  (i) failed to provide Plaintiff with proper notice of the charges against him;  (ii) failed to conduct their investigation within the timelines established by the Student Code of Conduct in force at the time of the incident; (iii) issued a No Contact Order to Plaintiff without issuing a corresponding order to Jane Roe; (iv) lacked the proper qualifications to serve as Investigator for the complaint against Plaintiff; (v) denied the right to examine the evidence in the Investigator's file contemporaneously ; (vi) failed to allow Plaintiff to directly or indirectly cross-examine Jane Roe at the hearing; (vii) failed to protect Plaintiff from harassment and retaliation at the hands Jane Roe and her parents; and (viii) drew an adverse inference against Plaintiff because he requested to know the allegations against him before providing a written statement; (viii) refused to wrote a cursory and perfunctory decision letter stating that they  had determined Plaintiff responsible.

149.   In the course of Penn State's investigation and adjudication, Penn State flagrantly violated Plaintiff's clearly established rights under the Due Process clause of the Fourteenth Amendment through its repeated acts of gender bias and

deprivation of the minimal requirements of procedural fairness.   Without limitation, such acts included the following:

- Soliciting complaints from Jane Roe.

- Investigating the accusations concerning Jane Doe for nearly a month before providing Plaintiff with a vague notice of the allegations;

- Denying Plaintiff and his counsel access to the investigative file until nearly three months after Jane Roe's complaint was made against him. When he was provided access, he could not receive a copy any of the information in the file;

- Denying Plaintiff the right to confront his accuser, present evidence, or cross-examine witnesses;

- Leaving the evaluation of the credibility of the witnesses and the weight of the evidence to the sole discretion of a single Investigator;

150.     Upon information and belief, Defendants were pressured by the Obama Administration's Department of Education into following the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague.

151.   In fact, demonstrating its attempted compliance with the 2011 Dear Colleague Letter, Penn State's 2016 Clery Report annual disclosure of crime statistics reveals that the number of forcible sex offenses investigated yearly at University Park campus between 2013 and 2015 ranged from 46 reports in 2013, to 40 in 2014, and 62 in 2015.

152.   Penn State was the subject of two OCR investigations opened during 2016.

153.   Catherine Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office of Civil Rights ("OCR"), testified at a Senate Hearing in June 2014 that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."  The DOE and OCR have accordingly treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes.  Ms. Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.  She additionally testified: "The 2011 DCL affirms that the Title IX requirements for sexual harassment. . . ."  Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Ms. Lhamon also stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Ms. Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce."

154.   The 2011 Dear Colleague Letter has in fact resulted in significant action and legal consequences.  At the July 2014 Dartmouth College conference, Ms. Lhamon stated: "Our release of the 2011 DCL [Dear Colleague Letter] is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL [Dear Colleague Letter]."

155.   Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication, his right to be informed of the evidence against him, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense.

156.   In attempting to demonstrate their compliance with the 2011 Dear Colleague Letter, the Defendants subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision tainted by gender bias.

157.   As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct at a state school.

158.   Defendants, as well as other agents, representatives, and employees of Penn State, was acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

159.   Defendants agreed to, approved, and ratified this unconstitutional conduct.

160.   As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. His lifelong goal of becoming of a physician has been shattered.

161.   Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

162.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, military career opportunities, economic injuries and other direct and consequential damages.

163.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining enforcement of

sanctions as a result of violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints.

## COUNT II
## Violation of Title IX of the Education Amendments of 1972

164.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

165.   Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681.

166.   Title IX applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX, even though there is very little direct federal funding of school sports.

167.   For its 2016-2017 fiscal year, Penn State received  $530.3 million in federal      funding      for      research      and      development. http://www.centredaily.com/news/local/education/penn-state/article139250263.html

168.   Both the Department of Education ("DOE") and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt

and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder.   34   C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).   Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

169.   The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord [] due process to both parties involved."

170.   The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice…of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment…";

- "Adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint…"[4]

171.   Title IX also obligates schools to make sure that all employees involved in the conduct of the procedures have adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

172.   Since January 2014, Penn State has been under investigation by the DOE's Office for Civil Rights ("OCR") as part of a "compliance review" rather than a specific complaint. Officials form the Office for Civil Rights said that they were reviewing Penn State in part because of "a dramatic increase in the number of forcible sex offenses occurring on campus as reported by the university itself," according to the Chronicle of Higher Education.  The spike in sexual assault reports could be linked to the University's efforts to strengthen reporting after the Jerry Sandusky scandal.[2]

173.   On November 3, 2016, the DOE announced that it would levy an historic fine of $2.4 million against Penn State for failure to comply with the Jeanne Clery Act after a review was prompted due to the university's handling of sexual misconduct incidents. "The Department is required by law to conduct periodic reviews of an institution's compliance with the Clery Act. These reviews may be initiated when a complaint is received, a media event raises concerns, a school's independent audit identifies areas of noncompliance, or other reasons." according to the press release by U.S. Department of Education, *U.S. Department*

---

[2] "Is Trump Shutting the door on sexual investigations at 13 Pa Colleges?," Pennsylvania Real Time News, http://www.pennlive.com/news/2017/07/pennsylvania_colleges_investig.html.

*of Education Levies Historic Fine Against Penn State Over Handling of Sexual*

*Misconduct Incidents*, Nov. 3, 2016.

174.   The Code put in place by Penn State deprived Plaintiff, on the basis of

his sex, of his rights to due process and equal protection. *The Code discriminates*

*against all respondents, who are habitually male.  Specifically:*

- The Code permits the University to investigate complaints against respondents before providing them with notice of the charges against them;

- A single, typically female, Investigator is responsible for conducting the investigation against the respondent, assessing the credibility of the witnesses, and determining whether the evidence demonstrates by "a preponderance of information" whether the respondent violated the Code;

- A review panel rubber stamps the Investigator's findings and is prohibited from conducting its own investigation;

- Respondents are denied the right to confront their accusers, cross-examine witnesses and put on their own evidence and testimony;

- Respondents are denied the right to examine the evidence in the Investigator's file until after the Title IX Investigator determines whether a Code violation has occurred;

- The Associate Director of the University's Office of Student Affairs singlehandedly decides the sanction to be imposed against the respondent.

175.   Upon information and belief, the University's Title IX Investigator,

lacked the experience necessary to conduct the investigation against Plaintiff as she

had only been employed by Penn State mere days before undertaking the

investigation of John Doe.  Upon information and belief, Plaintiff's case was the Investigator's first Penn State investigation of a Title IX matter and she had no previous certified Title IX training.

176.   Defendants also failed and/or refused to follow its existing policies and procedures when investigating the charges against Plaintiff.   Specifically, Defendants:

- Investigated the allegations against Plaintiff before providing him with notice of the charges against him;

- Failed to notify Plaintiff of the specific allegations against him for nearly a month;

- Refused to provide Plaintiff with access to complainant's incident reports so that he could respond to the allegations against him in a meaningful way;

- Permitted the hearing panel to make an adverse inference against Plaintiff because he requested to know the allegations against him prior to submitting a written statement denying the allegations.

177.   Penn State's existing practices and procedures discriminate, on the basis of sex, against the male accused, including Plaintiff. Penn State conducted its investigation of the allegations against Plaintiff in a manner that was slanted in favor of the female accusers.

178.   The preliminary investigation report stated that the allegations were based upon complainant's verbal statements made to her Resident Advisor and to

the University police, and their unverified incident reports were submitted as complainant's formal Title IX complaint.  Although the Title IX Coordinator and the Investigator had access to these reports since September 8, 2016, they withheld the information from John Doe until Dec. 16, 2016 when the investigation report had been completed.

179.   Penn State required Plaintiff to change his course schedule without his approval and without allowing Plaintiff an adequate opportunity to review and contest the specific allegations against him, without conducting a fair and equitable investigation, and without a hearing.

180.   Penn State erroneously placed the entire burden on Plaintiff to prove his innocence, instead of setting forth competent evidence to demonstrate how Plaintiff allegedly engaged *in non-consensual sex* with Jane Roe.

181.   Penn State's policies effectuate a denial of due process for the student population, especially the male student population, because they are set up to encourage and facilitate false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused.

182.   Penn State's policies and procedures disproportionately affect the male population of the Penn State community as a result of the higher incidence of female complainants of sexual misconduct versus male complainants of sexual misconduct.

183.   Penn State has created an environment in which an accused male student is effectively denied fundamental due process by being prosecuted through the conduct process under the cloud of a presumption of guilt. This one-sided process deprived Plaintiff, as a male student, of educational opportunities at Penn State on the basis of his sex.

184.   Penn State imposed sanctions on Plaintiff without conducting a fair, impartial investigation and without evidence that he engaged in non-consensual sex with Jane Doe. As a result, Plaintiff faces a permanent notation on his Penn State transcript labeling him a sexual predator, even though he was never given an opportunity for notice and a fair hearing.

185.   As stated above, cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997). Yet, in a case where Defendant Penn State relied upon a credibility assessment, no cross-examination was available and no sworn testimony was taken in violation of due process of law.  *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

186.   Defendant discharged their responsibilities in university Title IX adjudications that involved a conflict of interest contrary to a Fourteenth

Amendment interest in a fair process.  Defendants  (i) failed to provide Plaintiff with proper notice of the charges against him;  (ii) failed to conduct their investigation within the timelines established by the Student Code of Conduct in force at the time of the incident; (iii) issued a No Contact Order to Plaintiff without issuing a corresponding order to Jane Roe; (iv)  failed to protect Plaintiff from harassment and retaliation from jane Roe and her parents; (v) lacked the proper qualifications to serve as Investigators for the complaint against Plaintiff; (vi) denied the right to examine the evidence in the Investigator's; (vii) failed to allow Plaintiff to directly or indirectly cross-examine Jane Roe at the hearing; and (viii) drew an adverse inference against Plaintiff because he requested to know the allegations against him before providing a written statement.

187.   The totality of the circumstances establish that Defendants acted out of gender bias in reaching the "erroneous outcome."  Defendant Penn State credited false accusations of sexual assault made by a female student with no supporting documentation and discredited the male John Doe and disregarded his evidence tending to exculpate the Plaintiff

188.   Defendant Penn State required no reasoned consideration of evidence as required by a burden of proof.  Only an anti-male bias to find for the female complainant and against the male respondent can explain Defendants' purported findings concerning the preponderance of the evidence.

189.   Defendant Penn State failed to provide John Doe the factual basis for the violations determination and sanctions, resulting in a prejudiced ability for the John Doe as respondent to prepare and submit an appeal and allowing for discriminatory decision-making.

190.   Upon information and belief, Defendants were pressured by the Obama Administration's Department of Education and the 2016 2.4 million fine into following the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter regardless of due process considerations.   Upon information and belief, Defendant Penn State's mishandling of John Doe's case was wrongfully affected by federal pressure from the Federal Defendants.

191.   The totality of circumstances establishes that Defendant Penn State has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

192.   Upon information and belief, all students that have been suspended or expelled from Defendant Penn State for sexual misconduct have been male.

193.   Male respondents in sexual misconduct cases at Defendant Penn State are discriminated against solely on the basis of sex.   They are invariably found guilty, regardless of the evidence, or lack thereof.

194.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress,

loss of educational and career opportunities, economic injuries and other direct and consequential damages.

195.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction enjoining enforcements of the sanctions as a result of violations of the Title IX process of investigating and adjudicating sexual misconduct complaints and coats and disbursements.

## COUNT III
## Breach of Contract

196.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

197.   Based on the aforementioned facts and circumstances, Penn State created express and implied contracts when Plaintiff accepted an offer of admission to Penn State and paid tuition and fees.

198.   Based on the foregoing facts and circumstances, Penn State breached express and implied agreement(s) with Plaintiff.

199.   Penn State committed several breaches of its agreements with Plaintiff during  the investigation process.  A non-exhaustive list of Penn State's breaches include the following:.

A.     **Penn State Failed To Conduct An Equitable Investigation**

200.   The Code states that "the Office of Student Conduct strives to deliver a student discipline process that is equitable, just, educational, effective and expeditious; and to provide a system that promotes student growth through individual responsibility and in which the success of its educational endeavors is characterized by increased civility."

201.   The Code further states that the University strives to respect the dignity of all persons and a willingness to learn from the differences in people, ideas, and opinions.

202.   Penn State breached its contract with Plaintiff by failing to provide procedural equity by, among other things, (i) failing to provide Plaintiff with written notice of the charges against him for nearly nine months after the alleged incident; (ii) requiring Plaintiff to participate in numerous investigative interviews prior to being made aware of the specific charges against him; (iii) failing to advise Plaintiff of the changes to the Code of Conduct or that he could be accompanied by an advisor when meeting with the Office of Student Conduct and the Investigator; (iv) failing to complete its investigation within 60-days as contemplated by the Code of Conduct at the time of the incident; (v) refusing to allow him directly or through the hearing panel to properly and fully question his accuser.

### B. <u>Penn State Discriminated Against Plaintiff on the Basis of Sex</u>

203.   The Code prohibits discrimination and harassment on the basis of sex.

204.   As set forth, *supra*, in Count II of the Complaint Penn State breached its contract with Plaintiff because it conducted its investigation of the allegations against Plaintiff in a manner that was biased against him and slanted in favor of Plaintiff's accuser, Penn State engaged in sex-based discrimination against Plaintiff. Additionally, Defendants permitted their investigation to continue despite the fact that Jane Roe refused to provide the Defendants, despite their numerous requests, a copy of the medical report purportedly prepared following an examination close in time to the alleged incident.

### C.   <u>Penn State Failed to Resolve the Complaints Impartially</u>

205.   Penn States breached its contract with Plaintiff when it failed to follow its own Rules and Procedures that were in effect at the time of the alleged incident noticed in the Complaint. Penn State did not provide the Plaintiff with written notice of the charges until some eight (8) months after the commencement of the investigation, this despite the fact that Penn State's Rules required investigations to be typically completed within sixty (60) days of receipt of the Complaint. See, Section V,D,1.

### D. <u>Penn State Failed to Promptly Resolve the Complaints</u>

206.   The Code in use at the time of the alleged incident called for Penn State to resolve the complaint against Plaintiff within 60 days.

207.   Penn State breached its contract with Plaintiff by failing to conduct a prompt investigation of the allegations against him and instead allowing the investigation to proceed against Plaintiff for over nine months.

### E. <u>Penn State Failed to Notify Plaintiff of the Allegations Against Him</u>

208.   The Code states that "[i]f an investigation is conducted, the conduct officer will send the respondent a notice of investigation which will include a description of the alleged misconduct." App.1.D.3.

209.   Penn State breached its contract with Plaintiff by failing to follow this procedure. In the case of Jane Doe 1, the first notice of investigation provided to Plaintiff failed to provide adequate notice of the allegations against him.

### F. Penn State Did Not Afford Plaintiff a Meaningful <u>Opportunity to Respond to the Allegations Against Him</u>

210.   Penn State breached its contract with Plaintiff by failing to provide him with a meaningful opportunity to respond to the allegations against him, or present relevant information to the Investigator—Plaintiff was not permitted to review any of the evidence against him until nearly three months after the investigations began.

211.   As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, financial injuries, and other direct and consequential damages.

212.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, an injunction enjoining enforcements of the sanctions as a result of Defendants' breach of contract in investigating and adjudicating sexual misconduct complaints and costs and disbursements.

## COUNT IV
## Breach of the Covenant of Good Faith and Fair Dealing

213.   Plaintiff repeats and realleges every allegation hereinabove as if fully set forth herein.

214.   Based on the aforementioned facts and circumstances, Penn State breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by meting out the disproportionately severe sanction of expulsion where there was a lack of credible evidence concerning the claims against him.

215.   As a direct, reasonable and foreseeable consequence of this breach, Plaintiff sustained damages, including, without limitation, emotional distress, economic injuries,  the inability to complete his studies at Penn State, impact on

his future career and higher education prospects, and other direct and consequential damages.

216.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, an injunction enjoining enforcements of the sanctions as a result of breach of covenant of good faith and dealings in adjudicating allegations of alleged sexual misconduct complaints and costs and disbursements.

## COUNT V
## Estoppel and Reliance

217.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

218.   Penn State's various policies constitute representations and promises that Penn State should have reasonably expected to induce action or forbearance by Plaintiff.

219.   Penn State expected or should have reasonably expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that Penn State would not tolerate, and Plaintiff would not suffer, harassment by fellow students, and would not deny Plaintiff his procedural rights should he be accused of a violation of Penn State's policies.

220.   Plaintiff relied to his detriment on these express and implied promises and representations made by Penn State.

221.   Based on the foregoing, Penn State is liable to Plaintiff based on estoppel.

222.   As a direct, reasonable and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including without limitation, emotional distress, economic injuries, the inability to complete his studies at Penn State, and other direct and consequential damages.

223.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, an injunction enjoining enforcements of the sanctions as a result of estoppel and reliance in adjudicating allegations of alleged sexual misconduct complaints and costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Penn State as follows:

(i)   on the first count for violation of 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Penn State, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs

and disbursements;

(ii)     on the second count for violation of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Penn State, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iii)    on the third count for breach of contract, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Penn State, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iv)     on the fourth count for breach of the covenant of good faith and fair dealing, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Penn State, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(v)      on the fifth count for estoppel and reliance, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Penn State, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vi)     as to all counts for an injunction preventing defendants from prohibiting the plaintiff from attending classes (Fall 2017 semester) and full participation in Penn State-Jefferson's seven (7) pre-med medical program which

commences on August 21, 2017

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all issues so triable in the present matter.

**Dated: July 25, 2017**

          **SUMMERS, MCDONNELL, HUDOCK & GUTHRIE, P.C.**

          **By:***/s/ Kevin D. Rauch*
          **Kevin D. Rauch, Esq.**

          **945 East Park Drive, Suite 201**
          **Harrisburg, Pennsylvania**

          **NESENOFF & MILTENBERG, LLP**

          By: */s/ Andrew T. Miltenberg*
          **Andrew T. Miltenberg, Esq.**
          (***Pro Hac Vice* Petition Forthcoming)**
          **Stuart Bernstein, Esq.**
          (***Pro Hac Vice* Petition Forthcoming)**
          **Philip A. Byler, Esq.**
          (***Pro Hac Vice* Petition Forthcoming)**
          **Jeffrey S. Berkowitz, Esq.**
          (***Pro Hac Vice* Petition Forthcoming)**

          **363 Seventh Avenue, Fifth Floor**
          **New York, New York 10001**
          **(212) 736-4500**

          *Attorneys for Plaintiff John Doe*