IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| | : | No.: 4:17-CV-01315 |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | |
| | : | (Judge Brann) |
| **THE PENNSYLVANIA STATE UNIVERSITY, THE PENNSYLVANIA STATE UNIVERISTY BOARD OF TRUSTEES, ERIC J. BARRON,** individually and as agent for The Pennsylvania State University, **PAUL APICELLA,** individually and as agent for The Pennsylvania State University, **KAREN FELDBAUM,** individually and as agent for The Pennsylvania State University, **KATHARINA MATIC,** individually and as agent for The Pennsylvania State University, | : : : : : : : : : : | |
| **Defendants.** | : | |

**DECLARATION OF JOHN DOE
IN SUPPORT OF PLAINTIFF'S MOTION FOR A TRO/PRELIMINARY
INJUNCTION PROHIBITING DEFENDANTS FROM PRECLUDING
PLAINTIFF FROM ATTENDING CLASSES DURING THE 2017 FALL
SEMESTER AT PENN STATE UNIVERSITY WHICH COMMENCES ON
<u>AUGUST 21, 2017</u>**

1. Plaintiff, who wishes to proceed under the pseudonym John Doe, a separate application seeking the Court's approval has been filed, hereby declares subject to the penalties of perjury pursuant to 28 U.S.C. § 1746:

2. I am the Plaintiff in this action and submit the following in support of the current application.

3. Myself and my accuser, Jane Roe, at the time of the incidents in question were first year students at Penn State and enrolled in the University's accelerated pre-medical program (the "Program"), which is affiliated with Thomas Jefferson University in Philadelphia. The Program is highly competitive and allows enrolled students to complete their B.S./M.D. degree in seven years. Students enrolled in the Program must take a specific and structured schedule during their first three years at Penn State so they can prepare for the MCAT exam and be in a position to graduate from college after three years.

4. I met Jane Roe in June 2016 after we were both admitted to the Program, and during the summer before the start of school Jane Roe contacted me to encourage me to switch courses so I could be in her classes. Classes for the fall 2016 semester began on August 22, 2016, and the two of us saw each other frequently. During this time, I grew to care about Jane as a friend, and always acted respectfully towards her. Jane Roe told me that she had a boyfriend, but she nevertheless began making multiple physical advances in private and also made comments about preferring me over her boyfriend. I did not encourage Jane Roe's behavior and never reciprocated her advances.

5. On the evening of September 6, 2016, Jane and I walked back from class to my dorm room. We watched TV together with Jane Roe leaning back on my bed where she put her head on my chest. She equated her relationship with her

boyfriend and me to an old and new law firm with myself being labeled the new firm. After Jane Roe left my room, she messaged me saying she wanted to meet in the morning to walk to class together.

6. On September 7, 2016, Jane Roe arranged to be with me on three (3) separate occasions. Initially, we walked to class together as Jane Roe had previously requested. The second encounter took place at approximately 11:00 a.m. when Jane Roe sent another message, this time asking me to come to her dorm room to study. I agreed and when I arrived I discovered that Jane Roe was alone. I sat in a chair, only to have Jane Roe take my hand to pull me toward her bed. Upon arriving, I also told Jane Roe that I had plans to meet my friend for lunch.

7. I sat on the edge of the bed with my feet on the floor. Jane Roe began to hug me and swung her feet around to put her legs over my lap before moving onto my lap and putting her hands around my neck. Jane Roe then began to kiss me. I was shocked and pushed her off of my lap, grabbed my stuff and left for class. Jane Roe quickly grabbed her bag and followed me to class. When we arrived at class we sat in the front row with an empty seat between us.

8. During class, Jane Roe sent me a message on Facebook saying, "wft now you won't even talk to me?" I was completely taken back by what Jane Roe had done and did not want to continue the discussion as I was trying to focus on

the class. I did notice during class that that Jane Roe was messaging her friend back home on Facebook, which she often did. I also noticed that she was sniffling and sobbing.

9. After class ended at approximately 1:10 p.m., I rushed ahead because I had not eaten lunch and wanted to get something to eat. Jane Roe yelled my name and came running toward me asking "why did you leave a buffer seat?" She was clearly very sad and while I was hungry and wanted to get lunch, Jane Roe insisted that I come to her dorm room so she would not feel sad.

10. I went with Jane Roe to her dorm room for what was now the third encounter with her that day. This time, Jane Roe's roommate was in the room, sitting on her bed. As a fan was now on the chair that I sat on earlier in the day, Jane Roe physically signaled, by patting on it, for me to come and sit on her bed once again. I went over and sat on her bed, once again placing my feet on the floor while Jane Roe sat next to me. Jane Roe, her roommate and I talked until her roommate left for class at approximately 2:10 p.m.

11. After her roommate left, I started to grab my things so I could attend my Sociology class. Jane Roe, however, insisted that I stay and once again swung her legs over mine and put her hands around my neck. She then began to pout saying "Oh you don't love me. Oh, just go ahead, I'll just sit here crying and being sad. You love Sociology more than me." Jane Roe then started taunting me when

I tried to get up and go to class by saying, "Oh try to get me off you," and "Let's see what you can do," Feeling uncomfortable, I tried to gently push Jane Roe off my lap, but she would not move. I began to get frustrated with her and I tried pushing her off by pushing against her chest area. I pushed with both hands, but to no avail as Jane Roe continued to hug me while maintaining a strong, firm hold around my neck.

12. Each time I tried to push Jane Roe off my lap, she said, "That makes me want you even more." Jane Roe also stated that "If you wanna go to Sociology, carry me to Sociology with you." After pleading with her to let me leave as class had already begun, I again pushed back, and this time Jane Roe began to fall backwards off my lap toward the floor. I reached behind Jane Roe to catch her because I did not want her to fall and get hurt. In the process I touched her back, just above the waistband of her shorts and caught her, preventing her from falling.

13. Jane Roe finally agreed to stand up and let me leave for class. She offered to walk me downstairs, but I left abruptly because I was late for class. Jane Roe later sent me a Snapchat saying, "Maybe we shouldn't hangout anymore" to which I replied, "I was thinking the same thing." Jane Roe replied, "I'm sorry for being so confusing." After this exchange, I sent Jane a message asking her to bring my water bottle to class because I had forgotten it in her room. This text went unanswered. After my Sociology class ended, I went to my seminar class which

Jane Roe also attended. Although we did not speak, I thought Jane Roe seemed normal and did not seem unfriendly towards me.

14. I would ultimately learn months later, and only after the investigation report described below was completed, that Jane Roe engaged in a text message exchange with her roommate beginning at approximately 5:00 p.m. on September 7, 2016. In that exchange Jane stated "so after you left [Plaintiff] like tried to make a move and like kiss me and I swerved and that was fine" and "he put his hand on my leg and then like down you know" and "I was like um, please stop, no, I tried to move his hand, but his hand was like around my waistband, and he was like what can you do, try to stop me, and yeah, and then he had sociology so he left." Jane Roe stated in her texts that I had only touched her waistband and then I left for class, as I had stated during the school's investigation. Jane Roe's roommate, however, immediately replied with several expletives and "You need to report him" to which Jane Roe replied, "ik [I know] him well enough." The roommate asked if I had touched her. Now Jane Roe claimed, "he jammed his finger inside and now its kinda bleeding a little." The roommate responded, "we need to report him" and Jane Roe replied, "idk [I don't know] I just really wanna forget about it." At this point, the roommate threatened Jane Roe by replying, "That is called sexual assault and he needs to be reported. If you don't report him I will' and "u need to tell someone…like an administrator."

15. The next day, September 8, 2016, I realized that Jane Roe had blocked me from all of her social media accounts. Later that day, we had an English class together. Normally we would walk back from class together and get dinner, but this time Jane Roe left the classroom and raced ahead without me. At approximately 11:00 p.m. that night, I received a No Contact Order forbidding me to have any contact with Jane Roe. The No Contact Order was only issued to me and not to both of us. Shortly thereafter, Jane Roe tried to reconnect with me by adding me back to her Snapchat account.

16. Four days later, I received an email from the Title IX Coordinator requiring my presence at a meeting that afternoon to discuss a report of an incident that "may implicate the University's policy against sexual and gender-based harassment and misconduct." However, I was not notified of the details of the incident, nor was I informed that I could bring an advisor to the meeting. I attended the meeting alone and was informed that I would be removed from my English and Biology courses and reassigned to other sections because Jane Roe was in the same classes. The Title IX Coordinator also handed me a copy of a document listing my procedural rights as a respondent in a student conduct matter.

17. On September 21, 2016, I received an email from the Senior Title IX Compliance Specialist (the "Investigator") who requested a meeting for the

following day. Once again, I was neither advised of the purpose of the meeting nor was I told I could bring an advisor to the meeting.

18. The Title IX Investigator met with me for the first time on September 23, 2016. During that meeting, the Investigator informed me that Jane Roe would be submitting a written statement and that I would have an opportunity to read and respond to the statement. The Investigator told me that she would "strive to complete the investigation in 30 days," and that if I were found responsible, Penn State's policy was "more educational than punitive." I was also told that I could find the Code of Conduct and Student Conduct Policy and Procedures online.

19. During the September 23, 2016 meeting, I reported that there had been a breach of confidentiality by Jane Roe's parents who had sent threatening messages about me to a group chat of the parents of the students in the pre-medical program. The messages advised participants in the group that one of the students had committed forcible "sex offenses" against another pre-med student, that "the assaulter is son of one of the family on this forum" and "the assaulter needs to be in prison" where "he gets raped by someone else," and threatening to reveal his name in the forum and to the newspapers. The University failed to take any action as to the conduct of Jane Roe's parents and specifically failed to advise Jane Roe's father, who served as her advisor, of Penn State's policy and rules regarding confidentiality and non-retaliation.

20. On September 28, 2016, I once again met with the Investigator, who informed me that Residence Life had gone to Jane Roe's room to meet with her and her roommate on the evening of September 7, 2016. Residence Life's incident report indicated that Jane Roe stated that I had "attempted to kiss her, that she was afraid to scream, that there was touching of a hand up under her clothes and that she might be bleeding a bit." I indicated that I thought that perhaps I may have scratched Jane's back when I caught her from falling. The investigator read only these vague allegations from the report to me, and provided no further information. I was astonished and deeply disturbed by what I heard and told the Investigator everything I knew—that Jane Roe had attempted to me kiss in the morning and again in the afternoon, that I had rebuffed her advances, and that she had initiated all of the physical contact.

21. I met with the Investigator for the third time on October 5, 2016. Once again, I requested that she provide we with information regarding the allegations. The Investigator replied that Jane Roe still had not submitted a written statement or agreed to an interview. The Investigator advised me that she had spoken with the Title IX Coordinator and based upon the incident report prepared by Residence Life, Jane Roe was alleging that I was responsible for nonconsensual digital penetration. This was my seventh contact with University administrators, including the police, regarding the alleged incident and yet it was the first time that

I was hearing about the allegations that were documented in the September 7, 2016 incident report.

22. I had another meeting with the Investigator on October 21, 2016. During this fourth meeting with the Investigator, I learned that Jane Roe was still refusing to provide a written statement, but the Investigator had spoken with her. This time, Jane Roe claimed that I "had his hand on her inner thigh." I denied the allegation.

23. I had a fifth meeting with the Investigator on November 16, 2016. At that time, I noted I had fully cooperated during numerous interviews even though I had never been provided with a statement of the allegations made by Jane Roe. Additionally, the investigation had now exceeded the 60-day timeline recommended by Title IX guidance referenced in Penn State's policy.

24. The Investigator stated during this meeting that she had new evidence to discuss with me. Up until this time, Jane Roe had stated that she no longer had any of the texts or messages she had exchanged with me however, she now had only one that she wanted to submit. This concerned my text that I had sent after I left a seat between us in class and then had agreed that we should no longer hangout together.

25. On December 16, 2016, for the first time, I was allowed to review the preliminary investigation report in the Investigator's office under her supervision

for a limited time. I was not allowed to have a copy of the report, and it was the first time that I saw the incident reports prepared by Resident Life and the University Police back in September 2016.

26. The preliminary report revealed to me that several of the witnesses who had been contacted were reluctant to be interviewed. The witnesses were all pre-medical students in the same program. It is my understanding, the parents of the pre-medical students, who were part of the group chat that had received the threatening messages from Jane Roe's parents, had forbidden their children to become involved in the investigation. Specifically, one witness, who was a friend to both myself and Jane Roe, told me that Jane Roe had confided in her that she had romantic feelings for me knew that Jane Roe had pursued a physical relationship with me. However, that witness refused to be interviewed because her parents did not want her to be involved in the investigation.

27. I also learned from the reports that Jane Roe's roommate, who had been interviewed, stated that, "[Jane] told her the night before [the incident] that she felt she really liked me in a more intense way." She had also stated that Jane Roe had a boyfriend "but [Jane] had feelings, she herself was confused and asked [the roommate] 'am I cheating on my boyfriend with me?" The preliminary investigation report revealed that Jane Roe had lied to the University police on September 10, 2016 when she stated that "she wasn't interested in [me] other than

as a friend." Later, in a follow-up interview with the Investigator on February 1, 2017, Jane Roe admitted that she was flirtatious with me and also that she had made the law firm analogy about preferring me to her boyfriend.

28. I submitted a response to the preliminary investigation report on January 3, 2017. On January 13, 2017, I again met with the Investigator to review the revised investigation report. I told the investigator that I disagreed with the numerous redactions that had been made to the report. On January 18, 2017, the Investigator informed me that the investigation report was complete and had been forwarded to the Case Manager, the Associate Director of Student Conduct. I reiterated in an email that I disagreed with the numerous redactions and that my disagreement should be noted. On January 20, 2017, the Associate Direct of Student Conduct notified me that there were still a "few key points to clarify" and that she would be in touch when she was ready to meet with me. I had no contact with anyone from the Title IX or Student Conduct offices until March 2, 2017. The Investigator said the report was not complete but had been revised again.

29. On March 21, 2017, I reviewed another draft of the investigation report under the Investigator's supervision, and I submitted another response.

30. I then met with the Associate Director of Student Conduct for an administrative hearing on May 1, 2017. On May 10, 2017, I was notified that the Associate Director had determined, "that it is reasonable to believe a code of

conduct violation has occurred. As such, I have issued the following charge and sanctions: 02.03 / Nonconsensual Penetration: Digital or with an Inanimate Object. Conduct Suspension through FA2017. Educational Program and/or Counseling required for readmission determine by assessment." I refused to accept the false charge and accompanying Sanction. I informed the University I would contest the charge and requested a hearing.

31. On May 17, 2017, I submitted a written response to refute the charge and sanction. I adamantly denied the allegations, stating that I had endured nine months of an investigation in which I had not been fully informed of the details of the false allegations. I stated that I was directed to find a copy of the "Office of Student Code of Conduct and Student Conduct 4/25/2016" procedures online at the September 23, 2016 meeting with the investigator; however, although I would meet with administrators and staff regarding the alleged incident more than a dozen times during the investigation, it was not until the last May 1, 2017 meeting with the case manager that I was informed that the procedures had been revised and reissued nearly 6 months prior on November 3, 2016. No administrator or staff informed me that significant changes had been made to the Student Conduct Procedures during the 9 months I had been under investigation. Some of the changes included the removal of the 60-day timeline for completion of investigations.

32. On June 6, 2017, a hearing was held before a panel that included three faculty and staff members. After a nine-month investigation into allegations of sexual assault that resulted in a lengthy investigation report, the Hearing Panel had absolutely no questions to ask the Investigator or myself. I had been told by the Investigator and the Associate Director of Student Conduct that when I met with the Hearing Panel I could discuss information which I had previously submitted in my statements but had been redacted by Penn State in the final investigation report.

33. The Chair of the Hearing Panel instructed me to address the Panel to "say whatever you want;" however, when I began to speak I was silenced because what I started to say was "not contained in the investigation report".

34. The Chair stated that what I had to say was either not relevant or considered new evidence, and so I was told I could not continue to speak.

35. On June 9, 2017, I received a letter from the Associate Director of Student Conduct notifying me of the Decision that I had been found responsible for violating the University's Code of Conduct. The Sanction was increased to include: (i) suspension through the semester Fall 2017; (ii) required counseling evaluation/assessment under the direction of the Office of Student Conduct; (iii) loss of on-campus living privileges; and (iv) recommended loss of participation in the Penn State Jefferson premed/medical program for as long as Jane Roe is a participant in the program. The Sanction had been increased from the original

recommendation by the Associate Director of Student Conduct to include the loss of on-campus living privileges and recommended loss of participation in the pre-medical program.

36. On June 16, 2017, I submitted a timely appeal to the Decision, citing the lack of due process and a multitude of procedural errors by Penn State that resulted in the erroneous outcome and flawed Decision. On June 27, 2017, the Assistant Vice President and Associate Dean of Undergraduate Education and Professor of Art Education and Women's Studies issued a perfunctory one-page form letter denying my appeal.

July 26, 2017

_John Doe_ 7/26/17
John Doe