## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| | : | No.: 4:17-CV-01315 |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | |
| | : | (Judge Brann) |
| **THE PENNSYLVANIA STATE** | : | |
| **UNIVERSITY, THE PENNSYLVANIA STATE** | : | |
| **UNIVERISTY BOARD OF TRUSTEES, ERIC J.** | : | |
| **BARRON,** individually and as agent for The | : | |
| Pennsylvania State University, **PAUL APICELLA,** | : | |
| individually and as agent for The Pennsylvania State | : | |
| University, **KAREN FELDBAUM,** individually and as | : | |
| agent for The Pennsylvania State University, | : | |
| **KATHARINA MATIC,** individually and as agent for | : | |
| The Pennsylvania State University, | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
FOR A TRO/PRELIMINARY INJUNCTION PROHIBITING
DEFENDANTS FROM PRECLUDING PLAINTIFF FROM ATTENDING
CLASSES DURING THE 2017 FALL SEMESTER AT PENN STATE
UNIVERSITY WHICH COMMENCES ON AUGUST 21, 2017**

## <u>TABLE OF CONTENTS</u>

PROCEDURAL HISTORY...................................................................…...…...….......1

FACTUAL BACKGROUND.........................................................................…..….......1,2

QUESTION PRESENTED.............................................................................…..….....2

ARGUMENT..............................................................................................…......2

I.   LEGAL STANDARD FOR THE ISSUANCE OF A
     PRELIMINARY INJUNCTION/TRO.............................................…2

II.  THERE IS A LIKELIHOOD OF SUCCEEDING ON
     THE MERITS.....................................................................….....4

     A. Due Process..................................................................4

     1.  The Opportunity to Be Heard.................................…..….....5

     2.  The Opportunity to Confront and Cross-Examine Witnesses.................7

     3.  Defendants Failed To Fully and Properly Advise The
         Plaintiff of The Charges and The Procedures Governing
         The Investigation...................................................12

     4.  Gender Discrimination- Title IX Claims.......................17

     5.  The Right to an Impartial Decision Maker.....................25

     6.  Negligence...........................................................26

III. PLAINTIFF WILL CONTINUE TO SUFFER IRREPARABLE
     HARM.......................................................................27

IV.  INJUNCTIVE RELIEF RISKS NO HARM TO OTHERS......................30

V.   INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST......................32

VI.  BOND SHOULD BE WAIVED BECAUSE DEFENDANTS
     WILL NOT BE HARMED..............................................32

CONCLUSION...................................................................33

# TABLE OF AUTHORITIES

*Adams v. Freedom Forge Corp.*
    204 F.3d 475, 484-85 (3d Cir. 2000)……………………………………………...27

*Armstrong v. Manzo,*
    380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)…………………...………….5

*Bakalis v. Golembesk,*
    3 F.3d 318, 326 (7th Cir. 1994)………………………………………………………5,6

*Bieros v. Nicola*
    857 F. Supp. 445 ((E.D. Pa 1994)…………………………………………………….2

*Carter v. Harris*
    64 F. Supp. 2d 1182, 1189 (M.D. Ala. 1999)………………………………..…………5

*Caspar v. Snyder*
    77 F. Supp.3d 616, 640 (E.D. Mich. 2015)……………………………...…………….28

*Citibank N.A. v Kyle*
    15-cv-3298, 2015 WL 3755788 (E.D. Pa, June 16 2015)……………………….…….2

*Collick v. William Paterson University*
    2016 WL 6824374 (D. New Jersey 2016)………………………………......……18

*Daly v. New Century Trans, Inc.*
    2012 WL 4060687 (M.D. Pa 2012)……………………………………………………26

*Doe v. Brandeis*
    177 F.Supp.3d 561 (D. Mass 2016)………………………………………………….29

*Doe v. Brown*
    166 F. Supp.3d *177*, (D. Rhode Island 2016)………………………………….....24

*Doe v. Columbia Univ.*
    831 F.3d 46 (2d Cir. 2016)……………………………………………………………18

*Doe v. Middlebury College*
    No.: 1:15 -CV-192-JGM, 2015 WL 5488109 at 3 (D. Vt. Sept. 16, 2015)…………..29,31

*Doe v. Notre Dame*
    2017 WL 1836939…………………………………………………………………3,29,31

*Doe v. Univ. of the South*
    2011 WL 1258104, at *21 (E.D. Tenn. Mar. 31, 2011)……………………………....26

*Donohue v. Baker*
  976 F. Supp. 136, 146-47 (N.D.N.Y. 1997)…………………………………………………8

*Elliot* v. *Kiesewetter*
  98 F.3d 47,59 (3rd Cir 1996)…………………………………………………………...32

*Fitzgerald v. Barnstable  Sch. Comm.*
  555 U.S. 246, 257 (2009)…………………………………………………...…………18

*Frank's GMC Truck Center, Inc. v. G.M.C.*
  847 F.2d. 100,102 (3rd Cir 1988)………………………………………………...…3

*Furey v. Temple University*
  884 F. Supp.2d 223 (E.D. Pa 2012)……………………………………………....8,25

*Gati v. Univ. of Pittsburgh*
  91 A.3d 723, 729 (Pa. Super.  2014)……………………………………………....27

*Goldberg v. Kelly*
  397 U.S. 254, 269 (1970)……………………………..........................……7,8,25

*Goss v. Lopez*
  419 U.S. 565, 573-74 (1975)……………………………………………………..4

*Goss, Le v. University of Medicine and Dentistry*
  2009 WL 1209233 (D. New Jersey May 4, 2009)…………………………...……4

*Howe v. Pennsylvania State University-Harrisburg*
  2016 WL 393717 (M.D. Pa 2016)…………………………………………….3(n3)

*King v. DePauw Univ.*
  2014 WL 4197507 (S.D. Ind. Aug. 22, 2014)……………………………….3,29,31

*MarbleLife, Inc. v. Stone Res., Inc.*
  759 F. Supp.2d 552, 563 (E.D. Pa. 2010)……………………………………30,31

*Marshall v. Lauriault,*
  372 F. 3rd 175 (3rd Cir. 2004)……………………………………………………5

*Mathews v. Eldridge*
  424 U.S. 319, 333, 96 S.Ct. 893, 47 L.E.2d 18 (1976)…………………………...5

*Matthews v. Harney County Or., School District No. 4*
  819 F.2d. 889(9th Cir 1987)………………………………………...………..……7

*McNeil Nutritionals, LLC. v. Heartland Sweeteners LLC.*
   566 F.Supp 2d. 378 (E.D. Pa 2008)……………………………………..……….29

*Opticians Ass'n of Am. v. Jndep. Opticians of Am.*
   920 F.2d 187, 195 (3d Cir. 1990)………………………………………………..28,29

*Pavel v. University of Oregon*
   2017 WL 1827706 (D. Oregon May 3, 2017)……………………………...……..7

*Penglai Jinfu Stainless Steel Products Co., v. Gremacher, LLC*
   2016 WL 660920 (E.D. Pa 2016)…………………………………………………27

*Playfair v. South Lemhi School District*
   2009 WL 2474205 (D. Idaho 2009)……………………………………………….7

*Property Management Group, Ltd. v. City of Philadelphia*
   2017 WL 2242869 (E.D. Pa, May 23, 2017………………………………..……..4

*Ritter v. Oklahoma*
   2016 WL 2659602, at *8 (W.D. Okla. May 6, 2016)………………………..……3,31

*Scanvec Amiable Ltd. v. Chang*
   80 Fed. Appx 171, 175, 2003 WL 22597067 (3rd Cir 2003)…………………….…….32

*Schemberg v. Smicherko*
   85 A.3d 1071 (Superior Court Pa 2014)…………………………………………….26

*Temple University v. White*
   941 F.2d. 201, 219 (3rd Cir 1991)……………………………………………..……32

*URL Pharma, Inc. v. Reckitt Benckiser Inc.*
   2016 WL 1592695 (E.D. Pa April 20, 2016)……………………………………....2

*Valley v. Rapides Parish Sch. Bd.*
   118 F.3d 1047, 1056 (5th Cir. 1997)……………………………………………….28

*Washington v. Kirksey*
   811 F.2d 561, 564 (11th Cir.1987)……………………………………..………..7

*Winnick v. Manning*
   460 F.2d 545, 550 (2d Cir. 1972)…………………………………………………..8

*Yusufv. Vassar Coll.*
   35 F.3d 709, 714-15 (2d Cir. 1994)………………………………………………..18

## RULES AND STATUTES

20 U.S.C. 1681(a)………………… ………………………… ………………………………........17

Fed. Civ. 65…………………………………………………………………………………….2

## PROCEDURAL HISTORY

Plaintiff commenced[1] this action on July 25, 2017. Service upon the Defendants has not yet been made. Steps to effectuate service has been undertaken. On July 27, 2107, this Honorable Court granted Plaintiff's application to file an extend brief in support of this application. Said brief not to exceed 35 pages. (*See* **Exhibit "A"**).

## FACTUAL BACKGROUND

The full and extensive recitation of the facts are contained in John Doe's Declaration which has been filed in connection with this application and Plaintiff's recently filed Complaint. These documents are respectively incorporated by reference to the instant application.

In September of 2016, Plaintiff John Doe ("Plaintiff") was a freshman student participating in The Pennsylvania State University's ("Penn State" or the "University") prestigious combined pre-medical/medical program. On September 8, 2017 Plaintiff received "Notification of Administrative Directive"- No Contact Notice. (**Exhibit "B"**)[2] On September 12, 2016, the Plaintiff was advised by Defendant Paul Apicella that a report of an incident "that may implicate the University's policy against sexual and gender based harassment and misconduct" (**Exhibit "C"**). was made against him. Although there were several meetings between the Plaintiff and the Defendants, the

---

[1] Plaintiff has filed a motion to proceed pseudonymously due to the nature of the allegations in the complaint. Plaintiff is proceeding under the name "John Doe" and has identified his accuser as "Jane Roe."

[2] Plaintiff has redacted the names, addresses, and phone numbers of John Doe, Jane Roe and witnesses in several documents being annexed as Exhibits herein.

Plaintiff was not officially advised of the formal charges against him until May 11, 2017 (**Exhibit "D"**). On June 27, 2017 Plaintiff's appeal of his suspension and further prevention from participating in the combined pre-medical/medical program for as long as his accuser is in the program was denied. (**Exhibit "E"**) Penn State's Fall semester begins on August 21, 2017.

## QUESTION PRESENTED

**Question:**   Has the Plaintiff met the legal requirements for the granting of a TRO/Preliminary Injunction preventing Defendants from barring Plaintiff from attending classes and participation in Penn State's prestigious pre-med, medical program for the upcoming Fall 2017 semester beginning on August 21, 2017.

**Suggested Answer**: Yes, Plaintiff has met all of the legal requirements for the granting of said relief.

## ARGUMENT

## I.   LEGAL STANDARD FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION/TRO

Pursuant to Federal Rule 65, the standard for issuing a temporary restraining order and a preliminary injunction are the same.  To be successful in their application, a party needs to demonstrate:

> (1)   a likelihood of success on the merits; (2) the probability of irreparable harm if the relief is not granted; (3) that granting injunctive relief will not result in even greater harm to the other party; and (4) that granting relief will be in the public interest.

*URL Pharma, Inc. v. Reckitt Benckiser Inc.*, 2016 WL 1592695 (E.D. Pa April 20, 2016),

*Citibank N.A. v Kyle*, 15-cv-3298, 2015 WL 3755788 (E.D. Pa, June 16 2015), B*ieros v.*

*Nicola* 857 F. Supp. 445 ((E.D. Pa 1994), *Frank's GMC Truck Center, Inc. v. G.M.C.* 847

F.2d. 100,102 (3rd Cir 1988).

As demonstrated below, consideration of these factors unquestionably supports

Plaintiff's right to a temporary restraining order and subsequent preliminary injunction

preventing Defendants from enforcing its egregious decision to suspend Plaintiff from

Penn State for the fall 2017 semester and loss of participation in the prestigious Penn

State Jefferson pre-med/medical program.

Plaintiff will likely succeed on his causes of action. Plaintiff has suffered, and will

continue to suffer, irreparable harm, including the expulsion from the premed/medical

program, suspension from college, inability to earn a medical degree, denied or impaired

career and graduate school opportunities, and the lifelong stigma of being labeled a

violent sex offender. The harm to Plaintiff is without question far greater than any harm

Defendants could possibly experience if the requested relief is granted. The public has an

undeniable interest in ensuring the Defendants' wrongful, unfair, and discriminatory

conduct is enjoined[3].

Courts throughout the country have recognized in cases involving issues similar to

those here, that immediate injunctive relief is appropriate. *See, e.g., Doe v. University of*

*Notre Dame*, 2017 WL 1836939 (N.D. Indiana, South Bend Division May 8, 2017,

*Ritterv. Oklahoma*, 2016 WL 2659602, at *8 (W.D. Okla. May 6, 2016); *King v. DePauw*

*Univ.*, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014)

---

[3] It is respectfully submitted that the facts before this Honorable Court are distinguishable
as to render the Court's holding in *Howe v. Pennsylvania State University-Harrisburg*
2016 WL 393717 (M.D. Pa 2016) inapplicable to this motion.

3

## II.   THERE IS A LIKELIHOOD OF SUCCEEDING ON THE MERITS

### A.   Due Process

It is well established that the requirements of the 14th Amendment's Due Process Clause apply to student disciplinary proceedings at public institutions. A public educational institution may not expel a student for misconduct (or even suspend him for as few as ten days) "without adherence to the minimum procedures required by [the Due Process] Clause." *Goss v. Lopez*, 419 U.S. 565, 573-74 (1975), *Property Management Group, Ltd. v. City of Philadelphia*, 2017 WL 2242869 (E.D. Pa, May 23, 2017), citing *Goss, Le v. University of Medicine and Dentistry*, 2009 WL 1209233 (D. New Jersey May 4, 2009). In Goss, the Court held that a student was entitled to due process as the student had both a protected property interest in public education under state law, and a "liberty interest in reputation." Id. at 576.

Due process requires an impartial decision maker, an opportunity to be heard, and where important decisions turn on questions of fact, an opportunity to confront and question adverse witnesses. Here, the Defendants denied Plaintiff these fundamental rights from the outset when it failed to provide Plaintiff, for almost nine (9) months with notice of the charges against him. Defendants' egregious conduct continued throughout the process when Defendants' did nothing more than rubber stamp Jane Roe's baseless allegations.

Defendants from the outset believed Plaintiff's complainant's allegations even before a single second of investigative work occurred. On September 12, 2016, hours

4

after receiving an email from Title IX Coordinator Paul Apicella requiring Plaintiff's presence at a meeting that afternoon to discuss a report of an incident that "**may** implicate the University's policy against sexual and gender-based harassment and misconduct." (emphasis added) (**Exhibit "C"**) the Defendants required the Plaintiff to change his academic schedule to accommodate his accuser. The Plaintiff and his accuser were in the some of the same class sections. Despite absolutely no investigation having taken place, simply on the mere unsubstantiated, unverified accusations, the Plaintiff was forced to uproot his academic schedule. Clearly, this is a violation of Plaintiff's due process rights.

### 1.    The Opportunity to Be Heard

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.' *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.E.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), *Marshall v. Lauriault*, 372 F. 3rd 175 (3rd Cir. 2004) At the same time, the decision makers, however, must also be willing to listen. *See, e.g., Carter v. Harris*, 64 F. Supp. 2d 1182, 1189 (M.D. Ala. 1999).

In the case at bar, on June 1, 2017 the Plaintiff provided the Investigator a written correspondence entitled "Response to the Charge and Sanctions Notification". (**Exhibit "F"**) This document was provided to the Hearing panel but Penn State's Office of Student Conduct **redacted** large portions of Plaintiff's June 1, 2017 statement[4]. (**Exhibit "G"**) Plaintiff was then advised by both the Investigator and by the Associate Director

---

[4] The typed labeled "Redacted" as indicated on **Exhibit "G"** were not made by the Plaintiff but by the Defendants. The redacted version which when compared to **Exhibit "F"** illustrates Defendants blatant violation of Plaintiff's Due Process rights.

for the Office of Student Conduct that he could verbally present the redacted information directly to the Hearing Panel.[5]   Incredibly, when Plaintiff attempted to provide this crucial evidence to the Panel, the Chair of the Panel instructed him, **"you're allowed to say whatever you want to say,"** when the Plaintiff began to provide his recitation of the facts**, the Chair immediately objected and told Plaintiff he could not continue because the information was not in the investigative report.**

How can the Defendants possible consider this to be a fair opportunity to be heard? The Plaintiff not once, but twice was silenced when attempting to have his version of the events made known the Hearing Panel. First, the Defendants redacted his statement, so as to prevent the Hearing Panel from learning of his position, and then the Hearing Panel itself refused to allow the Plaintiff to speak despite the Defendants directly advising him to do so.

It is abundantly clear that Defendants made no effort to listen to the Plaintiff. Defendants made no effort to investigate Plaintiff's statements nor conduct a meaningful inquiry as to the true happening of the events. Defendants was focused on one goal finding Plaintiff responsible and suspending him.

It is well settled that "a body that has prejudged the outcome cannot render a decision that comports with due process." *Bakalis v. Golembeski*, 3 F.3d 318, 326 (7th

---

[5]  Plaintiff was not provided with any documents included in Defendants' Investigation report including but not limited his redacted statement. The Plaintiff was provided only a very limited window to look at the documents but was not permitted to make copies. As such, plaintiff cannot provide the Court with the documents contained in Defendants' investigation file.

Cir. 1994); see also *Pavel v. University of Oregon*, 2017 WL 1827706 (D. Oregon May 3, 2017); *Playfair v. South Lemhi School District* 2009 WL 2474205 (D. Idaho 2009) ('A hearing does not comport with due process if it "is totally devoid of a meaningful opportunity to be heard" because the decision-makers have predetermined the outcome of the hearing" (quoting *Matthews v. Harney County Or., School District No. 4*, 819 F.2d. 889(9th Cir 1987); *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir.1987) ("Due process of law does not allow the state to deprive an individual of property where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard.").

In an utter display of deprivation of one's due process rights, Jane Roe was asked if she had anything further to add and the Panel afforded her an opportunity to present a "closing statement" Incredibly, Plaintiff was denied the same opportunity without explanation.

It is respectfully submitted, that what Defendants purported to conduct was nothing but a predetermined, sham of an investigation and hearing that resulted in the denial of Plaintiff's constitutionally protected right of Due Process.

### 2.    The Opportunity to Confront and Cross-Examine Witnesses

Defendants' decision ostensibly turned on a finding that Jane Roe's version of events was more credible than Plaintiff's, yet Defendants denied Plaintiff any meaningful way of confronting his accuser. The Supreme Court has held that "in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269

(1970). Where a school disciplinary hearing turns almost entirely on the complainant's credibility, the accused student needs to be provided the right to challenge adverse testimony during the disciplinary proceedings. *Furey v. Temple University*, 884 F. Supp.2d 223 (E.D. Pa 2012); *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972). As the Winnick court explained, in cases in which the question of student discipline turns on a question of credibility, and the decision maker has to choose between either the accused or his accuser, "cross-examination might … [be] essential to a fair hearing." *Id*. at 550; *see also Donohue v. Baker*, 976 F. Supp. 136, 146-47 (N.D.N.Y. 1997)

As demonstrated below, Plaintiff was denied his right of cross-examination as he was not afforded the right to directly challenge his accuser's accusations and testimony. Although Plaintiff was permitted to submit questions to the Panel to be posed to his accuser, the Hearing Panel rejected almost all of the twenty (20) questions he had submitted. (**Exhibit "H"**)

More specifically, Plaintiff's accuser alleges to have suffered bleeding from the alleged incident. Jane Roe allegedly underwent a medical examination, close in time to the incident, but Defendants failed to inform Plaintiff of that fact until many months (April 2017) after the incident. Jane Roe continually refused to provide the information to the Defendants and the Defendants never insisted that she produce it before proceeding with the investigation. To date, this crucial evidence has never provided to the Plaintiff.

Despite Jane Roe's months-long refusal to cooperate, at the June 6, 2017 hearing she was permitted to testify that she had underwent a medical examination following the alleged incident.  The Hearing Panel and its Chair then ruled that her uncorroborated

statement should be considered evidence that she had been sexually assaulted. Plaintiff submitted the following questions at the hearing concerning Jane Roe's purported medical examination: (**Exhibit 'H'**)

> When and where did you have a medical examination? **The Hearing Chair ruled: NOT RELEVANT and did not ask the question.**

> You were examined to see if there was any evidence of non-consensual penetration by Plaintiff. Is this correct? **The Hearing Chair ruled: NOT RELEVANT and  did not ask the question.**

> You received the results of that medical examination, in a report or records, right? **The Hearing Chair ruled: NEW EVIDENCE and did not ask the question.**

> Before you were examined, you explained to someone there what happened and why you wanted a medical examination, is this correct? **The Hearing Chair ruled: NEW EVIDENCE and did not ask the question.**

> And you provided information about whether you had any medical conditions and whether you are taking any medications? **The Hearing Chair ruled: NEW EVIDENCE and did not ask the question.**

Despite Jane Roe's continued **refusal** to provide any evidence of this examination during the investigation and the Hearing Chair's refusal to pose Plaintiff's very germane, important, and probative questions, the Hearing Panel, instead of excluding Jane Roe's unsubstantiated testimony, acknowledged and accepted Jane Roe's assertion about the examination.

The Hearing Panel blatantly ignored and refused to ask Plaintiff's questions regarding what the report said and what Jane Roe told the staff at the facility about the incident. There can be no doubt that the questions posed to Jane Roe during the alleged medical examination, such as what caused your injuries, would have no doubt been asked by the examining facility and documented in the report.

9

Contrary to the Hearing Panel's assertion, the existence and content of this mysterious medical examination report was NOT NEW EVIDENCE. Defendants had been asking for the information for some time and the Plaintiff was advised as to its existence approximately two (2) months **before** the hearing.

Moreover, the purpose of the report is very relevant. The medical report would have disclosed information regarding whether Jane Roe suffered injuries consistent with a sexual assault. Thus, the Hearing Chair's refusal to ask relevant and pertinent questions, utterly violated Plaintiff's right to meaningful cross-examination.

Despite the enormous weight the Hearing Panel placed on Jane Roe's credibility, they utterly shut down Plaintiff's ability to confront and cross-examine his accuser. This is further highlighted by Jane Roe's documented inconsistent and erroneous statements that Plaintiff was not permitted to challenge. When the Hearing Panel asked Jane Roe a question submitted by the Plaintiff regarding her contradictory statements that Plaintiff had allegedly "kissed her" as compared to her statement that "there wasn't any kiss," she responded, **"I might have told [the police] the wrong thing. I didn't want to go back to the police after I gave them my account."** Jane Roe further indicated that although the police had tried on multiple occasions to contact her, **she chose not to respond to them to correct her statements**. Incredibly, the Hearing Panel not only failed to comment on this testimony, but also did not follow up with any questions to gain further information regarding the different statements made to the police. Instead, they simply accepted as true, Jane Roe's other statements that substantiate their findings of Plaintiff's responsibility.

Pursuant to a second question submitted by the Plaintiff, "After what you allege was a sexual assault, did you tell Investigator Kat Matic (regarding Plaintiff) that, "Yes, after the incident, I said we should stay apart, it's confusing for me." What was "confusing" for you?" **Jane Roe requested and received a several minute break to consider and formulate answers to these questions.**

After returning to the hearing, Jane Roe stated she never made this statement. She subsequently completely changed her response that "I never made this statement" to "I think when I said the word <u>confusing</u> I probably meant I was in <u>shock</u>. This happened many months ago so I'm not entirely sure exactly what I was saying." It is without question that the word "confusing" as uttered by Jane Roe, close in time to the incident, is the very real and logical choice of words due to her romantic feelings for the Plaintiff while she had a boyfriend. However, the Panel would never learn of this because the Hearing Panel made the conscious decision not to question Jane Roe about her contradictory and inconsistent testimony.

When a school's disciplinary hearing turns almost entirely on the complainant's credibility, the accused's right to meaningful cross-examination is essential. The accused student's right to challenge adverse testimony during the disciplinary proceeding is a fundamental right of Due Process. Furey, supra. In the case at bar, the rationale cited by the Hearing Panel as the primary evidence relied upon in making their determination for its decision was the credibility of the complainant. (**Exhibit "I"**) As demonstrated above, Defendants violated Plaintiff's right to a meaningful cross-examination and to confront his accuser.

11

Shockingly, during the hearing, Defendants permitted Jane Roe to view the Plaintiff, but affirmatively prevented Plaintiff from seeing her. The deprivation of one of our country's most fundamental rights, to confront one's accuser, was also in direct contradiction of Defendants' own policies.  Defendants' April 25, 2016-(Procedures in effect at the time of the incident) Student Code of Conduct Section V.D (v.) (D)(2)(vii) (vii) (**Exhibit "J"**) states: "Each party will have the option to observe the other's interaction with the hearing authority through remote video or audio access, if reasonably practicable."  Although Jane Roe participated in the hearing via web camera and the entire hearing panel could view her, she refused to allow the Plaintiff the same opportunity. The Defendants granted Jane this accommodation, while simultaneously denying Plaintiff that same right.

Plaintiff was denied any opportunity to confront his accuser although the Panel, mere inches away from him, could. The mere fact that Plaintiff could hear Jane's voice simply fails as a substitute for his right to "confront" his accuser. The absurdity of Defendants' irrational decision is underscored by the fact that the Panel was able to view Jane Roe, while seating inches from Plaintiff, and that Jane was not physically present in the same room.

**3.    Defendants Failed To Fully and Properly Advise The Plaintiff of The Charges and The Procedures Governing The Investigation**

On September 8, 2016, Plaintiff received a No Contact Directive (**Exhibit "B"**) regarding Jane Roe. On September 12, 2016, Plaintiff received an email from Title IX Coordinator Paul Apicella requiring his presence at a meeting that afternoon to discuss a

report of an incident that "may implicate the University's policy against sexual and gender-based harassment and misconduct." (**Exhibit "C"**) However, Plaintiff was not notified of any of the details of the alleged incident, nor was he informed that he could bring an advisor to this meeting. A formal Title IX complaint was not filed until September 21, 2016.

On September 23, 2016, Plaintiff met for 30 minutes with the Investigator who discussed the procedures and protocol for a Title IX investigation. There was no discussion of the complainant's allegations. On September 28, 2016 Plaintiff was informed that Jane Roe claimed that Plaintiff "attempted to kiss" her and "touch with hands up under her clothes."

Plaintiff's credibility and ultimately the determination of his responsibility was decided based upon prejudicial assessments as to some of Plaintiff's responses to the Title IX Investigator regarding the accusations made by his accuser against him before he knew what the allegations were about. The Hearing Panel stated in their rationale that although "[Plaintiff] was not aware of the specific allegations by [Jane Roe] when first meeting with the Title IX office, he chose not to share his version of the incident until after he knew what the specific allegations were." (**Exhibit "I"**) This backwards rationale only underscores the shear prejudicial nature and witch hunt conducted by Defendants' Hearing Panel. Plaintiff could not possibly provide his "version of the events" if he did not know what events to discuss. Plaintiff was deprived his right to be notified of the charges before speaking to the investigators. Plaintiff attempted to provide all of the

redacted information to the Hearing Panel, however, as discussed above, the panel Chair refused to allow the Plaintiff to submit this evidence.

In fact, Plaintiff met as requested with the Title IX Investigator on September 28, 2016 and with the University Police on September 30, 2016 for interviews during which he fully cooperated and responded to all questions. During these interviews, Plaintiff shared his perspective about what had occurred between himself and the complainant even though all of the information regarding the allegations had not been disclosed to him.

For reasons apparently known only to the Defendants, Plaintiff was inexplicably not provided written notice of the specific charges against him until May 11, 2017, **nearly 9 months after the alleged incident**. (**Exhibit "D"**) Requiring Plaintiff to participate in investigative interviews prior to being made aware of the specific charges against him, and understanding what he was ultimately responding to, unquestionably deprived him of the opportunity to adequately defend himself.

In addition to blatantly failing to properly and timely notify the Plaintiff about the charges against him, Defendants unilaterally changed the rules in the middle of the investigation without any notice to the Plaintiff. Significantly, at the September 23, 2016 meeting with the investigator. Plaintiff was directed to find a copy of the Office of Student Code of Conduct online (**Exhibit "J"**) Despite the fact he would meet with administrators and staff regarding the alleged incident more than a dozen times during the investigation, it was not until his May 1, 2017 meeting with the case manager that Plaintiff was informed that the procedures had been revised and reissued nearly 6 months

prior on November 3, 2016. (**Exhibit "K"**) No administrator or staff member informed the Plaintiff that significant changes had been made to the Student Conduct Procedures during the nine (9) months Plaintiff had been under investigation. As noted below, Defendants, without notice to the Plaintiff, unilaterally in the middle of his investigation, changed and omitted the 60-day timeline for completion of investigations as promulgated by the 2011 "Dear Colleague Letter" (DCL) for Title IX guidance.

Defendants' new revised Office of Student Conduct Procedures dated November 6, 2016 (Exhibit "?") had significant policy and procedural changes including:

Revision of the term "Title IX".  The new 11/3/16 policy stated, "G. The term "Title IX" refers to Title IX of the Education Amendment of 1972 and the related regulations and guidance, specifically as they relate to sexual harassment, gender discrimination and harassment, sexual assault and sexual violence.  Special procedures exist (Section V, D) for cases involving potential Title IX violations." The new definition included dating violence, domestic violence and stalking.

Deletion in the new 11/3/16 policy of "The term "University community member" [which] includes any person who is a student, faculty member, staff member, or other person employed by the University."

The term "Investigator" was redefined in the new 11/3/16 policy as any University official who is assigned by the Senior Director or Title IX Coordinator to conduct investigations in cases involving allegations of student misconduct.

The Title IX Decision Panel was redefined and the definition broadened from the 4/25/16 policy to the new 11/3/16 policy to state: "The terms "Title IX Decision Panel" and "Title IX Administrative Hearing Officer" or, collectively, "Title IX Hearing Authority" are defined as a specific group of faculty and staff authorized by the Senior Director to review cases alleging Title IX violations that have been assigned to them, to determine whether a student has violated the Student Code of Conduct, and to assign sanctions in response to violation(s).

The definition for the term "witness" was revised in the new 11/3/16 policy to include the stipulation that, "The Senior Director (or designee), AHO, UCB Chair, Investigator, or Title IX Hearing Authority may exclude witnesses if they are deemed duplicative, irrelevant, or inappropriate. **"Here, the University**

**arbitrarily made policy changes regarding witnesses while the investigation of Plaintiff was ongoing and failed to inform him.**


The Code of Conduct and Student Conduct Procedures revised 4/25/16 which were   in effect when Plaintiff met with the Title IX Coordinator on September 12, 2016  stated: "When a University conduct process is initiated for a case involving a potential Title IX violation, the following procedures will be followed in a timely manner, **typically within 60 days of receipt of the complaint of misconduct**. (Emphasis added). Alternatively, if the Senior Director determines that the investigative model articulated in Section D, 2 should be utilized to manage the case, he will refer the case to that process." **Penn State revised the policy and procedures on 11/3/16, during Plaintiff's investigation, to eliminate the 2011 DCL guidance for a timely, 60-day process, and further to remove the Investigative Model procedures**. The revised 11/3/16 procedures to stated: "The   University's Office of Sexual Misconduct Prevention   and Response (OSMPR) has responsibility for investigating allegations of Title IX violations. The OSMPR will typically investigate such allegations utilizing the process articulated at http://titleix.psu.edu. When information regarding a Title IX allegation is referred to the Office of Student Conduct and a conduct process is initiated, the following process will occur," which then detailed a revised process.

Revisions to the procedures that occurred during Plaintiff's investigation included that, "If the Senior Director or designee, in consultation with the Title IX Coordinator, determines that it is appropriate and necessary, additional investigation prior to the determination of charges and sanctions will occur." Here, consultation  by the Title IX Coordinator was added in the 11/3/16 procedures revision, and    although Plaintiff was never informed of this, the Title IX Coordinator was consulted during his investigation regarding redactions to the investigation report  and whether additional investigation was necessary.

Significantly, the new procedures stated, "If the acquired information reasonably supports a Code of Conduct violation, the Case Manager will recommend charges and sanctions, and the Complainant and Respondent will be given the opportunity to provide a written response within 5 business days."  This stage in the process had   been previously included in the Investigative Model of the 4/25/16 procedures.   Plaintiff chose to submit his objections and nearly half of his written response was redacted. This missing redacted information was ultimately    cited by the hearing panel as not having been disclosed by Plaintiff in their rationale for finding Plaintiff responsible.

Critically, the new policy redefined the protocol for a hearing to include new levels of hearings: "If the respondent contests the charges, the matter will be forwarded to a Title IX Administrative Hearing or a hearing before a Title IX Decision Panel. The Title IX Administrative Hearing is an informal hearing and will be conducted by an Administrative Hearing Officer (AHO) appointed by the Senior Director.  An Administrative Hearing will typically be      utilized in cases that will not result in sanctions ranging from Suspension to      Expulsion and   where   there   are   no   allegations   of   physical   or   sexual   violence   or nonconsensual  penetration.    The  Title  IX  Decision  Panel  (Panel)  hearing  will be utilized in cases in which there is a potential that the      respondent may be suspended or expelled from the University and/or where there are      allegations of physical or sexual violence or nonconsensual penetration." **Plaintiff had been relegated to the most serious hearing panel to consider the false  allegations against  him;  a  hearing  panel  whose  only  choices  were  suspension, expulsion or acquittal.  This was not the policy in effect and that was presented `to  Plaintiff  by  the  Title  IX  Coordinator  when  he  was  informed of his procedural rights on September 12, 2016.**

Both  the  4/25/16  and  11/3/16  procedures  stated,  "The  respondent  and  the complainant will each have the option to personally address the hearing authority in person, so that they may highlight the information that they feel is most relevant to the hearing authority's deliberation."  Notably, the procedures did not state that the respondent must highlight information from the investigation report; the procedures allow the respondent to highlight information they feel is most relevant to the  hearing authority's deliberation. Despite this, Plaintiff was silenced at the hearing  when  he  attempted  to  talk  about  the  procedural  errors  committed  by Defendants that had impacted his investigation and adjudication.

These   unilateral   and   unannounced   changes   in   the   middle   of   Plaintiff's investigation were unquestionably prejudicial and denied Plaintiff a fair and unbiased hearing.

### 4.    Gender Discrimination- Title IX Claims

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be  excluded  from  participation  in,  be  denied  the  benefits  of,  or  be  subjected  to discrimination  under  any  education  program  or  activity  receiving  Federal  financial assistance." 20 U.S.C. § 1681(a). Title IX "'bar[s] the imposition of university discipline

where gender is a motivating factor," and is enforceable through a private right of action for damages as well as for injunctive relief. *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) (quoting *Yusuf v. Va*ssar Coll., 35 F.3d 709, 714-15 (2d Cir. 1994)), *Collick v. William Paterson University* 2016 WL 6824374 (D. New Jersey 2016). The University receives federal funds, and so may be held liable under Title IX. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

In *Collick*, the Court held "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." On the facts as alleged in the instant Verified Complaint, (Exhibit "B") Plaintiff will likely succeed on his Title IX claims. Gender discrimination and gender stereotypes, permeated the investigation and the outcome. The investigative team acted as Jane's advocate rather than as an objective fact finder.

In a clear and unambiguous act of gender bias, Defendants utterly failed to protect the Plaintiff from harassment and retaliation from Jane Roe and her family as required by law. The Office for Civil Rights requires that "Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred."

18

Following the September 8, 2016, No Contact Order Defendants failed to provide a mutual directive to Jane Roe to cease contact with the Plaintiff. The Office of Student Conduct staff failed to offer to arrange a No Contact Order to protect Plaintiff from retaliation as required by Defendants' policy. Defendants also failed to advise Jane Roe's parents of Defendants' policies and rules regarding confidentiality and non-retaliation. Immediately following Jane Roe's report, her parents openly notified other parents of students in their mutual pre-med program, using a group chat text, that one of the students in the group had committed "forcible sex offenses" against another pre-med student. Jane Roe's parents also sent threatening texts stating, **"the assaulter is son of one of the family on this forum" and "the assaulter needs to be in prison" where "he gets raped by someone else" and "we will reveal name of the assaulter here and anywhere we feel fit including if possible newspapers."** (Exhibit "L")

Although Plaintiff provided to the Defendants the texts and a description of what had occurred, the Defendants did not investigate or take any steps to prevent retaliation by the complainant's parents. Defendants failed to enforce the requirements of Title IX and failed to protect Plaintiff when they effectively ignored his reports of the retaliation against him. Additionally, Defendants did not protect the Plaintiff from Jane Roe's parents' retaliation which influenced witnesses not to participate. Plaintiff received texts from a student who was also in the pre-medical program, declining to participate because her parents, who had read these false and retaliatory texts, did not want her to be involved. **(Exhibit "M")**

19

According to the U.S. Department of Justice Title IX Legal Manual, "Retaliation protections are designed to preserve the integrity and effectiveness of the enforcement process itself. Because of this purpose, the merits of any underlying complaint of sex discrimination are irrelevant in assessing a retaliation complaint. The prohibited conduct is the act of retaliation itself." However, the Title IX and Student Conduct staff and administrators at Penn State exhibited deliberate indifference by their failure to prevent retaliation against the Plaintiff. At Plaintiff's meetings with Defendants, as noted above, he provided the details of the harassment he was suffering at the hands of the complainant's parents. However, Defendants took no action against the female complaint or her parents.

Defendants' gender discrimination is further highlighted by Defendants' utter rush to judgment and uprooting, without choice, the male Plaintiff from his classes and not asking his female accuser to change instead. At the time of Plaintiff's removal from his classes, absolutely NO charges had been filed. Additionally, the Defendants only communication to the Plaintiff at that time indicated only that a … "report of an incident that **may** implicate the University's policy against **sexual and gender**-based harassment and misconduct." **(Exhibit "C")** (emphasis added) It is clear from the communication sent by the Defendants, that the University was viewing this matter from a **gender** slanted perspective. As such, Defendants simply cannot say that its decisions was not gender motivated. If not for gender based reasons, then why would the Defendants demand that the Plaintiff, a male, change his classes and not simply have his female accuser switch hers. The facts at the time, September 12, 2016, demonstrated only that

there **may** have been an incident. By removing the male Plaintiff, Defendants obviously came to a predetermination that he was guilty.

It is without question that the notoriety promulgated by former President Obama's Administration, through the DOE and OCR, in delivering their 2011 Dear Colleague Letter **(Exhibit "N")** `as binding on regulated parties, for all practical purposes, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

Catherine Lhamon, former Assistant Secretary of the Department of Education ("Assistant Secretary Lhamon") delivered what has continued to be treated as marching orders by colleges and universities: In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014. In June 2014, Assistant Secretary Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure

21

voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.

The onslaught by the government continued in July 2014, Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce).

To support making the Dear Colleague Letter binding, the OCR hired hundreds more investigators to ensure Title IX enforcement. The Federal Government is currently investigating approximately 339 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown, Columbia and Cornell Universities, Dartmouth College, Johns Hopkins University, the University of Chicago, Penn State, and many other top state universities. Colleges and universities, including Defendants Penn State, are fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds that a Title IX violation has occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for

22

enforcing Title IX, and may initiate an investigation or compliance review of schools; if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

In July 2016, Vice President Joseph Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016

To revoke federal funds -- the ultimate penalty -- is a powerful tool because institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: **"There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendants instead."** "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

Defendants simply cannot credibly advance the position that the DOE and OCR have not created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. On November 3, 2016, the DOE announced that it would levy an historic fine of $2.4 million against Penn State for failure to comply with the Jeanne Clery Act after a review was prompted due to the university's handling of sexual misconduct incidents. "The Department is required by law to conduct periodic reviews of an institution's compliance with the Clery Act. These reviews may be initiated when a complaint is received, a media event raises concerns, a

23

school's independent audit identifies areas of noncompliance, or other reasons." according to the press release by U.S. Department of Education, _U.S. Department of Education Levies Historic Fine Against Penn State Over Handling of Sexual Misconduct Incidents_, Nov.3, 2016.(www.ed.gov/news/press-releases/us-department-education-levies-historic-fine-against-penn-state-over-handling-sexual-misconduct-incidents)

In fact, demonstrating its attempted compliance with the 2011 Dear Colleague Letter, Penn State's 2016 Clery Report annual disclosure of crime statistics reveals that the number of forcible sex offenses investigated yearly at University Park campus between 2013 and 2015 ranged from 46 reports in 2013, to 40 in 2014, and 62 in 2015.

As the Court in _Doe v. Brown_, 166 F. Supp.3d 177, (D. Rhode Island 2016) recently stated: "One particular challenge in these types of cases is that the best information for discerning whether alleged discrimination was based on the plaintiffs gender as opposed to his status as an accused student is generally in the possession of the Defendants"… "conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts." Although the Brown Court was deciding a motion to dismiss, their rationale would certainly be applicable to the issue before this Court.

It is not lost on Plaintiff that in addition to the public pressure and the pressure inflicted by the White House and DOE, Defendants, Penn State also faces immense pressure and negative publicity for the handling of several other high profile sexual and non-sexual related incidents. Unfortunately, Plaintiff has paid a very high and life altering

price at the hands of the Defendants, as it attempts to avoid even more negative publicity and loss of Federal funding.

### 5.    The Right to an Impartial Decision Maker

The Fourteenth Amendment's Due Process Clause also requires an impartial decision maker. See, e.g., *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). In the context of a student disciplinary proceeding, "the providing of a fair and impartial tribunal imposes [no] great administrative burden on the school." *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 395 (E.D. Pa. 2010).

As demonstrated above, the Hearing Chair was anything but an impartial decision maker. The Hearing Chair's unilateral refusal to question the veracity of the complainant and refusal to permit plaintiff meaningful cross examination made clear that the Plaintiff was not provided an impartial decision maker.

Additionally, inexplicably, after nine months from the No Contact Order, the Hearing Panel had no questions for the Investigator or the Plaintiff. Thereafter, following the Panel's silence, the Chair stated, "I just want to clarify the allegations…no kissing, touching, fondling at all?" The Plaintiff in turn responded "and no penetration." Importantly, the Hearing Chair had improperly required the Plaintiff to respond to the complainant's original allegations **which were not included in the formal charge**. Furthermore, the Hearing Chair had not stated the charge of nonconsensual penetration, for which Plaintiff ultimately was formally charged and the subject of the hearing. Plaintiff had to correct the Hearing Chair so that he could formally and adamantly deny the charge of nonconsensual penetration for the record. The improper protocol by the

Hearing Chair resulted in a Hearing Panel that was instructed to consider the wrong charges during the hearing.

### 6.    Negligence

Plaintiff will prove that Defendants were negligent in its investigation and adjudication of Roe's claim. In Pennsylvania, the elements of a cause of action for negligence follow the common law and require a plaintiff to establish the existence of a duty, a breach of that duty, causation, and damages. *Schemberg v. Smicherko*, 85 A.3d 1071 (Superior Court Pa 2014), *Daly v. New Century Trans, Inc.*, 2012 WL 4060687 (M.D. Pa 2012). In a student disciplinary proceeding, schools have a duty to "refrain from conduct that will foreseeably cause injury to others." *Doe v. Univ. of the South*, 2011 WL 1258104, at *21 (E.D. Tenn. Mar. 31, 2011). There, the court concluded that "a jury could find that the harm caused by [a] University's allegedly and arguably haphazard implementation of its own Sexual Assault Policies was foreseeable, especially where…the harm was severe: a wrongful conviction by a disciplinary committee." Id.

Defendants breached the duty it owed to Plaintiff and harmed him through its one-sided investigation. Defendants had a duty to protect all of its students, including protecting individuals from having false allegations of sexual misconduct lodged against them. Additionally, as demonstrated more fully above, Defendants failed to protect the Plaintiff from retaliation and abuse at the hands of the complaint and her parents. The damages that Plaintiff has and will continue to suffer are as a direct result of the Defendants' negligent handling of Jane Roe's complaint by validating her false allegations in the face of a shear lack of evidence. Defendants' erroneous determination

that Plaintiff was responsible has resulted in Plaintiff suffering significant damages, including, the expulsion from a highly competitive and prestigious seven (7) pre-med medical program, economic injuries stemming from the loss of his professional career and the loss of educational opportunities.

## III.   PLAINTIFF WILL CONTINUE TO SUFFER IRREPARABLE HARM

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000), *Penglai Jinfu Stainless Steel Products Co., v. Gremacher, LLC*, 2016 WL 660920 (E.D. Pa 2016). This element is easily satisfied here.

The expulsion of Plaintiff from the prestigious seven (7) year premed medical program will cost him large sums of money for additional years of medical school (although, as noted below, it is highly doubtful he will ever be admitted to medical school with this permanent branding on his record) which constitutes irreparable harm. He likely will be prevented from gaining admission to another medical school and obtaining his medical degree at any other institution due to the Defendants' recommendation that his expulsion from the prestigious premed medical program and the alleged sexual violence offense be permanently noted on his transcript.  It is difficult to imagine a medical school wanting to admit a "sexually violent" student who has already been expelled from a medical program. In the context of a college disciplinary matter and resulting sanctions, a plaintiff's inability to continue or complete his education is irreparable injury. *See, e.g., Gati v. Univ. of Pittsburgh,* 91 A.3d 723, 729 n.10 (Pa. Super. 2014) (court "would have

no trouble" finding irreparable harm when university dismissed student for dishonesty shortly before his graduation and Defendant's "argument to the contrary is entirely unpersuasive")

Defendants has branded Plaintiff as a sex offender. Plaintiff will suffer irreparable harm as a result of Defendants' wrongful actions. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) ("[T]he Board's biased finding of inefficiency and incompetence will inflict such severe injury to her professional reputation that a monetary award would likely be inadequate and almost certainly speculative."); 11A Charles Alan *Wright, et al.*, Federal Practice and Procedure § 2948.1 (3d ed. 1998) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Plaintiff also has suffered emotionally as a result of Defendants' actions in wrongfully branding him as a sex offender. *See, e.g., Caspar v. Snyder*, 77 F. Supp.3d 616, 640 (E.D. Mich. 2015) (noting "loss of dignity and other emotional injury . . .not susceptible to quantitative calculation."). Being labeled a sexually violent offender irreparably harms Plaintiff, his reputation, and his future educational, professional, and social prospects. He will have to disclose it whenever he is asked if he has been the subject of a disciplinary proceeding or been found responsible for a violation, a common question in applications for graduate or professional school, professional licensure, and in employment. The term "sexual violence" is particularly inflammatory.

"Grounds for finding irreparable injury include loss of control of reputation, loss of trade and loss of good will". *Opticians Ass'n of Am. v. Jndep. Opticians of Am.*, 920

28

F.2d 187, 195 (3d Cir. 1990) (reversing district court order and directing court to issue an injunction), *see also\ McNeil Nutritionals, LLC. v. Heartland Sweeteners LLC.*, 566 F. Supp 2d. 378 (E.D. Pa 2008). Although these cases involved a commercial context, the basis for the finding of irreparable harm - loss of reputation and loss of opportunities-easily translates to the harm being suffered by the Plaintiff.

Recently, the Court in *Doe v. Brandeis*, 177 F.Supp.3d 561 (D. Mass 2016) found:

> [A] student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions. It is true that the consequences of a university sanction are not as severe as the consequences of a criminal conviction. Nevertheless, they bear some similarities, particularly in terms of reputational injury… Certainly, stigmatization as a sex offender can be a harsh consequence for    an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings. See also *Doe v. Notre Dame*, 2017 WL 1836939; *Doe v. Middlebury College*; No.: 1:15 -CV-192-JGM, 2015 WL 5488109 at 3 (D. Vt. Sept. 16, 2015;

Plaintiff will be irreparably harmed by the gap in his education that will result if Defendants suspend him for the upcoming semester. Even when justice prevails and Plaintiff is reinstated, or if he attends medical school, courts have frequently held that any gap in a college education constitutes irreparable harm. As the Court in *King v. DePauw University*, 2014 WL 4197507 (S.D. Indiana August 22, 2014) explained:

> If [plaintiff] is not permitted to complete this upcoming semester at DePauw- even if, as DePauw asserts, he could choose to attend another university and ultimately graduate on time-he will forever have a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain another situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct at DePauw. *Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. (emphasis added);*

## IV.    INJUNCTIVE RELIEF RISKS NO HARM TO OTHERS

The harm to the Plaintiff without question outweighs any potential harm to the Defendants. In fact, it can be argued and established that the Defendants would not incur any harm at all. As noted below, Plaintiff satisfies the Court's balancing test of the relative harm to the parties i.e., the potential harm to Plaintiff if an injunction is not issued versus the potential harm to the University if it is. *See, e.g., MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp.2d 552, 563 (E.D. Pa. 2010). The harm Plaintiff will suffer if the tainted process is not stopped is greater than any potential harm to the University.

As discussed above, on September 12, 2016, the Defendants unilaterally required the Plaintiff to alter his course schedule and change several of his classes for which his accuser was registered. The Plaintiff then completed not only one (1), but two (2) full semesters in the prestigious Penn State Jefferson pre-med medical program with his accuser still in the program. Additionally, not long after making her complaint, Jane Roe relocated from her dormitory room where she resided at the time of the alleged incident to move across campus and live in a building located directly across from the building where Plaintiff resided.  In the spring semester, the two parties attended a pre-medical students' social event without incident or objection by the complainant.  Importantly, at no time during the investigation of the alleged incident, which took place during the entirety of the parties' freshman year, was an interim suspension or other similar measure deemed necessary by Defendants. Plaintiff's honorable and compliant presence during

30

the entire academic year of the investigation was evidence that he did not create a hostile environment for complainant or for the Penn State community.

Clearly, the Plaintiff was not perceived to be a threat to his accuser or anyone else in the Penn State community. Therefore, logic dictates that the same would and should occur until this matter is resolved. Only the Plaintiff would be harmed should the injunctive relief presently being requested not be issued. How can the Defendants claim any harm when the relief sought would only maintain the status quo?

The balance of harm firmly favors the Plaintiff. *See, e.g., Doe v. Notre Dame*, 2017 WL 1836939 (N.D. Indiana, South Bend Division May 8, 2017)  *Ritter v. Oklahoma*, 2016 WL 2659602, at *5 (W.D. Okla. May 6, 2016 (noting balance favors granting injunction because any harm to college is "inconsiderable" compared to harm to student if he was wrongfully expelled); *Middlebury*, No. I:15-cv-192, slip op. at 7-8 (finding balance weighs in favor of student); *King*, 2014 U.S. Dist. LEXIS 117075, at *40-42 (finding balance of equities "firmly" in student's favor: "the real, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university); *see also MarbleLife, Inc*, 759 F. Supp.2d at 563 (granting preliminary injunction in trademark infringement case and finding that any harm to Defendants was at least partly self-inflicted due to its failure to abide by its contractual obligations).

It is respectfully submitted that the Plaintiff has amply demonstrated that Defendants committed grave and serious violations of Plaintiff's due process rights. Plaintiff's injuries are concrete, while Defendants' are speculative at best. Staying the

31

semester suspension and the expulsion from the premed medical program will mitigate the concrete injury that Plaintiff has already suffered.

## V.     INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

Granting a temporary restraining order and preliminary injunction and allowing Plaintiff to continue his education will also serve the public interest. There are serious doubts surrounding the legitimacy of Defendants' actions in expelling Plaintiff. That fact, when coupled with the fact that Plaintiff does not pose a threat to others strongly suggests that the public interest would best be served by allowing Plaintiff to continue with his education while the flawed process that produced his sanction is exposed.

## VI.    BOND SHOULD BE WAIVED BECAUSE DEFENDANTS WILL NOT BE HARMED

Finally, Plaintiff moves the Court to waive security for any injunction it issues. The strict adherence to Federal Rule 65(c) can be waived by the Courts. The Court should consider the "…possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant". *Scanvec Amiable Ltd. v. Chang 80* Fed. Appx 171, 175, 2003 WL 22597067 (3rd Cir 2003), *Elliot v. Kiesewetter*, 98 F.3d 47,59 (3rd Cir 1996), *Temple University v. White* 941 F.2d. 201, 219 (3rd Cir 1991) In this non-commercial case at bar, Defendants are at no risk of any monetary loss with the granting of Plaintiff's application.  The posting of a bond to the Plaintiff, a college student would be a hardship.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a preliminary injunction enjoining Penn State University from enforcing its decision to suspend Plaintiff for the fall 2017 semester and remove him from the Penn State Jefferson premed medical program and allowing him to attend classes during the fall semester which begins on August 21, 2017, and all subsequent semesters during the pendency of the requested preliminary injunction.

**Dated: July 28, 2017**

> **SUMMER, MCDONNELL, HUDOCK & GUTHRIE, P.C.**
>
> By: /s/ Kevin D. Rauch
> **Kevin D. Rauch, Esq.**
>
> **945 East Park Drive, Suite 201**
> **Harrisburg, Pennsylvania**
>
> -and-
>
> **NESENOFF & MILTENBERG, LLP**
>
> By: /s/ Andrew T. Miltenberg
> **Andrew T. Miltenberg, Esq.**
> (*Pro Hac Vice* **Petition Pending**)
> **Stuart Bernstein, Esq.**
> (*Pro Hac Vice* **Petition Pending**)
> **Philip A. Byler, Esq.**
> (*Pro Hac Vice* **Petition Forthcoming**)
> **Jeffrey S. Berkowitz, Esq.**
> (*Pro Hac Vice* **Petition Forthcoming**)
>
> **363 Seventh Avenue, Fifth Floor**
> **New York, New York 10001**
>
> *Attorneys for Plaintiff John Doe*

33