## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, | : | No. 17-CV-01315 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY, THE PENNSYLVANIA | : | |
| STATE UNIVERSITY BOARD OF | : | |
| TRUSTEES, ERIC J. BARRON, individually: | | |
| and as agent for The Pennsylvania State | : | |
| University, PAUL APICELLA, individually | : | |
| and as agent for The Pennsylvania State | : | |
| University, KAREN FELDBAUM, | : | |
| individually and as agent for The | : | |
| Pennsylvania State University, | : | |
| KATHARINA MATIC, individually and as | : | |
| Agent for The Pennsylvania State University, : | | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### AUGUST 18, 2017

Before the Court for disposition is Plaintiff John Doe's Motion for a

Temporary Restraining Order and Preliminary Injunction. Following a hearing on

August 10–11, 2017 and upon thoughtful consideration of the parties' arguments,

this Motion will be granted in accordance with the reasoning set forth below.

# I.    BACKGROUND

## A.    The Complaint

On September 7, 2016, Jane Roe ("Roe"), a student in the joint program between The Pennsylvania State University ("Penn State") and the Sidney Kimmel Medical College at Thomas Jefferson University,[1] made an initial complaint to Resident Life Coordinator Kyle Kowal of alleged[2] sexual misconduct by Plaintiff John Doe ("Doe").[3] Roe specifically alleged that Doe, a fellow student in this joint program, had, earlier on that same day, attempted to kiss her "a couple of times," and touched her with his hands under her clothes.[4] She further alleged that, during this encounter, she was "unable to fight," "afraid to scream," and, as result, was "bleeding a little" from digital penetration of her vagina.[5]

Following this complaint by Roe, two immediate actions were taken. First, Doe was issued, on September 8, 2016, a "Notification of Administrative Directive" by Mr. Kowal stating that he was to have no contact with Roe.[6] Second,

---

[1]   This program is a highly competitive, accelerated  seven year program in which students must complete three years at Penn State, followed by four years at Thomas Jefferson in Philadelphia. *See* ECF No. 31-6, at 3.

[2]   Here, Doe and Jane Roe vigorously disagree about what happened during the incident in question on September 7, 2016.  However, despite this disagreement, the facts surrounding Defendant The Pennsylvania State University's handling of the complaint, the true subject of this litigation, are largely undisputed.

[3]   *See* ECF No. 31-6, at 30.

[4]   *Id.*

[5]   *Id.* at 30, 33.

[6]   *See* ECF No. 31-7.

Doe received an email on September 12, 2016 from Penn State's Title IX Coordinator, Defendant Paul Apicella ("Mr. Apicella"), requesting his presence at a meeting that afternoon to discuss a report of an incident that "may implicate the University's policy against sexual and gender-based harassment and misconduct."[7] Doe attended the meeting alone and was informed that he would be removed from his current English course, Biology course and Biology lab and reassigned to other sections because Jane Roe was a student in the same classes.[8] Doe was also given a document listing his procedural rights as a respondent in this student conduct matter.[9]

## B.    The Investigation

On September 21, 2016 John Doe received an email from the Senior Title IX Compliance Specialist, Defendant Katharina Matic ("Ms. Matic"), requesting a meeting for the following day.[10] During that meeting, ultimately held on September 23, 2016, Doe was informed (1) about Penn State protocol; (2) that Roe would be submitting a written statement and that Doe would have the opportunity to read the statement and then respond; (3) that Investigator Matic would "strive to complete the investigation in 30 days"; and (4) that if he were found responsible,

---

[7]    Compl. (ECF No. 1) ¶ 74, at 25.

[8]    *Id.* ¶ 76, at 26.

[9]    *Id.* ¶ 77, at 26.

[10]    *Id.* ¶ 78, at 26.

Penn State policy was "more educational than punitive."[11] John Doe was further told by the Investigator that he could find the Code of Conduct and Student Conduct Policy and Procedures online.[12] He then reported to Ms. Matic that there had been a breach of confidentiality by Jane Roe's father who openly notified parents of students in the pre-med program using a group chat text that one of the students had committed "forcible sex offenses" against another premed student.[13] Ms. Matic later had a meeting with Roe in which she "strongly encourage[d] her to talk to her parents" about the messages.[14]

On September 28, 2016, John Doe again met with Ms. Matic, the Investigator, during which he was first informed of the general substance of Jane Roe's allegations. He was specifically informed that Residence Life had gone to Jane Roe's room to meet with her and her roommate on the afternoon of September 7, 2016. During that meeting, Jane Roe had stated that John Doe had "attempted to kiss her, that she was afraid to scream, that there was touching of a hand up under her clothes and that she might be bleeding a bit."[15] Doe denied these

---

[11]  *Id.* ¶ 79, at 26–27.

[12]  *Id.* The document online on September 23, 2016 was identified as the "Code of Conduct and Student Conduct Procedures, Revised 4/25/2016".  Compl. (ECF No. 1) ¶ 80, at 27.

[13]  Compl. (ECF No. 1) ¶ 81-82, at 27–28.

[14]  *See* Preliminary Injunction Hearing Transcript, Volume II (ECF No. 43) at 150:15-24.

[15]  Compl. (ECF No. 1) ¶ 83, at 28.

allegations by stating that it was Roe who had twice attempted to kiss him, and that he had rebuffed both of these advances.[16]

John Doe met with Ms. Matic again on October 5, 2016. While Roe had not yet submitted a written report, Ms. Matic stated that, based upon the incident report from Residence Life, Roe was alleging that John Doe was responsible for nonconsensual digital penetration.[17] The following day, on October 6, 2016, Doe submitted a written statement to Ms. Matic detailing his version of the events on September 7, 2016.[18] Doe had two additional meetings with Ms. Matic, on October 21, 2016 and November 16, 2016, respectively, in which he learned that, despite declining to submit a written statement for review, Roe had nevertheless expressed to Ms. Matic verbally that Doe "had his hand on her inner thigh."[19] Doe denied the accusation.[20] At the subsequent meeting with Ms. Matic held on November 16, 2016, Doe noted that, despite the investigation now eclipsing the 60 day timeline embodied in Penn State's Code of Conduct and Student Conduct Procedures, Revised 4/25/2016, he had not yet been provided with a written statement of the allegations by Roe.[21]

---

[16]   *Id.* ¶ 84, at 28.

[17]   *Id.* ¶ 86, at 29.

[18]   *Id.* ¶ 87, at 29.

[19]   *Id.* ¶ 88, at 29.

[20]   Compl. (ECF No. 1) ¶ 88, at 29.

[21]   *Id.* ¶ 89, at 30.

On December 16, 2016, John Doe was allowed to see the preliminary investigation report compiled by Ms. Matic for a limited time in her office and under her supervision.[22] This report stated that the allegations against Doe were based upon Jane Roe's verbal statements made to her Resident Advisor and to the university police, and their unverified incident reports were submitted as Jane Roe's formal Title IX complaint.[23] Doe thereafter submitted a response to the preliminary investigation report on January 3, 2017.[24] In that response, he noted, among other things, that (1) one witness whom he alleges had confided in him that Jane Roe had feelings for him and pursued a physical relationship refused to participate in the investigation after consultation with her parents, (2) Roe's statements to University Police concerning her feelings for Doe were contradicted by one of her witnesses to the investigation, and (3) Roe's statements concerning the extent of physical contract and Doe's statements to her during the incident on September 7, 2016 were inconsistent.[25] These statements were subsequently redacted by Ms. Matic.[26]

---

[22] *Id.* ¶ 90, at 30.

[23] *Id.* ¶¶ 90–91, at 30.

[24] Compl. (ECF No. 1) ¶ 97, at 32; *see also* John Doe's Unredacted Response to the Preliminary Investigation Report (Defs.' Exhibit 2).

[25] *See* John Doe's Unredacted Response to the Preliminary Investigation Report (Defs.' Exhibit 2).

[26] *See* Pennsylvania State University Office of Sexual Misconduct Prevention and Response Investigative Report (ECF No. 31-6), Attachment J, at 65–67.

On January 13, 2017, Doe again met with the Investigator to review the revised investigation report, and, in the course of that meeting, told Ms. Matic that he disagreed with the numerous redactions that had been made in the report.[27] Ms. Matic subsequently conducted a second interview of the witness for Doe, and twice interviewed Roe for clarification.[28]

On March 21, 2017, Doe reviewed another draft of the investigation report, and thereafter submitted another response.[29] At the close of her investigation, Ms. Matic had a telephone conversation with Roe in which Roe stated that (1) she had a medical examination a week after the September 7, 2016 incident, and (2) she had provided physical evidence in the form of blood stained underwear and shorts to University Police.[30] Despite Ms. Matic's subsequent email requests, Roe never responded, and thus did not provide this physical evidence for purposes of this investigation.[31]

The final Investigative Report and Exhibits was provided to Defendant Karen Feldbaum, Associate Director of Student Conduct ("Ms. Feldbaum") on

---

[27] Compl. (ECF No. 1) ¶ 98, at 32.

[28] *See* Pennsylvania State University Office of Sexual Misconduct Prevention and Response Investigative Report (ECF No. 31-6), at 23–26.

[29] Compl. (ECF No. 1) ¶ 101, at 33.

[30] *See* Pennsylvania State University Office of Sexual Misconduct Prevention and Response Investigative Report (ECF No. 31-6), at 26.

[31] *Id.*

April 18, 2017.[32] On May 10, 2017, Ms. Feldbaum notified John Doe that, based

on her review of the investigative packet, it was her determination as case manager

"that it is reasonable to believe a code of conduct violation has occurred."[33] This

notification further stated:

> As such, I have issued the following charge and sanctions:
>
> 02.03 / Nonconsensual Penetration: Digital or with an Inanimate Object.
>
> Conduct Suspension through FA2017.
> Educational Program and/or Counseling required for readmission determine by assessment.
>
> I have attached the University form which indicates the charge and sanctions. You have five business days to respond (the form indicates 3 but we provide 5 given the nature of the violation and sanction). Your decision is due to me no later than 5:00PM on May 17, 2017. Your options are:
>
> 1) Accept the charge and sanction
> 2) Accept the charge and contest the sanction
> 3) Contest the charge, which will also carry with it a determination of the sanction.[34]

John Doe refused to accept the charge and accompanying sanction, and filed

a written response on May 17, 2017 denying Roe's allegations and objecting

specifically to Penn State's failure to inform him as to a November 3, 2016

---

[32] *See generally id.*

[33] *See* May 11, 2017 Email Concerning Charges and Sanctions Notification (ECF No. 11-7).

[34] *Id.*

revision in the Code of Conduct.[35] That Response was again subject to redaction by Ms. Matic.[36] A hearing before a Title IX Decision Panel was then scheduled.[37]

### C. The Hearing and the Board's Decision

The Title IX Decision Panel was held on June 6, 2017. Plaintiff alleges that the following errors occurred before the decision panel. First, Doe alleges that he was silenced when he attempted to talk about the procedural errors committed by Penn State which had impacted the investigation and adjudication in violation of Penn State's Code of Conduct.[38] Second, Doe alleges that the hearing panel improperly rejected eighteen of twenty-two submitted questions as either not relevant or pertaining to new evidence.[39] Doe specifically alleges that the hearing panel rejected the following questions relating to the medical exam which Roe declined to provide:

> When and where did you have a medical examination?

---

[35] Compl. (ECF No. 1) ¶ 103, at 33. Doe specifically stated that, at the September 23, 2016 meeting with Matic, he was directed to find a copy of the "Office of Student Code of Conduct and Student Conduct 4/25/2016" procedures online. Despite meeting with administrators and staff regarding the alleged incident more than a dozen times thereafter, he was not informed until until the last May 1, 2017 that the procedures had been revised and reissued nearly 6 months prior on November 3, 2016. Compl. (ECF No. 1) ¶ 105, at 34.

[36] *Cf.* John Doe's June 1, 2017 Un-redacted Response to Charge and Sanction Notification (ECF No. 11-9) *with* John Doe's Redacted Response to Charge and Sanction Notification (ECF No. 11-10).

[37] *See* May 23, 2017 Email from Karen Feldbaum to John Doe and Marybeth Sydor Report (Defs.' Exhibit 6).

[38] Compl. (ECF No. 1) ¶ 118, at 39.

[39] *Id.* ¶ 121, at 40.

You were examined to see if there was any evidence of non-consensual penetration by [Doe]. Is this correct?
You received the results of that medical examination, in a report or records, right?
Before you were examined, you explained to someone there what happened and why you wanted a medical examination, is this correct?
And you provided information about whether you had any medical conditions and whether you are taking any medications?[40]

The Hearing Chair rejected all these questions, reasoning:

We understand you already went for a medical exam and we also understand that a medical exam is not going to determine whether it was consensual or nonconsensual activity in any case, so that's not relevant. **Again, that's new information so not considering**.[41]

The Title IX Decision Panel found Doe to be in violation of Penn State's Code of Conduct that same day,[42] and issued an opinion memorializing these findings on June 7, 2017.[43] The Panel issued the following sanctions: (1) "Disciplinary Suspension through FA2017"; (2) "Required to successfully complete counseling evaluation/assessment under the direction of the Office of Student Conduct"; (3) "Loss of on-campus privileges"; and (4) "Recommendation for the loss of participation in the Penn State Jefferson premed/medical program as long as [Roe] is a participant in this program."[44]

---

[40] Questions for Complaint (ECF No. 11-11).

[41] Compl. (ECF No. 1) ¶ 125, at 42 (emphasis added).

[42] *See* Email from Karen Feldbaum to Doe on June 6, 2017 (Defs.' Exhibit 10).

[43] *See* Title IX Decision Panel (ECF No. 11-12).

[44] *Id.*

### D. The Appeal

On June 16, 2017, Doe appealed this decision to the Student Conduct Appeals Officer, Yvonne Gaudelius.[45] On appeal, Doe raised made the following arguments: (1) "Respondent has been deprived of his rights"; (2) "Stated procedures were not followed that affected the outcome"; and (3) "the sanctions imposed were outside the University's sanction range for such violations and were not justified by the nature of the offense."[46] On June 27, 2017, Dr. Gaudelius denied the appeal on grounds that "there was no deprivation of rights or failure to follow stated procedures, such that the outcome would have been different."[47]

### E. This Action

On July 25, 2017, Plaintiff John Doe commenced the instant action against Defendants The Pennsylvania State University; The Pennsylvania State University Board of Trustees; Eric J. Barron, individually and as agent for the Pennsylvania State University; Paul Apicella, individually and as agent for the Pennsylvania State University; Karen Feldbaum, individually and as agent for the Pennsylvania State University; and Katharina Matic, individually and as agent for the Pennsylvania State University.[48] In the operative Complaint, Doe alleged the

---

[45] Doe's Appeal of Title IX Decision Panel Findings (ECF No. 31-11).

[46] *Id.*

[47] Penn State's June 27, 2017 Appeal Denial Letter (ECF No. 11-8).

[48] ECF No. 1.

following causes of action: (1) denial of Fourteenth Amendment procedural due process pursuant to 42 U.S.C. § 1983; (2) violation of Title IX of the Education Amendments of 1972; (3) breach of contract; (4) breach of covenant of good faith and fair dealing; and (5) estoppel and reliance.[49] A subsequently filed Motion to Proceed under a Pseudonym was granted by the Court on August 3, 2017.[50]

On July 28, 2017, Plaintiff filed the instant Motion for a Temporary Restraining Order and Preliminary Injunction to prohibit Defendants from barring Plaintiff from attending Fall Semester 2017 Classes at Penn State and from participation in the Penn State–Jefferson seven (7) year pre-med program.[51] This Motion has since been fully briefed,[52] and an evidentiary hearing held on August 10–11, 2017.[53] The matter is now ripe for disposition.

## II.    LAW

The United States Court of Appeals for the Third Circuit has recognized that "the grant of injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances."[54] In order to obtain a preliminary injunction, the moving party must demonstrate (1) a reasonable probability of success on the

---

[49]  *Id.*

[50]  ECF No. 20.

[51]  ECF No. 11.

[52]  ECF Nos. 12, 31, & 33.

[53]  ECF No. 34.

[54]  *Instant Air Freight Co. v. C.F. Air Freight. Inc.*, 882 F.2d 797, 800 (3d Cir.1989) (internal quotations and citation omitted).

merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the non-moving party if the injunction is granted; and, (4) whether granting the injunction is in the public interest.[55]

In *Reilly v. City of Harrisburg*, the Third Circuit recently clarified the burden on a party seeking issuance of a preliminary injunction.[56] The *Reilly* Court specified that a party seeking a preliminary injunction must first demonstrate that: (1) "it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)," and (2), "it is more likely than not to suffer irreparable harm in the absence of preliminary relief."[57] The *Reilly* Court continued that "[i]f these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[58] Finally, I note that "[i]t is well established that 'a preliminary injunction

---

[55] *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 302 (3d Cir. 2013); *Crissman v. Dover Downs Entm't, Inc.*, 239 F.3d 357, 364 (3d Cir. 2001); *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384, 391 (M.D. Pa. 2014).

[56] 858 F.3d 173 (3d Cir. 2017).

[57] *Id.* at 179.

[58] *Id.*

is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.' "[59]

## III.  ANALYSIS

In Doe's Motion for a Temporary Restraining Order and Preliminary Injunction, he argues that injunctive relief is appropriate because he has shown (1) a likelihood of success on the merits of both his due process and Title IX gender discrimination claim,[60] (2) immediate irreparable injury if the imposition of his suspension and recommendation of a multi-year suspension from the Penn State-Thomas Jefferson program is not stayed, (3) that the balance of harms favors injunctive relief, and (4) that the public interest favors relief. Penn State, for its part, denies the satisfaction of all factors in favor of injunctive relief. Having heard and considered the arguments of both parties, I find that preliminary relief is appropriate.

### A.      Plaintiff Has Demonstrated a Likelihood of Success on the Merits of his Due Process Claim.[61]

---

[59]  *Kos Pharmaceuticals Inc. v. Andrx Corporation*, 369 F.3d 700, 718 (2004) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

[60]  Plaintiff has not briefed, and the Court will therefore not opine on, the likelihood of success on the merits of the remaining claims within his Complaint.

[61]  This merits determination is only for purposes of the instant motion for injunctive relief, and, as such, the Court is not bound by its findings and conclusions in deciding a future dispositive motion. *See Morris v. Hoffa*, 361 F.3d 177, 189 (3d Cir. 2004)("[A] decision on a preliminary injunction is, in effect, only a prediction about the merits of the case." Therefore, "a trial court, in deciding whether to grant permanent relief, is not bound by its decision or the appellate court's decision about preliminary relief." (citations omitted)).

The Due Process Clause of the Fourteenth Amendment provides that "nor shall any state deprive any person of life, liberty, or property, without due process of law."[62] The leading case on Due Process rights in the public educational context is *Goss v. Lopez*, 419 U.S. 565 (1975). There, the Supreme Court of the United States held that the notion that "the Due Process Clause does not protect against expulsions from the public school system . . . misconceives the nature of the issue and is refuted by prior decisions."[63] Rather, the Court concluded that the Due Process Clause does in fact protect against arbitrary suspensions from the public education system, writing:

> A short suspension is, of course, a far milder deprivation than expulsion. But, "education is perhaps the most important function of state and local governments," *Brown v. Board of Education*, 347 U.S. 483 (1954), and the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary.[64]

Turning to the application of the Due Process Clause, the Court wrote: "Once it is determined that due process applies, the question remains what

---

[62]   U.S. Const. Amend. XIV.

[63]   *Goss v. Lopez*, 419 U.S. 565, 572 (1975) (White, J.).

[64]   *Id.* at 576.

process is due."[65] To identify "the specific dictates of due process" once the

Due Process Clause applies, courts must consider the three factors identified

in *Matthews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[66]

Importantly, in a school disciplinary setting, the *Goss* Court wrote that "students

facing suspension and the consequent interference with a protected property

interest must be given some kind of notice and afforded some kind of hearing."[67]

Furthermore, "[b]eyond the right to notice and hearing, the span of procedural

protections required to ensure fairness becomes uncertain, and must be determined

by a careful weighing or balancing of the competing interests implicated in the

particular case."[68]

In the instant matter, I find that, based on the singularities of this case, Doe

has made the necessary showing of likelihood of success on the merits. My

---

[65]  *Id.* at 577 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

[66]  424 U.S. 319, 335 (1976).

[67]  *Goss*, 419 U.S. at 579.

[68]  *Osei v. Temple University of Commonwealth System of Higher Educ.*, Civil Action No. 10-CV-2042, 2011 WL 4549609, at *8 (E.D.Pa. Sept. 30, 2011)(quoting *Gorman v. University of Rhode Island*, 837 F.2d 7, 14 (1st Cir. 1988)).

reasoning is based on both (1) significant and unfair deviations from policy during the investigation and hearing, and (2) the redactions made by the Investigator to Doe's June 1, 2017 Response to the Charge and Sanction Notification.

First, Doe alleges that his right to due process in a school disciplinary setting has not been satisfied because, among other things, he was denied the opportunity to meaningfully cross examine and confront his accuser.[69] Penn State denies that allegation by arguing that the Code of Conduct procedure allows for the submission of questions by a Respondent to be asked by the panel.[70]

Due Process in disciplinary proceedings does not, in itself, require that the accused be afforded the right to cross examination witnesses supporting a charge.[71] In *Furey v. Temple Univ.*, however, the Honorable Mary A. McLaughlin cited the Fifth Circuit case of *Winnick v. Manning*, 460 F.2d 545 (2d Cir. 1972) to reinforce the importance of cross–examination when the outcome of a disciplinary is ultimately dependent on **credibility-based** determinations.[72] In accordance with the United States Department of Education, Office for Civil Rights regulatory

---

[69]  *See* Pl.'s Br. in Supp. (ECF No. 12), at 7–10.

[70]  *See* Defs.' Br. in Opp. (ECF No. 31), at 19–23. *See also* Code of Conduct, revised 11/3/2016 (ECF No. 31-4) at V.D.1.j.vi ("the Complainant and Respondent may suggest questions to be posed to the other party by and through the Panel. Proposed questions will be submitted to the Panel/hearing authority, which will review the proposed question(s) for relevance and appropriateness before they are posed to the other party.").

[71]  *Goss*, 419 U.S. at 583.

[72]  884 F. Supp. 2d 223, 251 (E.D. Pa. 2012).

guidance for matters involving sexual violence or assault, Penn State procedure provides for cross examination through the submission of questions to the hearing panel subject to a screening for relevance.

Doe argues, however, that Penn State nevertheless deviated from this procedure when the hearing panel rejected as "new evidence" almost all of the twenty-two questions he submitted, including, most pertinently for purposes of my analysis today, questions concerning an unproduced medical exam.[73] Inconsistent application of a university's procedures governing a disciplinary hearing may offend due process.[74] In *Furey v. Temple University*, for example, that court denied summary judgment where there were significant departures from an otherwise facially valid disciplinary process.[75] These deviations included Temple University's failure to recommend a new hearing upon the discovery that a panel member was Facebook friends with the officer who testified and the Vice President of Student Affairs' failure to give presumptive weight to the recommendations of the Review Board.[76]

Here, I find, at this preliminary stage in the litigation, that Penn State's failure to ask the questions submitted by Doe may contribute to a violation of

---

[73]  Pl.'s Br. in Supp. at 8.

[74]  *See Furey*, 730 F.Supp.2d at 396–97 (citing *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972)).

[75]  *Id.* at 397.

[76]  *Id.*

Doe's right to due process as a "significant and unfair deviation" from its procedures. As noted above, Penn State's procedure, as embodied in the Code of Conduct, provides that "the Complainant and Respondent may suggest questions to be posed to the other party by and through the Panel. Proposed questions will be submitted to the Panel/hearing authority, which will review the proposed question(s) for relevance and appropriateness before they are posed to the other party."[77] These questions are subject to further limitation in that "no new information may be provided to the hearing authority, unless the person offering the information can show that the evidence was (1) not available during the investigation, and (2) is relevant to establishing whether or not the Respondent is responsible for misconduct.[78] It was based on this procedure that the hearing chair in the instant matter refused to pose of any questions concerning this medical exam because it was both "new information" and "irrelevant."[79]

While Penn State's policy allowing for the submission of questions for review and use by the hearing panel may satisfy an accused's rights to confront and cross examine adverse witnesses,[80] the instant case demonstrates the

---

[77]  *See* Code of Conduct, revised 11/3/2016 (ECF No. 31-4) at V.D.1.j.vi.

[78]  *Id.* at V.D.1.j.vii.

[79]  Compl. (ECF No. 1) ¶ 125, at 42.

[80]  Indeed, this Opinion should not be read to find that this method of cross examination *in toto* offends due process. *See Doe v. University of Cincinnati*, 223 F.Supp.3d 704, 711 (S.D.Ohio. 2016)(finding that, although this format of cross-examination may not constitute a due

precarious balance hearing panel members must strike in their review of submitted questions. Here, their erroneous rejection of these questions constitutes a significant and unfair deviation from Penn State's procedure for two reasons. First, while Roe's medical examination statement to Investigator Matic occurred late in her investigation, mention of this examination and other previously undisclosed and unproduced physical evidence was unquestionably within both the Investigative Report and Doe's June 1, 2017 Response thereto.[81] This was certainly not new evidence, and the Court strains to understand the hearing chair's reasoning to that end.

Second, while I accept the finding of the hearing chair that this evidence was "not going to determine whether it was consensual or nonconsensual activity,"[82] this finding unfairly limits the potential significance of questions concerning the exam. If produced in a redacted form, this medical exam could unquestionably affect the credibility of Roe by (1) confirming its ultimate existence, and (2) corroborating or discrediting her allegations against Doe. However, even without its production in redacted form, questions regarding this exam were still essential to the panel's final, and ultimately dispositive, credibility determination. Indeed, at

---

process violation, complainant's failure to attend and be subject to such evaluation constituted a violation).

[81] *See* Pennsylvania State University Office of Sexual Misconduct Prevention and Response Investigative Report (ECF No. 31-6), at 26; John Doe's June 1, 2017 Response to the Charge and Sanction Notification (ECF No. 11-9).

[82] Compl. (ECF No. 1) ¶ 125, at 42.

the hearing held before this Court on August 10, 2017, Ms. Feldbaum herself

admitted this relevance in the following exchange:

> THE COURT: But do you know whether she actually sought medical treatment beyond her say-so?
>
> THE WITNESS: It indicated it in the packet and there was nothing that questioned that in the packet.
>
> THE COURT: But you don't know whether there was actually beyond her saying it -- in Latin it would be ipse dixit. Beyond her saying so, you don't know whether she actually went to a doctor or she went to the infirmary or she went to the medical provider because there was actually no report reviewed by you?
>
> THE WITNESS: Correct.
>
> . . .
>
> THE COURT: But were you concerned in a way in evaluating the credibility of the complainant who said this is what happened and then there was actually beyond her statement that it had no medical report provided? You don't know whether there was any medical treatment sought. Were you concerned about her credibility in following up on that or not following up on it?
>
> THE WITNESS: That's --
>
> THE COURT: Because you were assessing credibility weren't you?
>
> THE WITNESS: I am. That is one piece of my determination, looking at all of the information that was provided in the packet. So there was enough another sufficient information that that was not a key point for me.[83]

---

[83] *See* Preliminary Injunction Hearing Transcript, Volume I, (ECF No. 44), at 149:21–150:6; 150:17–151:5.

Prior to the hearing, Doe submitted questions which would have challenged the medical report's existence in a way which Ms. Feldbaum herself admitted was absent from the investigative packet. Therefore, I find, at this preliminary stage, that Doe has demonstrated a likelihood of success on the merits of his due process claim premised on Penn State's significant and unfair deviation[84] from its policy concerning cross examination.

Second, and again owing to the particular circumstances of this case, I find that Doe has shown that (1) a deviation from Penn State's policy concerning the production of the investigative packet to the hearing panel, and (2) that Penn State's redactions of Doe's Response before the Title IX hearing panel and subsequent limitation of oral testimony may have worked in conjunction to violate his right to due process. As noted by the Supreme Court of the United States, "[a] fundamental requirement of due process is 'the opportunity to be heard.' It is an opportunity which must be granted at a meaningful time and in a meaningful manner."[85] To be fair, the accused must therefore be "afforded the opportunity to

---

[84] *See Doe v. University of Cincinnati*, 223 F.Supp.3d 704, 711 (S.D.Ohio. 2016)(finding that, although this format of cross-examination may not constitute a due process violation, complainant's failure to attend and be subject to such evaluation constituted a violation).

[85] *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)(quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)).

respond, explain, and defend."[86] Finally, "due process requires a "neutral and detached judge in the first instance."[87]

The November 3, 2016 version of the Code of Conduct stipulates the following:

> The hearing authority will be permitted at least five business days to individually review the Investigative Packet. During this time, they may submit additional questions to the Investigator or request additional follow up by the investigator. If new information is acquired by the Investigator, both parties will be permitted to review this new information and respond within an appropriate amount of time, to be determined within the discretion of the investigator.[88]

Doe argued at the hearing that this provision was violated when the Title IX Decision panel did not receive his Response to the Investigative Packet within this timeframe. In an exchange between Doe's counsel and Case Manager Feldbaum at the hearing, Ms. Feldbaum all but admitted this violation, stating the following:

> Q. Well, ma'am, why don't you just go up a little to J and where J defines what the investigative packet is. "Which will include the relevant information collected and any relevant written responses to the charges." Relevant written responses to the charges are what the complainant and the respondent submit. Correct?

> A. Correct.

> Q. Those are included -- that investigative packet includes the investigative report, the 77 pages and the complainant and respondent --

---

[86] *Gorman v. University of Rhode Island*, 837 F.2d 7, 13 (1st Cir. 1988).

[87] *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 617 (1993).

[88] *See* Code of Conduct, revised 11/3/2016 (ECF No. 31-4) at V.D.1.j.ii.

A. Correct.

Q. So isn't it a fact, ma'am -- if I have to go through the –isn't it a fact that the panel did not receive the investigative packet as defined by Penn State's policies and procedures until the day before?

A. Correct.

. . .

Q. They got that the day before, hours before the hearing. Correct?

A. A day before.

. . .

Q. Okay. So they got it the day before. They got it on June 5th. You would agree with me, ma'am, that that is a violation of J(ii), is it not, ma'am?

A. A violation?

Q. Yeah. It violates the rule. The hearing authority would be permitted at least five business days to individually review the investigative packet. That did not happen here, did it?

A. No, that did not happen.[89]

This delay, or deviation from the Penn State procedure, is troubling given that the

Title IX decision panel chair, Jamey Perry, admitted during the preliminary

---

[89] *See* Preliminary Injunction Hearing Transcript, Volume I, (ECF No. 44), at 94:23–95:13; 96:19–21; 96:24–97:6; *see also* Preliminary Injunction Hearing Transcript, Volume II, (ECF No. 43), at 15:2–6 (Perry admitting that receiving part of the investigative packet the day before would be a violation of this procedure).

injunction hearing that he knew nothing about the case itself prior to receiving documentation from the case manager.[90] Based on this scenario, the panel was therefore limited in the time given to consider Doe's response to the Charge and Sanction Notification.

Beyond an admitted deviation from the policy allowing the Title IX decision panel five days to review and reflect upon a Respondent's Response to the Charge and Sanction Notification, Doe alleges that he was further denied a meaningful opportunity to respond through both the significant redactions to his June 1, 2017 Response to the Charge and Sanction Notification and the subsequent limitation of his testimony at the June 6, 2017 hearing.[91] Penn State, in turn, responds that these redactions were proper because the Code of Conduct provides that the hearing panel may only review information both learned during investigation, or, if it is new information, information which was previously not available and is relevant to the underlying misconduct.[92]

The Court views with skepticism the role of the Investigator in redacting this information. I specifically note that, during the hearing, Ms. Matic stated repeatedly that her ultimate role is "be impartial and objective to both parties" and

---

[90] *See* Preliminary Injunction Hearing Transcript, Volume II, (ECF No. 43), at 13:22–14:2 ("I wouldn't know what the case was until I received the investigative information.").

[91] Pl.'s Reply Brief (ECF No. 33) at 4–6.

[92] *See* Def.'s Br. at 20 (citing Code of Conduct, revised 11/3/2016 (ECF No. 31-4) § V(D)(1)(j)(vii)).

that is this goal necessitates that she redact information provided.[93] I preliminarily find that those statements to be in conflict and may work to violate Doe's due process. For example, here, Doe alleges that Ms. Matic redacted information which, if considered by the ultimate factfinder—the Title IX decision panel, may have altered their ultimate credibility determinations.[94]

I note further that this function has a funneling effect whereby information deemed irrelevant by the Investigator, an allegedly neutral party, is thereafter disallowed from submission to the Title IX decision panel—the ultimate, and I believe proper, arbiter of both relevance and the accused's fate. Indeed, during the hearing held before this Court, Mr. Perry, the chair of the Title IX Decision Panel, stated the following concerning the limitation which these redactions placed on Doe:

> Q. Well, let me ask you this. Do you recall my client attempting to give you background information and that you cut him off and stopped him?
>
> A. I recall that. I explained to him periodically throughout the proceedings that any information he is providing **needs to be a part of the investigative packet** and relevant to the charges at hand.[95]

---

[93] *See* Preliminary Injunction Hearing Transcript, Volume II, (ECF No. 43), at 130:13–14; 133:19–20; 136:25–137:2; 137:14–16.

[94] Pl.'s Reply Brief (ECF No. 33) at 4–6.

[95] *See* Preliminary Injunction Hearing Transcript, Volume II, (ECF No. 43), at 33:17-23 (emphasis added).

Within this framework, it is therefore easy to foresee that an errant relevancy determination by the Investigator may result in the erroneous deprivation of a private interest by preventing, in totality, the disclosure of otherwise relevant information.

Based on the above deviations in conjunction with what I view as the questionable role of the Investigator in redacting information, I find that Doe has demonstrated the necessary showing of likelihood of success on the merits of his due process claim.

### B. Plaintiff Has Demonstrated Immediate Irreparable Harm.

Having determined that Doe has made the necessary showing of success on the merits of his due process claim, I must now address the second of the "most critical" gatekeeping factors—immediate irreparable harm.[96] In the instant matter, Doe alleges that, in the absence of preliminary relief, he will suffer irreversible harm during the pendency of this litigation because of not only his immediate suspension from the rapidly approaching Fall 2017 semester, but also the recommendation that he be suspended from the Penn State–Thomas Jefferson joint program while Roe is also a participant.[97] Penn State disagrees that suspension from the joint program constitutes irreparable harm and argues that, at most, this

---

[96] *See generally Reilly*, 858 F.3d 173.

[97] *See* Pl.'s Br. at 27–29.

suspension would last two years.[98] I disagree with this contention, and believe

Penn State is understating the significance of the disciplinary action taken.

In *Reilly v. City of Harrisburg*, the Third Circuit quoted the Honorable Frank

H. Easterbrook of the United States Court of Appeals for the Seventh Circuit for

the following proposition:

> How strong a claim on the merits is enough depends on the balance of
> the harms: the more net harm an injunction can prevent, the weaker
> the plaintiff's claim on the merits can be while still supporting some
> preliminary relief.[99]

Here, I find that issuance of injunctive relief can prevent the imposition of serious

net harm. Specifically, I conclude that, contrary to the assertions of Penn State and

given the broad language of the sanction issued by the Title IX decision panel, the

harm Doe would suffer absent some preliminary relief is real, immediate, and

irreparable.

First, while Penn State argues that suspension from the joint program is for a

mere two years, the exact language of the sanction recommends his exclusion *as

long as [Roe] is a participant in the program.*[100] This suspension from the

---

[98]    *See* Defs.' Br. at 33.

[99]    *Reilly*, 858 F.3d at 179 (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock
Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

[100]   *See* Title IX Decision Panel Opinion (ECF No. 11-12).

program[101] would presumably last for another six years if Thomas Jefferson adopts the recommendation, and Doe's ensuing gap, or delay, in completion of the program would constitute irreparable harm.

Second, given the competitive nature of medical school applications and what he avers are the mandatory disclosures required for admission to an alternative medical school, Doe would essentially be without means to mitigate this harm by securing acceptance into another medical program, and, if he intends to proceed with his goal of becoming a doctor, would essentially be forced to await his return to full participation in the program. At the hearing held by this Court, Doe explained with specificity the conundrum in which he finds himself absence preliminary relief:

> Q. You indicated that you would not be able to get to medical school based on this? Why? Tell the Court why.
>
> A. The only reason I believe -- the reason I believe I could not get to medical school is with this institution -- this is termed an institutional action. And when I apply for medical school, I have to indicate if I was ever subjected to any institutional action and I have to explain the institutional action, of course.
>
> And as far as I know any suspension, especially for a sexual misconduct, is pretty much I will be -- I will -- as I heard from experts or people who are ex medical admissions officers that they basically said if you have any sexual misconduct or any institutional.[102]

---

[101] As noted above, this program is a highly competitive, accelerated seven year program in which students must complete three years at Penn State, followed by four years at Thomas Jefferson in Philadelphia. *See* ECF No. 31-6, at 3.

[102] *See* Preliminary Injunction Hearing Transcript, Volume II, (ECF No. 43), at 124: 9–21.

Finally, even if this limitation on acceptance into an alternative medical school did not exist and I were to accept Penn State's assertion that a gap of only two years will result, Doe would still be irreparably harmed by the imposition of this sanction. In *Doe v. Middlebury College*, the United States District Court for the District of Vermont found that immediate irreparable harm existed where "plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap."[103] This finding has since been followed by other courts addressing this issue.[104] I join my sister courts in that conclusion. Specifically, even if Doe's suspension from the Penn State–Thomas Jefferson program were limited to two years (as adduced by Penn State), I nevertheless conclude that this gap would constitute irreparable harm as he would forever be forced to explain his lengthy tenure within this program and, ultimately, his delayed entry into the professional workforce.

### C.    The Balance of Harms Weighs in Favor of Injunctive Relief.

Having found that the most critical factors concerning the issuance of injunctive relief have been satisfied, the Court must now consider the final two factors of this conjunctive test—the balance of harms and the public interest. The

---

[103]    Civil Action No. 15–CV–192, 2015 WL 5488109, at *3 (D.Vt. Sept. 16, 2015).

[104]    *See Doe v. University of Cincinnati*, 223 F.Supp.3d 704, 712 (S.D.Ohio. 2016)(finding that a suspension of one year constitutes irreparable harm); *King v. DePauw Univ.*, Civil Action No. 14-CV-70, 2014 WL 4197507, at *13 (S.D.Ind. Aug. 22, 2014)(finding that a gap or a senior-year transfer on his record constitutes irreparable harm).

third factor requires that I weigh the interests and relative harm of the parties, i.e. "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued."[105] Penn State argues that the balance of harms weighs in its favor because the issuance of preliminary relief will lead to students seeking injunctive relief each time they are unhappy with the outcome of their disciplinary proceeding, and that sound policy concerns caution against that result.[106]

I generally agree with that contention. However, in the instant matter, Doe has shown that the absence of immediate relief during the pendency of the litigation will work irreparable harm to his professional career and advancement. Given that this harm is caused by a constitutional violation on which Doe has shown the necessary likelihood of success, I find that it outweighs that inflicted on Penn State. Furthermore, to the extent that Penn State argues that this factor is in its favor because of the its further need to protect its students and Roe, I note that, during the pendency of the investigation, Doe remained (1) on campus, (2) in the Penn State–Thomas Jefferson program, and (3) separated from Ms. Roe, **without incident**. I have no reason to believe that this *status quo*[107] cannot be maintained

---

[105]   *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578,596 (3d Cir. 2002).

[106]   Defs.' Br. at 34.

[107]   The Court finds that allowing Doe to register for classes and continue in the Penn State-Thomas Jefferson program this semester would not alter the status quo, as he was a

during the pendency of this litigation.[108] Thus, I find that the balance of harms

weighs in favor of issuance of injunctive relief.[109]

### D.    The Public Interest Weighs in Favor of Injunctive Relief.

The final factor considers "whether there are policy considerations that bear

on whether the order should issue."[110] Here, Defendant argues intensely that the

public has an interest in "maintaining order and discipline in our schools without

prohibitive costs and in a manner that will contribute to, rather than disrupt, the

educational process."[111] While I again generally agree with this contention, I note

that Doe has alleged a violation of his right to due process based, in significant part

on Penn State's deviation from its own policies. That potential constitutional harm

suffered must be subject to review. Based on these allegations, I therefore find that

---

participant in the preceding two semesters. As such, Doe must not meet a heightened burden of irreparable harm. *See Bennington Foods LLC v. St. Croix Renaissance, Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008) ("[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction.").

[108]  Indeed for the comfort  and safety of all parties, this continued practice of separating the parties is needed, and based on the representations of Ms. Matic during the hearing, feasible. *See* Preliminary Injunction Hearing, Volume II, (ECF No. 43), at 152:20–154:19.

[109]  *See King*, 2014 WL 4197507, at *14 (finding that "if [defendant university] ultimately wins this suit, the harm it will have suffered by King's court-ordered return to campus this fall, while real, will not be as great as the harm King will have suffered if he is not permitted to return to campus but ultimately wins.").

[110]  *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 598 (W.D. Pa. 2009) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2948.4 at 200–01 (2d ed. 1995)).

[111]  Defs.' Br. at 35 (quoting *Palmer by Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989) (citing *Goss*, 419 U.S. at 584)).

vindication of Doe's constitutional rights is itself a more compelling public interest weighing in favor of injunctive relief.[112]

## IV. CONCLUSION

Based on the above reasoning, injunctive relief is appropriate and will be granted in the instant matter. Therefore, Penn State shall immediately permit and assist the Plaintiff, John Doe, in registering for classes necessary for participation in the Penn State–Jefferson seven (7) year pre-med program for the Fall 2017 Semester which begins on August 21, 2017.

Said registration and participation by Doe is to be effectuated in accordance with Penn State's practice, utilized during the prior academic year, of separating Doe and Roe.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[112] *See Doe v. University of Cincinnati*, 223 F.Supp.3d at 712 (finding that a plaintiff has adequately shown that the issuance of an injunction is in the public interest where he has alleged a violation of his due process rights based on the university's deviation from its own policies); *see also Knoch v. University of Pittsburgh*, Civil Action No. 16-CV-970, 2016 WL 4570755, at *9 (W.D.Pa. Aug. 31, 2016) (finding this factor to be, at most neutral, because "[w]hile the public's interest in pursuing education free of constitutional violations is undeniable, (citation omitted), an educational institution's authority to make disciplinary decisions without having to resort to court intervention is a substantial public interest.").