## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------------

JOHN DOE,                                              :
                                                       :
      **Plaintiff,**                                   :
                                                       :    No.: 4:17-CV-01315
   **-against-**                                        :
                                                       :    (Judge Brann)
THE PENNSYLVANIA STATE UNIVERSITY,                     :
THE PENNSYLVANIA STATE UNIVERSITY                      :
BOARD OF TRUSTEES, ERIC J. BARRON,                     :
individually and as agent for The Pennsylvania         :
State University, PAUL APICELLA, individually          :
and as agent for The Pennsylvania State University,    :
KAREN FELDBAUM, individually and as agent              :
for The Pennsylvania State University,                 :
KATHARINA MATIC, individually and as agent             :
for The Pennsylvania State University,                 :
                                                       :
      **Defendants.**                                  :

-------------------------------------------------------------------

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' PARTIAL MOTION TO DISMISS

**NESENOFF & MILTENBERG LLP**
363 Seventh Avenue – 5th Floor
New York, New York 10001
212-736-4500

**SUMMERS, MCDONNELL, HUDOCK & GUTHRIE, P.C.**
945 East Park Drive – Suite 201
Harrisburg, Pennsylvania 17111
717-901-5916

**Attorneys for Plaintiff John Doe**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ………………......……………………………..…iii

PRELIMINARY STATEMENT ……………..…………………………………1

COUNTER-STATEMENT OF PROCEDURAL HISTORY …………………..3

COUNTER-STATEMENT OF FACTS (THE ALLEGATIONS
OF THE COMPLAINT) ………………………………………………...……5

COUNTER-STATEMENT OF QUESTIONS PRESENTED ……………….....12

STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS ………..13

ARGUMENT ………………………………………………………………...…13

I.   THE COMPLAINT STATES A TITLE IX CLAIM ………………….......14

    A.    The Basic Law Of A Title IX Discrimination Claim……………….....14

    B.    The Complaint's Title IX Allegations Amply Satisfy The Law…...…16

        1.    The Complaint's Title IX Allegations Are
             Relevant and Not Conclusory…………………………...…….16

        2.    The Complaint's Title IX Allegations More
             Than Sufficiently Plead Gender Bias………………..……….17

        3.    Defendants' Mischaracterization Of John Doe's
             Title IX Case Should Be Rejected……………………………20

        4.    John Doe Alleges Facts To Support an "Erroneous
             Outcome" Theory Of Title IX Liability………………………23

        5.    John Doe Has Alleged A "Severity of Penalty/Selective
             Enforcement" Theory Of Title IX Liability…….……………..25

II.    THE COMPLAINT STATES A BREACH OF CONTRACT CLAIM ……27

III.   THE COMPLAINT STATES A QUASI-CONTRACT CLAIM …………..28

IV.   THE BOARD OF TRUSTEES AND INDIVIDUAL DEFENDANTS
       ARE PROPERLY SUED FOR CONSTITITIONAL DUE PROCESS
       VIOLATIONS……………………….……………………………...……31

       A.    The Joinder Of The Penn State President
             and Board of Trustees Is Proper…………………………….……32

       B.    The Individual Defendants Acted To Deprive
             John Doe Of His Constitutional Due Process Rights ……………..….33

       C.    Consideration Of The Qualified Immunity Defense
             Either Does Not Apply Or Is Premature and
             Without Merit On This Motion……………………………….…...33

CONCLUSION ………………………………………………………….……..35

# <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988)…………………….………..26

*Armstrong Pharm., Inc. v. Micron Technologies, Inc.*, 2010 WL 745057
    (D. Mass. 2010)……………………………………………………...……5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)……………………………………13, 22, 29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2008) …………………………..5, 13, 22

*C & K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188 (3d Cir. 1988) ………29

*Coleman v. Wetzel*, 2016 WL 8252571 (M.D. Pa. Dec. 16, 2016) ………………..34

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) ……………………13

*Crouse v. Cyclops Indus.*, 745 A.2d 606 (Pa. 2000)………………………………..28

*Davis v. Monroe Bd. Of Education*, 526 U.S. 629 (1999) …………,,……13-14, 15

*DeJohn v. Temple Univ.*, 2006 WL 2623274 (E.D. Pa. Sept. 11, 2006) …………30

*Doe v. Baum*, 2017 WL 57241 (E.D. Mich. Jan. 5, 2017) …………………22-23, 24

*Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D.R.I. 2016) ………………………24-25

*Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016)……………………….………..3, 13, 14,
                                            19-20, 24-25

*Doe v. Cummins*, 662 Fed. App'x 437, 453 (6th Cir. 2016) …………………..21, 23

*Doe v. Regents of the Univ. of California*, 2016 WL 5515711
    (C.D. Cal. July 25, 2016)…………………………………………...………24

*Donovan v. Pittston Area School Dist.*, 2015 WL 3771420
  (M.D. Pa. June 17, 2015) …………………….…………………………34

*Fletcher-Harlee Corp., v. Pote Concrete Contractors, Inc.,*
  482 F.3d 247 (3d Cir. 2007)……………………………………………………2

*Frazer v. Temple Univ.*, 2014 WL 2547076 (E.D. Pa. June 5, 2014)…………..…23

*Geesey v. CitiMortgage, Inc.*, 135 F.Supp.3d 332 (W.D. Pa. 2015)………………29

*Goss v. Lopez*, 419 U.S. 565 (1975) …………………………………………………35

*Harris v. Saint Joseph's Univ.*, 2014 WL 1910242 (E.D. Pa. May 13, 2014) ……23

*Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990)………………26

*Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc.,*
  822 F. Supp. 2d 84 (D.N.H. 2011)……………………………………………5

*Kelly v. Delaware River Joint Commission*, 187 F.2d 93 (3d Cir. 1951) ………..…2

*Kovats v. Rutgers*, 822 F.2d 1303 (3d Cir. 1987) …………………………..31-32

*Lawal v. McDonald*, 546 Fed. App'x 107, 110 (3d Cir. 2014)……………………..33

*Mallinckrodt Inc. and Liebel-Flarsheim Company v. E-Z- EM Inc. and
  Acist Medical Systems, Inc.* 671 F. Supp.2d 563 (D. Del. 2009) ………..…..2

*Mallory v. Ohio Univ.*, 76 Fed. App'x 634 (6th Cir. 2003)…………….…………27

*Matter of Carr v. St. John's Univ.*, 17 A.D.2d 632,
  231 N.Y.S.2d 410 (2d Dep't 1962) …………………………………29, 30-31

*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) …………………………19

*Newland v. Reehorst*, 328 Fed. App'x 788 (3d Cir. 2009) …………………..………34

*O'Hara v. Indiana University of Pa.*, 171 F.Supp.2d 490 (W.D. Pa. 2001) ………32

*Pearson v. Callahan*, 555 U.S. 223 (2009)…………………………….………..…34

*Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) ………………………..34

*Sahm v. Miami Univ.*, 110 F.Supp.3d 774 (S.D. Ohio 2015) …………………21-22

*ScanSource, Inc. v. Datavision-Prologix, Inc.*, 2009 WL 973497
    (E.D. Pa. Apr. 8, 2009)…………………………………………………....2

*Schwartz v. Booker*, 702 F.3d 573, 588 (10th Cir. 2012)…………………………..35

*Stefanowicz v. Bucknell Univ.*, 2010 WL 3938243 (M.D. Pa. Oct. 5, 2010)…..….14

*Tafuto v. N.J. Inst. of Technology*, 2011 WL 3163240 (D. N.J. July 26, 2011) ……27

*Vought v. Teachers College, Columbia Univ.*, 127 A.D.2d 654,
    511 N.Y.S.2d 880, 881 (2d Dep't 1987) …………………………….29-30, 31

*Wells v. Xavier University*, 7 F. Supp.3d 746 (S.D. Ohio 2014)……………..………22

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994)………..…15, 20, 21, 25, 26, 27

*Zuluga v. Provident Life & Acc. Ins. Co. of Am.*,
    671 F.Supp.2d 623 (M.D. Pa. 2009)…………………………………27-28

## **Statutes and Rules**

Federal Rule of Civil Procedure 12(b) …………………………………………..…2

Federal Rule of Civil Procedure 12(b)(6)…………………………………1, 2, 13, 35

Federal Rule of Civil Procedure 15(a) …………………………………………..…2

20 U.S.C. § 1681(a) …………………………………………………………….…14

42 U.S.C. § 1981…………………………………………………………...………26

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ......14-27

U.S. Constitution, 11th Amendment ……………………………………………32

U.S. Constitution, 14th Amendment …………………………………...…….35

**Other Authorities**

A. Gruber, *Anti-Rape Culture*, 64 Kansas L. Rev. 1029 (2016)…………………..18

A. Gruber, *Consent Confusion*, 38 Cardozo L. Rev. 415 (2016) …………..……..18

A. Scalia, *Reading Law: The Interpretation of Legal Texts* (West Pub. 2012)……19

Department of Education Secretary Betsy DeVos,
   www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement..................................................................................................17

R. Katzman, *Judging Statutes* (Oxford Univ. Press 2014)………………………..19

## **PRELIMINARY STATEMENT**

Plaintiff John Doe ("John Doe") respectfully submits this Memorandum of Law in opposition to Defendants' partial motion to dismiss.  For reasons explained herein, Defendants' motion should be denied.

As a preliminary point, Defendants' partial motion to dismiss is untimely and should be dismissed as such.  Defendants' motion required an Order extending time to file a motion, but the only extension consented to and ordered by your Honor was for a responsive pleading, which is not a Rule 12(b)(6) motion.

On August 15, 2017, Defendants' counsel James Keller, Esq., requested from John Doe's counsel, Stuart Bernstein, Esq., a consent adjournment until August 31, 2017 for defendants to file ***"a single responsive pleading"***.  (A copy of the e-mail exchange between James Keller, Esq. and Stuart Bernstein, Esq. is annexed hereto as **Exhibit "A".**)  John Doe's counsel consented to Defendants' stated request. (See **Exhibit "A".**)  On August 17, 2017, Defendants' counsel filed an Unopposed Motion For Enlargement Of Time To File Responsive Pleading. Defendants in their unopposed motion requested that the Court grant an extension for "Defendants to file a **responsive pleading** until August 31, 2017" (emphasis added). (A copy of Defendants' August 17, 2017 motion is annexed hereto as **Exhibit "B".**)  On August 18, 2017, your Honor granted Defendants' unopposed motion permitting the defendants' to "file **one responsive pleading** on or before August 31, 2017"

1

(emphasis added). (A copy of the Court's August 18, 2017 Order is annexed hereto as **Exhibit "C".**)

It is well settled law in the Third Circuit that a motion to dismiss is **not** a "responsive pleading." *Kelly v. Delaware River Joint Commission*, 187 F.2d 93, 94 (3d Cir. 1951); *Fletcher-Harlee Corp., v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 252 (3d Cir. 2007); *ScanSource, Inc. v. Datavision-Prologix, Inc.*, 2009 WL 973497 (E.D. Pa. Apr. 8, 2009); *Mallinckrodt Inc. and Liebel-Flarsheim Company v. E-Z- EM Inc. and Acist Medical Systems, Inc.* 671 F. Supp.2d 563, 567 (D. Del. 2009). For example, the Court in *Mallinckrodt Inc*, 671 F.Supp.2d at 567, clearly stated: "It is clearly established in the Third Circuit that **a motion to dismiss is not a responsive pleading**." (Emphasis added). The above cited cases, in holding that a Rule 12(b) motion is not a responsive pleading, meant that the plaintiff could amend the Complaint per Rule 15(a).

At no time did Defendants ever request, suggest or discuss an extension of time to file a motion to dismiss. If that had been Defendants' intention, they should have requested of John Doe's counsel consent to file a responsive pleading, a motion to dismiss or an extension of time to exercise any of their rights under Rule 12(b). But Defendants did not do so. The consent given and Order issued was solely to extend the time of the Defendants to serve a **responsive pleading**, not make a partial Rule 12(b)(6) motion. Defendants' partial motion to dismiss is thus untimely.

2

Should your Honor not dismiss Defendants' motion as untimely, Defendants' motion should still be denied as without merit. John Doe has stated claims upon which relief may be given for Title IX sex discrimination and for the alternative state law claims of breach of contract and quasi-contract (promissory estoppel and detrimental reliance); contrary to the apparent assumption in Defendants' partial motion to dismiss, only Defendant The Pennsylvania State University ("Penn State") is being sued for Title IX discrimination and breach of contract -- the Board of Trustees and individual Defendants are not; the Board of Trustees and individual Defendants are, however, properly being sued for constitutional due process violations.

## **COUNTER-STATEMENT OF PROCEDURAL HISTORY**

Defendants' "Procedural History" begins by describing the university disciplinary proceedings in a manner totally contrary to the Complaint and thus also contrary to the rules governing motions to dismiss requiring that the facts alleged in the Complaint be accepted as true. *Doe v. Columbia*, 831 F.3d 46, 48-49, 54 (2d Cir. 2016).

According to the Complaint (and what is the truth), Jane Roe made up false allegations of sexual assault after John Doe rejected Jane Roe's attempts to initiate sexual activity, Jane Roe then failed to provide any verbal or written statement for the Title IX investigator about the alleged incident throughout the entire investigation and Jane Roe further did not provide key medical evidence that would

3

have corroborated or impeached her allegations.   In contrast, John Doe fully cooperated with the "investigation," submitting to multiple interviews and filing a number of written responses; that "investigation" spanned nine months with much unexplained delay and was not adequate, reliable and impartial.   Due to presumptions that the female "victim" is telling the truth and the male "perpetrator" is not, the "investigation" report, which had many omissions of material fact, "determined" "that it is reasonable to believe a code of conduct violation has occurred."   John Doe was charged with non-consensual penetration, given a suspension through Fall 2017 and subjected to a requirement of educational programming and/or counseling for readmission.  John Doe contested the charge and sanctions. The ensuing hearing was perfunctory; the Hearing Panel had no questions for John Doe and did not allow him to say anything not contained in the investigation report. John Doe was thereafter notified that he had been found responsible for violating the University's Code of Conduct and the sanction was increased to include the loss of on-campus living privileges and recommended loss of participation in the pre-medical program.   John Doe submitted a timely appeal, citing the lack of due process and a multitude of procedural errors by Penn State that resulted in the erroneous outcome, but the appeal was denied.

John Doe brought this lawsuit with a 70-page Complaint and also moved for a temporary restraining order and preliminary injunction.  The Court held a two-day hearing and issued a preliminary injunction based on John Doe's due process claims.

Defendants then made this partial motion to dismiss that John Doe opposes.  John Doe has also brought on a motion for contempt.

## COUNTER-STATEMENT OF FACTS
## (THE ALLEGATIONS OF THE COMPLAINT)

Defendants express strong disagreement with the facts alleged in the Complaint.  (Dfs. Mem. 2.)  Defendants, instead of assuming the pleaded facts to be true, selectively characterize them in the context of an attack on John Doe's Title IX case.  Defendants' approach is contrary to the point of law that a Court is to consider a motion to dismiss in terms of the plaintiff's actual pleadings *in toto*, and not in terms of a defendant's selective characterization of the facts.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n. 14 (2008); *Armstrong Pharm., Inc. v. Micron Technologies, Inc.*, 2010 WL 745057, at *2 (D. Mass. 2010); *Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc.*, 822 F. Supp. 2d 84, 93 (D.N.H. 2011).  The Court can read for himself the Complaint for a proper treatment of the Complaint.

John Doe had a 3.92 GPA his freshman year at Penn State, had a clean disciplinary record and was accepted into in the prestigious accelerated pre-medical medical program affiliated with Sidney Kimmel Medical College at Thomas Jefferson University, which allows the student to complete B.S./M.D. degrees in seven years.  Selection for the program is highly competitive.  (Cmplt. ¶¶ 2, 49, 51.)

Students in the accelerated pre-medical program must take a specific and structured course schedule during their three years at Penn State prior to

matriculating to Jefferson University. Any deviation from the schedule will prevent the student from being prepared to successfully take the MCAT exam, which is necessary for admission to the medical school. A suspension from Penn State would derail John Doe's ability to complete the pre-medical program and would undoubtedly terminate any possibility of John Doe attending Jefferson University or any other medical school and becoming a doctor.  (Cmplt. ¶ 3.)

The false allegations of sexual assault involving Jane Roe arose from her attempts to initiate sexual activity with John Doe, and his rejection of her attempts, on the afternoon of September 7, 2016 (the "Incident").  (Cmplt. ¶¶ 4, 56-66.)  After their encounter, Jane Roe fabricated allegations in text messages that she sent to her roommate accusing John Doe of touching her inappropriately while they were in her dorm room during the afternoon of September 7, 2016.  (Cmplt. ¶¶ 5, 68.)

The roommate threatened Jane Roe, stating that if she did not report John Doe to the administrators, then she would. Together, Jane Roe and her roommate reported the false accusations against John Doe to their Resident Advisor, who was required to report the allegations to the Residence Life Coordinator and the University Police, who then issued a timely warning about a Forcible Sex Offense and informed the Title IX Office.  (Cmplt. ¶¶ 6, 69-72.)

At the insistence of her parents, Jane Roe responded to attempts by the University Police to contact her, and she met with them on September 10, 2016 to repeat her false allegations against John Doe. Jane Roe's parents repeated the false

allegations by sending texts to the parents of other pre-medical students threatening harm to John Doe.  (Cmplt. ¶¶ 7, 81-82.)

On September 12, 2016, John Doe received an email from the Title IX Coordinator requiring his presence at a meeting that afternoon to discuss a report of an incident that "may implicate the University's policy against sexual and gender-based harassment and misconduct." John Doe was not notified of the details of the incident, nor was he informed that he could bring an advisor to the meeting. Ultimately, John Doe would be found responsible because "he chose not to share his version of the incident until after he knew what the specific allegations were." (Cmplt. ¶¶ 8, 74-77.)

On September 21, 2016, Jane Roe met with the Title IX Office investigator. She stated that she would not provide a verbal account of her allegations, but instead would submit a written account at a later date. However, after promising on several occasions to do so, Jane Roe failed to provide any written account of the Incident, nor was she willing to provide a verbal statement of what she claimed had occurred in the text messages she had sent to her roommate. (Cmplt. ¶ 9.)

In fact, Jane Roe failed to provide any verbal or written statement for the Title IX investigator throughout the entire nine-month investigation; however, the Title IX Office continued its pursuit into the unsubstantiated allegations against John Doe with a full-scale University Police and Title IX investigation in which Jane Roe refused to take part.  (Cmplt. ¶ 10.)

Jane Roe's refusal to detail the allegations against John Doe resulted in an unfair and biased investigation against the accused male based on no real evidence. (Cmplt. ¶ 11.)

A lengthy nine-month investigation by the Title IX and Student Conduct Offices ensued, which included multiple interviews with John Doe by the investigator, university police and student conduct case manager, in addition to written statements and evidence provided by John Doe.  Hundreds of pages of documentation for the investigation were compiled by the Title IX Office.  (Cmplt. ¶¶ 12, 78-80, 83-101.)

Although John Doe would meet with Title IX and Office of Student Conduct administrators and staff regarding the alleged Incident numerous times, it was not until his last meeting with the Associate Director of the Office of Student Conduct, held on May 1, 2017, that he was informed that the student conduct procedures had been revised and reissued nearly six months prior.  The revised policy and procedures had significant changes to the protocol for cases of sexual misconduct that directly impacted John Doe. (Cmplt. ¶¶ 13, 105-118.)

On May 11, 2017, John Doe was issued a charge of Non-consensual Penetration: Digital, with Sanctions of Conduct Suspension through Fall 2017 and required Educational Programming and/or Counseling for readmission.  John Doe refused to accept the baseless charge and resulting sanctions. He informed the University he would contest the charge and requested a hearing.  (Cmplt. ¶¶ 14, 103.)

Finally, on June 6, 2017, a hearing was held before a panel that included three faculty and staff.  Inexplicably, after a nine-month investigation into allegations of sexual assault that resulted in a lengthy investigation report, the Hearing Panel had absolutely no questions to ask the Investigator or to ask John Doe. John Doe submitted more than 20 questions to the hearing panel, which only asked three questions; all five questions addressed to the medical exam that could have provided exculpatory information were not asked on the ground it was not relevant or was impermissible new evidence. (Cmplt. ¶¶ 15, 120-127.)

John Doe had been told by the investigator and the Associate Director of Student Conduct that when he met with the Hearing Panel he could discuss information which he had previously submitted in his statements but had been redacted by Penn State in the final investigation report. The Chair of the Hearing Panel instructed John Doe to address the Panel to "say whatever you want;" however, when John Doe began to speak he was silenced because what he started to say was not contained in the investigation report.  The Chair stated that what John Doe had to say was not relevant or considered new evidence, and so he was told he could not continue to speak. Ultimately, it was the lack of this information that was used against John Doe in the Hearing Panel's determination of his responsibility. Also, Jane Roe was given the opportunity to give a closing statement, but John Doe was not.  (Cmplt. ¶¶ 16, 128-130.)

On June 9, 2017, following a cursory hearing during which Jane Roe's

inconsistencies and contradictions were not challenged by the Hearing Panel but accepted as true, John Doe received a letter from the Associate Director of Student Conduct notifying him of the Decision that he had been found responsible for violating the University's Code of Conduct. The Sanction was increased to include: (i) suspension through the semester Fall 2017; (ii) required counseling evaluation/assessment under the direction of the Office of Student Conduct; (iii) loss of on-campus living privileges; and (iv) recommended loss of participation in the Penn State Jefferson pre-med/medical program for as long as Jane Roe is a participant in the program. The Sanction had been increased from the original recommendation by the Associate Director of Student Conduct to include the loss of on-campus living privileges and recommended loss of participation in the pre-medical program.  (Cmplt. ¶ 17.)

On June 16, 2017, John Doe submitted a timely appeal to the Decision, citing the lack of due process and a multitude of procedural errors by Penn State that resulted in the erroneous outcome and flawed Decision.  (Cmplt. ¶ 18.)

On June 27, 2017, the Assistant Vice President and Associate Dean of Undergraduate Education and Professor of Art Education, and Women's Studies issued a perfunctory one-page form letter denying John Doe's appeal.  (Cmplt. ¶ 19.)

As a result, John Doe has suffered physical, psychological, emotional and reputational damages and economic injuries and most critically, the loss of his admission to medical school as a pre-medical student in the Jefferson University

program, permanently denying him a career as a physician.  (Cmplt. ¶ 20.)

Throughout the investigative process, Penn State defendants failed to abide by Penn State's own guidelines and regulations and acted in direct violation of federal and/or state law.  (Cmplt. ¶ 21.)

A non-exhaustive list of Penn State Defendants' wrongful actions included the following: (i) Defendants' failure to conduct a thorough and impartial investigation;  (ii) Defendants' failure to notify John Doe that the Student Code of Conduct and Procedures had been revised during the investigation process; (iii) Defendants' failure to prevent and respond to retaliation against John Doe; (iv) Defendants' failure to utilize the preponderance of the evidence standard in determining John Doe's responsibility; (v) Defendants' failure to provide exculpatory evidence and improperly excluded relevant information to the hearing panel; (vi) Defendants evidenced a gender bias against John Doe as the male accused throughout the investigative and hearing process; (vii) Defendants made assessments of credibility and evidentiary weight with respect to each party without any logical basis or rationale; (viii) Defendants denied John Doe of the opportunity to present and question all relevant witnesses; (ix) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; (x) Defendants acted with an anti-male discriminatory bias in violation of Title IX; and (xi) an unwarranted and unduly severe sanction was arbitrarily assessed and increased against John Doe.  (Cmplt. ¶¶ 22-24.)

11

John Doe has been damaged by the actions of Defendants:  his education and career prospects have been compromised as he will be unable to gain admission to the Jefferson University medical school, or to any other medical school because of the disciplinary mark on his record, let alone obtain a medical license in the unlikely event that he was able to obtain admission to a medical school.  John Doe will also be cut off from admission to any institution of similar standing to complete his undergraduate education or to obtain gainful employment with the permanent notation of the erroneous finding on his academic record. As a result, John Doe has suffered physical, emotional and reputational damages, and the loss of educational and career opportunities.  (Cmplt. ¶ 26.)

Defendants conducted a flawed proceeding, afflicted by an anti-male discriminatory bias, resulting in an erroneous outcome and a discriminatory sanction that inflicted unwarranted damages on Plaintiff.  (Cmplt. ¶ 27.)

## COUNTER-STATEMENT OF QUESTIONS PRESENTED

1.      Is the Defendants' partial motion to dismiss timely?  No.

2.      Does the Complaint state a claim for Title IX discrimination?  Yes.

3.      Does the Complaint state a claim for alternative state law claims for breach of contract and promissory estoppel/detrimental reliance?  Yes.

4.      Does the Complaint state a claim against the Board of Trustees and individual defendants for violations of due process?  Yes.

## STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

The legal standard for a Rule 12(b)(6) motion is whether the facts alleged in the Complaint (which the Court must accept and not add other facts), drawing all reasonable inferences in plaintiff's favor, are "sufficient to support a plausible inference that the defendant is liable for the misconduct alleged." *Doe v. Columbia*, 831 F.3d 46, 48-49 (2d Cir. 2016). "When there are well pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016), interpreting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009) ("*Iqbal*"). Thus:

> The issue is simply whether the facts the plaintiff alleges, if true, are plausibly sufficient to state a legal claim. For that reason, the court, in judging the sufficiency of the complaint, must accept the facts alleged and construe ambiguities in the light most favorable to upholding the plaintiff's claims.

*Doe v. Columbia*, 831 F.3d at 48-49. John Doe's Complaint satisfies this standard. Defendants' motion should be denied.

## ARGUMENT

Defendants preface their argument for the partial motion to dismiss with a general assertion that courts should refrain from second guessing disciplinary decisions, quoting *Davis v. Monroe Bd. Of Education*, 526 U.S. 629, 648 (1999), where the U.S. Supreme Court made that statement in passing when ruling that Title

IX may be violated by, and a school may be sued for, the school's failure to prevent or remedy sexual harassment or sexual assault.  The cited language from *Davis* did not mean that schools can render disciplinary decisions without constraint by constitutional due process, Title IX imposed non-discrimination and contractual requirements; schools can't do so.  Defendants' "see" citation in this connection is to a very inapposite case in *Stefanowicz v. Bucknell Univ.*, 2010 WL 3938243 (M.D. Pa. Oct. 5, 2010), where the Court denied a motion for a preliminary injunction sought by one Ms. Kelly Stefanowicz to enjoin a sexual misconduct hearing so that she would not have to appear at it; the hearing was over university charges against a male Bucknell student who had sexually assaulted Ms. Stefanowicz and who was also subject to criminal charges filed by the District Attorney.

## I.

## THE COMPLAINT STATES A TITLE IX CLAIM

The Complaint here does state a Title IX claim, just as the Complaint did in *Doe v. Columbia*, 831 F.3d 46.

### A.    The Basic Law Of A Title IX Discrimination Claim.

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX may be violated by a

school's failure to prevent or remedy sexual harassment or sexual assault, *Davis*, 526 U.S. 629, or by "the imposition of university discipline where gender is a motivating factor in the decision to discipline," *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). In either case, the statute is enforceable through an implied private right of action. *Yusuf*, 35 F.3d at 714.

*Yusuf* classified challenges to university disciplinary proceedings for sex discrimination as falling in two categories: (1) "erroneous outcome" cases, in which "the claim is that plaintiff was innocent and wrongly found to have committed an offense"; and (2) what some courts have called "selective enforcement" cases, but are better called "severity of penalty/selective initiation" cases, in which "the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender." 35 F.3d at 715.

According to *Yusuf*, for either kind of claim, the plaintiff must plead and prove that conduct was discriminatory; for an "erroneous outcome" case, the plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and must "also allege particular circumstances suggesting gender bias was a motivating factor behind the erroneous findings," such as (but not only) statements by disciplinary tribunal members and university officials and patterns of decision-making. 35 F.3d at 715.

**B.**     **The Complaint's Title IX Allegations Amply Satisfy The Law.**

To satisfy the law, the Complaint pleads at length specific facts (Cmplt. ¶¶ 1-27, 36-130), and after pleading at length a constitutional due process claim (Cmplt. ¶¶ 131-163), the Complaint pleads at length the Title IX claim (Cmplt. ¶¶ 164-195), relying principally upon the "erroneous outcome" theory but also invoking the "severity of penalty" theory.  Defendants' attack on the Complaint is without merit.

**1.     The Complaint's Title IX Allegations Are
           Relevant and Not Conclusory.**

Defendants deride the Complaint's Title IX allegations as containing irrelevant information and "conclusory" statements. (Dfs. Mem. 4.)   Those assertions are way wide of the mark.  Quite relevant in John Doe's case are:

> (i)     the Title IX regulatory framework (Cmplt. ¶¶ 168-171);

> (ii)    the investigation of and penalties imposed by Penn State by the Department of Education's Office for Civil Rights (Cmplt. ¶¶ 172-173);

> (iii)   the resulting discriminatory practices followed by Penn State (Cmplt. ¶¶ 174-175);

> (iv)   the deficiencies of the actions and training of the Title IX investigator (Cmplt. ¶¶ 176-179);

> (v)    the erroneous procedures in Penn State disciplinary cases, such as placing the burden of proof on male respondents to prove innocence, the presumption of guilt against male respondents, the encouragement of filing false reports by females, the failure to provide proper notice, the failure to protect male respondents from retaliation, the inadequacy of the hearing procedures and the adverse inference

from the respondent asking to know the allegations before responding to them (Cmplt. ¶¶ 180-186);

(vi)   the totality of circumstances establish that Defendants acted out of gender bias in reaching an "erroneous outcome," as Defendants credited false accusations of sexual assault made by a female student with no supporting documentation and discredited the male disregarding his exculpatory evidence (Cmplt. ¶¶ 187, 191);

(vii)   the lack of reasoned consideration of evidence as required by a burden of proof (Cmplt. ¶¶ 188-189);

(viii)   the political pressures placed by the Obama Administration to mishandle cases such as John Doe's (Cmplt. ¶ 190);

(ix)   that all suspended or expelled students for sexual misconduct have been male and that guilty findings are made against males regardless of evidence (Cmplt. ¶¶ 192-193); and

(x)   the damages suffered by John Doe (Cmplt. ¶¶ 194-195).

These allegations are not conclusory but are corroborated in the September 22, 2017 speech of Department of Education Secretary Betsy DeVos, who revoked the April 2011 Dear Colleague Letter and who denounced the un-American denials of due process in the campus tribunals: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

## 2.   The Complaint's Title IX Allegations More Than Sufficiently Plead Gender Bias._____

Defendants deride the Complaint's Title IX allegations as involving theoretical statements that do not include any allegations of specific gender bias by any of the individuals involved and as devoid of any allegations that similarly

17

situated female respondents are treated differently (Dfs. Mem. 5.) These misconceived arguments are, to use a Marine's phrase, "empty barrels."

There are no or very few female respondents with which to make comparison; and in a confidential system, it would be difficult to assert allegations in a Complaint prior to any discovery anyway.  Further, Defendants are dreadfully mistaken in arguing that the Complaint's Title IX allegations are insufficient because they outline a defective system and do not allege personal animus by individuals. Proscribed gender bias is reflected in how the sexual misconduct process is structured and how the decisions are made -- which is why, among other things, the Complaint alleges, for example, "Only an anti-male bias to find for the female complainant and against the male respondent can explain Defendants' purported findings concerning the preponderance of the evidence" (Cmplt. ¶ 188).

The crux of the problem is the ideology of Title IX administrators -- an ideology at odds with the text of Title IX passed by Congress.  Title IX by text and legislative history is a non-discrimination statute, for fairness for men and women, and not a political device for having kangaroo courts to be used against men based on radical political sentiments that treat males as rapists and female "victims" as presumptively telling the truth.  See Professor Aya Gruber's writings in, for example, *Consent Confusion*, 38 Cardozo L. Rev. 415 (2016) and *Anti-Rape Culture*, 64 Kansas L. Rev. 1029 (2016).  Such radical political sentiments are not found in

the text of Title IX and are not found in the legislative history of Title IX.  For the importance of text in statutory interpretation, *see* A. Scalia, *Reading Law: The Interpretation of Legal Texts* (West Pub. 2012); and for the argument for examining legislative history, *see* R. Katzman, *Judging Statutes* (Oxford Univ. Press 2014).

The approach taken in the Complaint here is supported by the prominent case of *Doe v. Columbia*, 831 F.3d 46.  There, the Second Circuit upheld a Complaint alleging an intentional discrimination Title IX case based on, among other things, a number of defects in the process (particularly the investigation), the questionable outcome given the evidence and the political pressures affecting the treatment of sexual misconduct cases. The Second Circuit did so adopting the legal principles from Title VII cases using the framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), explaining:

> [A] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a *minimal plausible inference* of such discrimination.

831 F.3d at 56 (emphasis in the original).  "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct." *Doe v. Columbia*, 831 F.3d at 57 (emphasis in the original).

19

Notably, the Second Circuit observed: "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side…it is plausible to infer…that the evaluator has been influenced by bias." *Doe v. Columbia,* 831 F.3d at 57.  The Second Circuit added:

> [T]he Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue. Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusation that they had failed to protect female students from sexual assault.

831 F.3d at 57. *See also Yusuf*, 35 F.3d at 715: for the "erroneous outcome" category, "a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof."

### 3. Defendants' Mischaracterization Of John Doe's Title IX Case Should Be Rejected.

Defendants badly mischaracterize John Doe's case when asserting: "'I am a male and I was disciplined' is Plaintiff's argument" and "What Plaintiff claims is this: Respondents tend to be male, and I am male, and I was found responsible."

(Dfs. Mem. 9, 10.)   In support of those bald mischaracterizations, Defendants erroneously posture that John Doe does not point to specific facts supporting gender bias.  Simply put, Defendants are ignoring most of what is pleaded in the Complaint supporting a Title IX case. (Cmplt. ¶¶ 164-195.)   Defendants, relying upon their mischaracterization of John Doe's case, also cite to a series of inapposite cases.

Defendants cite to the unpublished opinion in *Doe v. Cummins*, 662 Fed. App'x 437, 453 (6th Cir. 2016), to deny that the procedural defects in that case were tied to gender bias; however, the Sixth Circuit recognized the published *Doe v. Columbia* precedent and distinguished it on the ground that facts were pleaded in *Doe v. Columbia* showed gender bias -- as they are also here.  Defendants note that *Doe v. Cummins* recognizes that *Yusuf v. Vassar College*, 35 F.3d 709, identifies the Title IX theories of "erroneous outcome" and "severity of penalty/selective enforcement"; however, that point only reinforces John Doe's argument because, as noted above, John Doe's pleading of a Title IX claim invokes those two theories. Defendants' assertion that John Doe's Title IX allegations bear no relationship to those legal theories again shows that Defendants are ignoring most of what is pleaded in the Complaint supporting a Title IX case. (Cmplt. ¶¶ 164-195.)

Defendants cite to another inapposite case in *Sahm v. Miami Univ.*, 110 F.Supp.3d 774 (S.D. Ohio 2015), where the Court rejected the claim of bias because there was not biased decision-making and the Title IX investigator's holding of

multiple roles as part-time police officer, a member of a task force on sexual assault did not create a disabling conflict of interest.  Notably, the *Sahm* court distinguished the *Sahm* case from *Wells v. Xavier University*, 7 F. Supp.3d 746 (S.D. Ohio 2014), where the federal district court, after discussing *Iqbal* and *Twombly*, denied the university's motion to dismiss the Title IX claim brought by Mr. Wells for having been expelled for alleged sexual misconduct.  The pleaded Title IX case of sex discrimination included: the female claimed rape, but the university hospital examination showed no trauma; the female declined to press criminal charges and the local District Attorney in any event doubted the accusation; Mr. Wells gave an account of consensual sex; Mr. Wells alleged that the disciplinary hearing was unfair; and Mr. Wells alleged he was made a scapegoat for the university to demonstrate a response to sexual assault.

Defendants cite to yet another inapposite case in *Doe v. Baum*, 2017 WL 57241 (E.D. Mich. Jan. 5, 2017), where the investigator, after a thorough investigation that included interviewing 23 witnesses, concluded that the plaintiff had not engaged in any unwanted sexual activity and that the complainant was not incapacitated.  In response to the complainant's appeal of the investigative findings, a review panel conducted a *de novo* review but without a hearing and concluded to the contrary to the investigator.  Much of the decision concerned the due process issues raised by the plaintiff complaining about the review panel's action, and the

Court's conclusions on those issues may fairly be strongly questioned.  In any event, the Title IX claim asserted by the plaintiff was summarily dismissed on the ground that gender bias was not sufficiently alleged.  *Doe v. Baum* is an unusual case not germane to the present one.

Defendants also cite to additional inapposite cases in *Harris v. Saint Joseph's Univ.*, 2014 WL 1910242 (E.D. Pa. May 13, 2014) and *Frazer v. Temple Univ.*, 2014 WL 2547076 (E.D. Pa. June 5, 2014).  Both were pre-*Doe v. Columbia* cases; both cases focused on a number of legal issues other than Title IX; and both cases summarily ruled that as to the Title IX claim, the plaintiffs had failed to allege gender bias as the motivating factor -- in the disciplinary decision in *Harris* and the purported retaliation claimed in *Frazer*.

**4.   John Doe Alleges Facts To Support an "Erroneous Outcome" Theory Of Title IX Liability.**

Defendants' denial that an "erroneous outcome" theory of Title IX liability rests upon the mischaracterization of John Doe's case as "the majority of respondents are male and the majority of complainants are female," the misconceived attempt to apply the unpublished opinion in *Doe v. Cummins* instead of the published opinion in *Doe v. Columbia* and the quite erroneous charge that the Complaint's Title IX allegations are conclusory.  (Dfs. Mem. 11-14.)

Contrary to Defendants' conclusory assertions, John Doe in this case does not simply register disagreement with the disciplinary decision, but rather pleads many

pages of allegations to show that the disciplinary decision was the product of a gender biased process that produced an "erroneous outcome" motivated by gender bias.  As discussed above, Defendants' argument about "specific gender bias" not being pleaded is without merit and contrary to *Doe v. Columbia*.  *Doe v. Baum*, 2017 WL 57241, discussed above, does not provide a basis for arguing that gender bias is not sufficiently pleaded in this case.  *Doe v. Regents of the Univ. of California*, 2016 WL 5515711 (C.D. Cal. July 25, 2016), also cited by Defendants, merely repeats what is involved in an "erroneous outcome" claim and finds that the allegation in that case about a backlash against sexual assaults on campus insufficient to create an inference of gender discrimination; that one assertion pales in comparison to what is alleged in the Complaint in this case.

Defendants' effort to compare this case with *Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D.R.I. 2016), and *Doe v. Columbia* in order to find this case wanting only results in pointing to two cases supporting the sufficiency of the Complaint in this case pleading a Title IX claim.  The successful plaintiff in *Doe v. Brown Univ.* was represented by Nesenoff & Miltenberg LLP, John Doe's attorneys in this case, and the Complaints in both this case and *Doe v. Brown Univ.* reflect an understanding of how the ideology of female victimhood/male predation and the university sexual misconduct procedures function in terms of biased investigations, inadequate hearings and males bearing a burden of proving innocence to produce

erroneous outcomes due to gender bias.  In *Doe v. Brown Univ.*, there were some express statements of bias that were available before discovery (which more typically is not available), but the same problem of gender biased handling of the case here and in *Doe v. Brown Univ.* existed. As discussed above, *Doe v. Columbia* is clearly supporting precedent for finding an "erroneous outcome" Title IX claim in this case.

5.     **John Doe Has Alleged A "Severity of Penalty/Selective Enforcement" Theory Of Title IX Liability.**

John Doe's "severity of penalty/selective initiation" claim is that the severity of the penalty that John Doe received was due to his sex: sanctions require rational consideration of the specific circumstances of the case, including disciplinary history, aggravating circumstances and community impact; John Doe was a student in good standing, had no history of sexual misconduct and had no disciplinary record of any kind; yet, John Doe was suspended with a recommended loss of participation in the pre-medical program.  Per *Yusuf*, "the severity of the penalty" imposed on John Doe "was affected by the student's gender."  35 F.3d at 715.

Defendants' denial that a "severity of penalty/selective enforcement" theory of Title IX liability first engages in an attack on the Complaint's allegations made on "information and belief" that that all students suspended or expelled at Penn State have been male and that male respondents are invariably found guilty.  (Dfs. Mem. 14-15, *see* Cmplt. ¶¶ 192-193.)   Statistical evidence is under the control of

Defendants, however, and Defendants had the opportunity to present such evidence at the preliminary injunction hearing but did not do so; thus, such evidence will have to be obtained in discovery.  It should further be noted that the allegation that males accused are invariably found guilty regardless of evidence was specifically upheld in *Yusuf* as not conclusory and indeed supportive of the causal connection to gender discrimination:

> The allegation that males invariably lose when charged with sexual harassment at Vassar provides a verifiable causal connection similar to the use of statistical evidence in an employment case.  *See*, *e.g.*, *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir. 1990).

35 F.3d at 716.

Defendants are ill-focused in raising in this case the specter of floodgates being opened to Title IX litigation if particularized allegations of severity of penalty/selective enforcement are not required. (*See* Dfs. Mem. 15-16.)  Contrary to Defendants' posturing, the Complaint does provide specific allegations that go to the "severity of penalty/selective initiation" claim, and the sanction imposed upon John Doe in this case was unduly harsh.  Defendants citation to *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988), is mistaken. Title IX was not involved in that case.  The issue there was whether students who had been suspended for having occupied the main administration building of Hamilton College have a claim under 42 U.S.C. § 1981 providing for equal rights as are enjoyed by white citizens, and the Court concluded the students did not have such a claim.

26

Defendants also rely upon cases such as *Tafuto v. N.J. Inst. of Technology*, 2011 WL 3163240 * 2 (D. N.J. July 26, 2011), and *Mallory v. Ohio Univ.*, 76 Fed. App'x 634 (6th Cir. 2003), that appear to impose the specific requirement for a "severity of penalty/selective initiation" claim that a male respondent include allegations that female respondents were treated more favorably in similar circumstances.  (Dfs. Mem. 16-17.)  But that requirement cannot be justified, as it would effectively negate the *Yusuf* "severity of penalty/selective initiation" claim. A requirement that would compare treatment of female-on-male sexual assaults with treatment of similar male-on-female sexual assaults erroneously presumes there are a sufficient number of female-on-male sexual assaults for a comparison.

In short, John Doe's "severity of penalty/selective initiation" claim is well conceived and not subject to dismissal.

## II.

## THE COMPLAINT STATES A BREACH OF CONTRACT CLAIM

The Complaint here states a claim for breach of contract, as Defendants do not contest the sufficiency of the pleading of the breach of contract claim and only argue that the there is no independent cause of action under Pennsylvania law for breach of the contract covenant of good faith and fair dealing and that the duty of good faith and fair dealing is merely a term of the contract.  Defendants cite a litany of cases for this point – for example, *Zuluga v. Provident Life & Acc. Ins. Co. of*

*Am.*, 671 F.Supp.2d 623 (M.D. Pa. 2009).   (Dfs. Mem. 17.)   On this point, Defendants are correct.  But what all that means is that the allegations of Count Four for breach of the covenant of good faith and fair dealing (Cmplt. ¶¶ 213-216) are to be treated as part of Count Three for breach of contract (Cmplt. ¶¶ 196-212).

## III.

### THE COMPLAINT STATES A QUASI-CONTRACT CLAIM

The Complaint here states a claim for quasi-contract (promissory estoppel and detrimental reliance).  As Defendants point out, detrimental reliance and promissory estoppel are the same cause of action and have three elements: (i) the defendant made a promise that defendant should have expected to induce action tor forbearance on the part of the plaintiff, (ii) the plaintiff actually took action or refrained from taking action in reliance on the promise and (iii) injustice can only be avoided by enforcing the promise.  *Crouse v. Cyclops Indus.*, 745 A.2d 606 (Pa. 2000).  (Dfs. Mem. 18.) John Doe's Complaint satisfies all three elements.

Defendants acknowledge that the Complaint alleges that Penn State's Policies contain promises that Penn State should have reasonably expected to induce action or forbearance by John Doe and that John Doe relied to his detriment on the express and implied promises made by Penn State.  (Dfs. Mem. 18, citing Cmplt. ¶¶ 218-220.)   Defendants nevertheless attack the quasi-contract cause of action in the Complaint for tracking the elements of the claim as if that is all that is done in the

28

Complaint, which is not the case.  Cases such as *Iqbal* and *Geesey v. CitiMortgage, Inc.*, 135 F.Supp.3d 332 (W.D. Pa. 2015), are not on point because the claim incorporates prior paragraphs of the Complaint (Cmplt. ¶ 217) where more detail is provided.

Defendants attack the quasi-contract cause of action in the Complaint on the ground that an express promise is required under Pennsylvania law, citing *Geesey v. CitiMortgage, Inc.* and *C &K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188 (3d Cir. 1988).  (Dfs. Mem. 19.)  Defendants overlook the point that the claim incorporates prior paragraphs of the Complaint (Cmplt. ¶ 217); the breach of contract claim includes allegations concerning the express promises in the Student Code with respect to investigations, discriminatory conduct, equitable and prompt resolution of complaints and notice of complaints (Cmplt. ¶¶ 200-208).

Defendants nevertheless seem to suggest that the "promise" must be directed to John Doe personally.  (Dfs. Mem. 19.)  The contract cases involving students and universities, however, base the "contract" upon the student-university relationship with the university policies providing the "terms."  *See*, *e.g.*, *Matter of Carr v. St. John's Univ.*, 17 A.D.2d 632, 231 N.Y.S.2d 410, 413 (2d Dep't 1962) ("When a student is duly admitted by a private university, secular or religious, there is an implied contract between the student and the university that, if he complies with the terms prescribed by the university, he will obtain the degree which he sought.");

*Vought v. Teachers College, Columbia Univ.*,127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (2d Dep't 1987) ("When a student is admitted to a university, an implied contract arises between the parties.")  It follows that the "promise" for promissory estoppel and detrimental reliance may be based upon the university policies.

Defendants also deny that university policies can provide the basis for promissory estoppel, but the case cited by Defendants for when "university policy" does not serve as the basis of an express promise illustrates the limitation of that category. In *DeJohn v. Temple Univ.*, 2006 WL 2623274 (E.D. Pa. Sept. 11, 2006), a student alleging a promissory estoppel claim based on "a community of scholars in which freedom of inquiry and freedom of expression are valued."  (Dfs. Mem. 19-20.)  That asserted basis for promissory estoppel in a general aspiration of university life is wholly different from the basis asserted here and in other cases brought by respondent students that rely upon published university policies and student codes of conduct for the promises.

Defendants finally attack the quasi-contract claim on the ground that John Doe did not really rely upon the university policies other than in enrolling at Penn State. (Dfs. Mem. 20, citing Cmplt. ¶ 219.)  Enrollment, however, establishes the student-university relationship subject to the university policies; nothing more is required. The cases recognizing a "contract" between university and student do so as of the admission of the student at the school.  *See*, *e.g.*, *Matter of Carr v. St. John's Univ.*,

30

17 A.D.2d 632, 231 N.Y.S.2d 410; *Vought v. Teachers College, Columbia Univ.*,127 A.D.2d 654, 511 N.Y.S.2d 880.  It follows that the "reliance" for promissory estoppel and detrimental reliance may be based upon enrollment.

## IV.

## THE BOARD OF TRUSTEES AND INDIVIDUAL DEFENDANTS ARE PROPERLY SUED FOR CONSTITITIONAL DUE PROCESS VIOLATIONS

As noted at the outset of the Memorandum of Law, contrary to the apparent assumption in Defendants' partial motion to dismiss, only Defendant The Pennsylvania State University ("Penn State") is being sued for Title IX discrimination and breach of contract -- the Board of Trustees and individual Defendants are not.  (Cmplt. ¶¶ 164-216.)  That statement is made in light of the fact that Defendants spend pages in their Memorandum of Law on the lack of individual legal liability for the Title IX and breach of contract claims.  (Dfs. Mem. 26-27.) What the Board of Trustees and the individual Defendants are sued for are constitutional due process violations.  (Cmplt. ¶¶ 131-163.)

Defendants' partial motion to dismiss does not seek to dismiss Penn State from the suit and thus does not and cannot seek to dismiss Penn State from the claim for constitutional due process violations.  *Kovats v. Rutgers*, 822 F.2d 1303, 1312 (3d Cir. 1987) ("district courts in this circuit have held that the University of Delaware, Temple University, the University of Pittsburgh and Penn State

University, although affiliated with their states in varying degrees, are not alter egos of those states and therefore do not share the states' Eleventh Amendment immunity"); *O'Hara v. Indiana University of Penn.*, 171 F. Supp. 2d 490, 497 n. 8 (W.D. Pa. 2001) (Penn State considered "state related institution" which has not been granted Eleventh Amendment immunity).   Defendants' partial motion to dismiss does seek to dismiss the Penn State Board of Trustees and individual Defendants from the claim for constitutional due process violations.

### A.      The Joinder Of The Penn State President and Board of Trustees Is Proper._____

Defendants first complain that the Penn State President Barron and Board of Trustees should be dismissed from the case because the claims are not against them individually and are not necessary for any of the relief sought.  (Dfs. Mem. 21.)  But to invoke President Truman's saying, the "buck stops" with the Penn State President Barron and Board of Trustees; and given the recalcitrance of the Title IX administrators at Penn State, who are proceeding as if Education Secretary DeVos has not given her speech revoking the April 2011 Dear Colleague Letter and emphasizing the need for due process and as if this Court had not found specific due process violations your Honor has, and given the importance of the subject and the need for the contempt motion, the people where the buck stops at Penn State need to be retained as parties in this case. The Penn State President Barron and Board of Trustees are necessary for relief in this case.

32

**B.    The Individual Defendants Acted To Deprive
        John Doe Of His Constitutional Due Process Rights.**

Defendants contest on this motion whether the individual Defendants Matic, Feldbaum and Apicella caused the deprivation of the right to constitutional due process. Defendants acknowledge that the individual Defendants Matic, Feldbaum and Apicella may be held liable if they directly participated in the deprivation, directed others to violate John Doe's rights or knew and acquiesced in the violation of John Doe's rights, citing *Lawal v. McDonald*, 546 Fed. App'x 107, 110 (3d Cir. 2014). But Defendants assert that the individual Defendants have been treated collectively in the Complaint and thus the law is not satisfied. (Dfs. Mem. 22-23.)

The argument is without merit. Defendant Apicella was the Penn State Title IX Coordinator; Defendant Feldbaum was Penn State Associate Director of Student Conduct who was the Case Manager; Defendant Maric was the Senior Compliance Specialist at Penn State. Nearly everything happened in this case concerning the handling of John Doe's case happened because either individual Defendants Matic, Feldbaum and Apicella directly participated in it, directed others to act or at least knew and acquiesced in the handling of the case that violated John Doe's rights.

**C.    The Qualified Immunity Defense Either Does Not Apply
        Or Is Premature and Without Merit On This Motion.**

Defendants argue that the individual Defendants have a qualified immunity defense (Dfs. Mem. 23-26), but the short answer is either the defense does not apply

because Penn State does not have sovereign immunity or the defense is being raised prematurely and the Complaint pleads sufficient facts that would strip the qualified immunity from the university officials named in their individual capacities.

This defense, even if applicable, is premature because a qualified immunity claim is generally addressed by way of summary judgment. *Newland v. Reehorst*, 328 Fed. App'x 788, 791 n.3 (3d Cir. 2009) ("it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases"); *Donovan v. Pittston Area School Dist.*, 2015 WL 3771420 (M.D. Pa. June 17, 2015) (Manion, J.) (determination of qualified immunity inappropriate at pleading stage); *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) ("summary judgment provides the typical vehicle for asserting a qualified immunity defense").   On a motion to dismiss, the issue is whether "immunity is established on the face of the complaint." *Coleman v. Wetzel*, 2016 WL 8252571 *5 (M.D. Pa. Dec. 16, 2016) (Mehalchick, J.).

Thus, in considering a qualified immunity defense on a motion to dismiss, a Court must decide whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right and whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 223–24 (2009).   The issuance of the preliminary injunction reflects that the Complaint establishes a violation of constitutional right, and it is well established

that a student's interest in pursuing a public education falls within the liberty and property protections of the Fourteenth Amendment and that students facing expulsion or suspension from a public educational institution are entitled to due process protections. *Goss v. Lopez*, 419 U.S. 565, 574–75 (1975). Here, a qualified immunity defense cannot withstand the Rule 12(b)(6) standard. *See Schwartz v. Booker*, 702 F.3d 573, 588 (10th Cir. 2012) (affirming district court order denying defendants' qualified immunity defense when due process rights well established).

## CONCLUSION

For the reasons stated above, the Defendants' partial motion to dismiss the Complaint should be denied, and the Court should grant such further and other relief as is deemed just and proper.

Dated:   October 26, 2017

**NESENOFF & MILTENBERG LLP**
**By: _/s/ Philip A. Byler _____**
**Philip A. Byler, Esq.**
**Stuart Bernstein, Esq.**
**Andrew T. Miltenberg, Esq.**
**363 Seventh Avenue – 5th Floor**
**New York, New York 10001**
**212-736-4500**

**SUMMERS, MCDONNELL, HUDOCK**
**    & GUTHRIE, P.C.**
**By: __/s/ Kevin D. Rauch_____**
**Kevin D. Ruach, Esq.**
**945 East Park Drive – Suite 201**
**Harrisburg, Pennsylvania 17111**

**Attorneys for Plaintiff John Doe**

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2017, a copy of the foregoing was filed electronically with this Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ **Philip A. Byler**__
**Philip A. Byler, Esq.**