# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, | No. 4:17-CV-01315 |
| Plaintiff. | (Judge Brann) |
| v. | |
| THE PENNSYLVANIA STATE UNIVERSITY, THE PENNSYLVANIA STATE UNIVERSITY BOARD OF TRUSTEES, ERIC J. BARRON, PAUL APICELLA, KAREN FELDBAUM, and KATHARINA MATIC, | |
| Defendant. | |

## MEMORANDUM OPINION

### JANUARY 8, 2018

Defendants—The Pennsylvania State University, The Pennsylvania State University Board of Trustees, Eric J. Barron, Paul Apicella, Karen Feldbaum, and Katharina Matic—all moved to dismiss Plaintiff John Doe's Complaint. For the reasons that follow, that motion is granted in part and denied in part.

## I. BACKGROUND[1]

### A. The September 7, 2016 Incident

In the fall of 2016, John Doe began his first year of classes at The Pennsylvania State University ("PSU").[2] He was enrolled in the school's accelerated pre-medical program, which allowed students to matriculate into medical school at Thomas Jefferson University after successfully completing three years at PSU.[3] Jane Roe was a fellow first-year student in the program.[4]

On September 7, 2016, Mr. Doe and Ms. Roe spent time alone together in Ms. Roe's dorm room.[5] The two individuals have offered wildly different characterizations of what went on there: Mr. Doe alleges that Ms. Roe attempted—unsuccessfully—to seduce him, while Ms. Roe has alleged that Mr. Doe sexually assaulted her. For purposes of this motion, however, the precise details of those allegations are irrelevant. More important are the steps taken by PSU and its administrators in that incident's aftermath, including the university's investigation and subsequent decision to sanction Mr. Doe.

---

[1] When considering a motion to dismiss for failure to state a claim, a court assumes the truth of all allegations made in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The material in this section, then, is taken entirely from John Doe's Complaint, ECF No. 1, and is presumed true for present purposes.

[2] ECF No. 1 (Complaint) ¶ 48, 54.

[3] *Id.* ¶ 48.

[4] *Id.* ¶ 53.

[5] *Id.* ¶ 61-66.

### B. Investigation by Katharine Matic

On September 8, 2016, one day after the incident, the University Police delivered a "No Contact Order" to Mr. Doe at his dorm room, forbidding him to have any further contact with Ms. Roe.[6] On September 12, 2016, Mr. Doe received an email from PSU's Title IX Coordinator, Paul Apicella, asking Mr. Doe to attend a meeting that day.[7] At the meeting, Mr. Apicella told Mr. Doe that he was being removed from the classes he shared with Ms. Roe and informed Mr. Doe of some of his procedural rights.[8]

On September 23, 2016, Mr. Doe met for the first time with a PSU Title IX Investigator, Katharina Matic. Ms. Matic told Mr. Doe that she would "strive to complete the investigation in 30 days" and that PSU's policy was "more educational than punitive." She also told Mr. Doe that Ms. Roe would be submitting a written statement to which Mr. Doe could respond, but did not elaborate further on any of Ms. Roe's allegations.

Mr. Doe met with Ms. Matic for a second time on September 28, 2016.[9] Although Ms. Roe had not yet submitted a written statement, Ms. Matic told Mr. Doe that PSU Residence Life had met with Ms. Roe on the night of the incident

---

[6] *Id.* ¶ 72.

[7] *Id.* ¶ 74.

[8] *Id.* ¶ 76.

[9] *Id.* ¶ 83.

and that, at that time, Ms. Roe alleged that Mr. Doe "attempted to kiss her, that she was afraid to scream, that there was touching of a hand up under her clothes and that she might be bleeding a bit."[10] In response, Mr. Doe orally outlined his version of the incident.[11]

Mr. Doe met with Ms. Matic for the third time on October 5, 2016, where he learned, for the first time, that Ms. Roe was alleging "nonconsensual digital penetration."[12] Although Ms. Roe had not yet submitted a written statement—as it turns out, she would never do so—Mr. Doe submitted a written statement of his own the next day.[13]

Mr. Doe met with Ms. Matic again on October 21, November 16, and December 16, 2016.[14] At the December 16 meeting—their sixth meeting—Ms. Matic allowed Mr. Doe to view a draft of her investigation report and take notes, but did not allow Mr. Doe to remove the draft from her office.[15] This was the first time that Mr. Doe saw incident reports created by Residence Life and the University Police.[16] Because Ms. Roe did not submit a written statement, those

---

[10] *Id.*

[11] *Id.* ¶ 84.

[12] *Id.* ¶ 86.

[13] *Id.* ¶ 10, 87.

[14] *Id.* ¶¶ 88, 89, 90.

[15] *Id.* ¶ 90.

[16] *Id.*

incident reports had been submitted as Ms. Roe's formal Title IX complaint.[17] Mr. Doe submitted a written response to the draft investigation report on January 3, 2017.[18]

Mr. Doe met with Ms. Matic again on January 13 and March 21, 2017.[19] He reviewed further drafts of the investigative report at both meetings, expressed his disagreement with redactions made in it, and submitted another written response.[20]

### C. Administrative Hearing with Karen Feldbaum

On May 1, 2017, Mr. Doe met with PSU's Associate Director of Student Conduct, Karen Feldbaum, for an administrative hearing.[21] A few days later, Ms. Feldbaum—who was serving as Mr. Doe's case manager—issued a letter stating "that it is reasonable to believe a code of conduct violation has occurred."[22] She listed the charge of "Nonconsensual Penetration: Digital or with an Inanimate Object," and recommended that Mr. Doe be suspended through the fall 2017 semester and submit to educational programming and counseling before readmission.[23]

---

[17] *Id.* ¶ 91.

[18] *Id.* ¶ 97.

[19] *Id.* ¶¶ 98, 101.

[20] *Id.*

[21] *Id.* ¶ 102.

[22] *Id.* ¶ 103.

[23] *Id.*

Mr. Doe refuse to accede to the charge, and issued a written response contesting it.[24] Therefore, the matter was forwarded to a Title IX Decision Panel for a hearing.[25]

**D.  Appearance Before the Title IX Decision Panel**

Mr. Doe's hearing was held on June 6, 2017, and was governed by procedures appearing in PSU's Code of Conduct and Student Conduct Procedures ("Code of Conduct").[26] At the outset of the hearing, Mr. Doe was informed that his evidence "should be limited to" the information appearing in Ms. Matic's investigation report.

The Code of Conduct indicated that Mr. Doe could submit questions for Ms. Roe to the Decision Panel, which questions would be reviewed "for relevance and appropriateness."[27] Mr. Doe submitted several questions about a medical examination Ms. Roe allegedly underwent a few days after the incident; Ms. Roe, however, never submitted the report from that examination and, consequently, the

---

[24]  *Id.* ¶¶ 103-04.

[25]  *Id.* ¶ 117.

[26]  *Id.* ¶ 15, 117.  The Code of Conduct also contained procedures governing other steps of the disciplinary process, including Ms. Matic's investigation.

[27]  *Id.* ¶ 121.

report did not appear in the investigation report.[28] Therefore, the Panel rejected Mr. Doe's questions about it as "not relevant" and "new evidence."[29]

The Code of Conduct also stated that Mr. Doe would "have the option to observe [Ms. Roe's] interaction with the hearing authority through remote video or audio access, if reasonably practicable."[30] Ms. Roe, however, refused to allow Mr. Doe to see her while she testified at the hearing via webcam.[31]

After the hearing, the Decision Panel found Mr. Doe responsible. In accordance with Ms. Feldbaum's recommendation, it suspended him through the fall 2017 semester and required him to submit to counseling before readmission.[32] In addition, it also denied him on-campus living privileges and recommended that he be removed from the accelerated pre-medical program.[33]

### E. Procedural History

Mr. Doe initiated the instant action on July 25, 2017. His Complaint lays out the above events and contains five counts: a Due Process Clause claim (Count I),[34] a Title IX claim (Count II),[35] a breach of contract claim (Count III),[36] a breach

---

[28] *Id.* ¶ 123.
[29] *Id.* ¶ 125.
[30] *Id.* ¶ 120.
[31] *Id.*
[32] *Id.* ¶ 17.
[33] *Id.*
[34] *Id.* ¶¶ 131-63.

of the covenant of good faith and fair dealing claim (Count IV),[37] and an estoppel and reliance claim (Count V).[38]

On July 28, 2017, Mr. Doe moved for a temporary restraining order against PSU,[39] which this Court granted on August 18, 2017.[40] On August 31, 2017, Defendants moved to dismiss parts of Mr. Doe's complaint.[41] Mr. Doe opposed that motion on October 26, 2017,[42] and Defendants replied to that opposition on November 22, 2017.[43]

## II. DISCUSSION

### A. Standard of Review

When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[44] a court assumes the truth of all factual allegations in the plaintiff's complaint and draws all inferences in favor of that party;[45] the court

---

[35] *Id.* ¶¶ 164-95.
[36] *Id.* ¶¶ 196-212.
[37] *Id.* ¶¶ 213-16.
[38] *Id.* ¶¶ 217-223.
[39] ECF No. 11.
[40] ECF No. 48.
[41] ECF No. 50.
[42] ECF No. 63.
[43] ECF No. 73.
[44] Federal Rule of Civil Procedure 12(b)(6).
[45] *Phillips v. Cnty. Of Allegheny*, 616 F.3d 224, 228 (3rd Cir. 2008).

does not, however, assume the truth of any of the complaint's legal conclusions.[46] If a complaint's factual allegations, so treated, state a claim that is plausible – *i.e.*, if they allow the court to infer the defendant's liability – the motion is denied; if they fail to do so, the motion is granted.[47]

### B. Whether Defendants' Motion to Dismiss is Timely

Mr. Apicella's response to Mr. Doe's Complaint was due on August 28, 2017; the other defendants' responses were due on August 21, 2017. On August 17, 2017, Defendants sought "a brief extension to file one responsive pleading on behalf of all Defendants by August 31, 2017."[48] That motion was granted the next day.[49]

Mr. Doe argues that Defendant's Motion to Dismiss is untimely. He notes that this Court extended the time to file a "responsive pleading," not the time to file a motion to dismiss, and cites case law drawing a distinction between the two types of filings.[50] Therefore, he argues, Defendants were required to file any motion under Rule 12(b) by the original deadlines—*i.e.*, by either August 21 or August 28, 2017.

---

[46] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

[47] *Id.*

[48] ECF No. 41.

[49] ECF No. 49.

[50] ECF No. 63 at 2. The cited cases draw the distinction in the context of Rule 15(a), which regulates when a party may amend its complaint before trial.

This is a clever argument—but not a winning one. The only deadline imposed by Rule 12(b) on a motion to dismiss is that it "must be made before pleading if a responsive pleading is allowed." When this Court extended the deadline for the responsive pleading to August 31, 2017, then, it simultaneously extended the deadline for any motion to dismiss.

### C. Whether Mr. Doe Has Adequately Alleged His Claims Against the Individual Defendants

Defendants argue that Mr. Doe has not alleged facts sufficient to support his claims against the individual defendants—*i.e.*, against the PSU Board of Trustees, Eric Barron, Mr. Apicella, Ms. Feldbaum, and Ms. Matic. In response, Mr. Doe clarifies that only Count I is brought against those defendants.[51]

Because claims against individuals in their official capacity "are really against the employing governmental entity"[52] and "are redundant with . . . claims against [the] municipality that employs the official"[53]—here, PSU—Count I against all individual defendants in their official capacities will be dismissed.

To state a constitutional claim against an individual under 42 U.S.C. § 1983, "a plaintiff must plead that each Government-official defendant, through the

---

[51] ECF No. 63 (Doe's Opposition to Defendants' Motion to Dismiss) at 31 ("What the Board of Trustees and the individual Defendants are sued for are constitutional due process violations.")

[52] *Kohn v. School Dist. of City of Harrisburg*, 817 F.Supp.2d 487, 510 (M.D. Pa. 2011).

[53] *Snell v. City of York*, 20907 WL 1412061 at * 2 (M.D. Pa. 2007).

official's own individual actions, has violated the Constitution."[54] A plaintiff may sustain this burden by showing that an individual defendant "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations."[55]

Mr. Doe has adequately alleged his due process claim against Mr. Apicella, Ms. Feldbaum, and Ms. Matic in their individual capacities. His complaint alleges numerous constitutional violations "[i]n the course of [the] investigation and adjudication."[56] It alleges, for example, that he was not provided "proper notice of the charges against him," since it was not until October 5, 2016—after meeting with Mr. Apicella and Ms. Matic several times—that he learned of the allegation of "nonconsensual digital penetration."[57] The complaint also alleges that Ms. Feldbaum wrote a "cursory and perfunctory decision letter stating that [she] had determined [Mr. Doe] responsible."[58] Therefore, Count I against Mr. Apicella, Ms. Feldbaum, and Ms. Matic in their individual capacities survives.

Mr. Doe has not, however, adequately alleged his due process claim against Mr. Barron or the Board of Trustees, since his complaint contains absolutely no factual allegations against either of those parties. Therefore, Count I against Mr.

---

[54] *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

[55] *Santiago v. Warmister Tp.*, 629 F.3d 121, 129 (3d Cir. 2010). See also

[56] ECF No. 1 ¶ 146.

[57] *Id.* ¶ 148.

[58] *Id.*

- 11 -

Barron and the Board of Trustees in their individual capacities will be dismissed. Mr. Doe, however, may amend his complaint to cure this deficiency.

### D. Whether the Individual Defendants Have Qualified Immunity

Defendants argue that Mr. Apicella, Ms. Feldbaum, and Ms. Matic are entitled to qualified immunity. Although qualified immunity shields government officials from liability unless their conduct violates "clearly established statutory or constitutional rights,"[59] the United States Court of Appeals for the Third Circuit "has cautioned that it is generally unwise to venture into a qualified immunity analysis at the pleading stage[,] as it is necessary to develop the factual record."[60] Here, the complaint alleges a profusion of ways in which the Defendants violated Mr. Doe's constitutional rights,[61] which may or may not be borne out by the record after discovery and further legal analysis. Because it is not yet clear how (or if) defendants violated Mr. Doe's constitutional rights, this Court cannot determine if those rights were "clearly established." It also cannot, therefore, grant the individual defendants qualified immunity at this time.

### E. Whether Mr. Doe Has Adequately Alleged a Violation of Title IX

Defendants argue that Mr. Doe has not adequately alleged a violation of Title IX. Title IX states that "[n]o person in the United States shall, on the basis of

---

[59] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[60] *Williams v. Papi*, 30 F.Supp.3d 306, 314 (M.D. Pa. 2014).

[61] *See, e.g.*, ECF No. 1 ¶¶ 146, 148-49.

sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."[62] It has been interpreted to, *inter alia*, "bar the imposition of university discipline where gender is a motivating factor."[63] There are several theories under which to bring such a Title IX university discipline case;[64] Mr. Doe's claims are brought under an "erroneous outcome" theory and under what he terms a "severity of penalty" theory.[65] Under either theory, however, Mr. Doe

---

[62] 20 U.S.C. § 1681(a).

[63] *Doe v. The Tr. of the Univ. of Pa.*, ___ F.Supp.3d ___, 2017 WL 4049033, at *15 (E.D. Pa. 2017) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016).

[64] *See id.; see also Winter v. Pa. State Univ.*, 172 F.Supp.3d 756, 775-76 (M.D. Pa. 2016).

[65] ECF No. 63 at 14-16.

The two most prevalent theories under which to bring a Title IX university discipline case are the "erroneous outcome" theory and the "selective enforcement theory." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). Under an "erroneous outcome theory," a plaintiff "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* Mr. Doe has satisfied that standard here with a litany of allegations. *See, e.g.*, ECF No. 1 ¶ 180 (PSU "erroneously placed the entire burden on [Mr. Doe] to prove his innocence, instead of setting forth competent evidence to demonstrate how [he] allegedly engaged in non-consensual sex with Jane Roe.").

Under a "selective enforcement theory," on the other hand, a plaintiff is asserting that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. Here, Mr. Doe alleges that, prior to these proceedings, he "had a spotless academic record and a stellar reputation in the [PSU] community," ECF No. 1 ¶ 52, and argues that his punishment—recommended expulsion from the accelerated pre-medical program—is disproportionate to the alleged misconduct. At this stage of the proceedings, these allegations suffice to state a Title IX claim under a "selective enforcement"—or, as Mr. Doe prefers, a "severity of penalty"—theory.

must allege facts that allow this Court to infer that the disciplinary proceedings were infected with impermissible gender bias.[66]

Mr. Doe's Complaint contains a host of conclusory allegations of gender bias, which this Court need not credit for purposes of considering a motion to dismiss.[67] For example, he alleges that PSU's "existing practices and procedures discriminate, on the basis of sex, against the male accused"; that PSU "conducted its investigation of the allegations against [him] in a manner that was slanted in favor of the female accuser[]";[68] and that "[m]ale respondents in sexual misconduct cases at [PSU] are discriminated against solely on the basis of sex."[69]

Mr. Doe also alleges a number of facts that, he argues, support his claim of gender bias. He alleges, for example, that the process used by PSU to find him responsible was unfair, biased in favor of his accuser, and violative of PSU's own written Code of Conduct.[70] Even if these allegations are assumed true, however, they do no more than indicate a pro-victim—not an anti-male—bias.[71]

---

[66] *See Collick v. William Paterson Univ.*, 2016 WL 6824374 at * 9 ("Differences between [the] different theories aside, Plaintiffs concede that in any case they must adequately allege that the complained-of conduct was discriminatory."); *see also Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

[67] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[68] ECF No. 1 ¶ 178.

[69] *Id.* ¶ 193.

[70] *See, e.g.*, *id.* ¶¶ 174, 176, 181.

[71] *See, e.g.*, *Doe v. Cummins*, 662 Fed.Appx. 437, 453 (6th Cir. 2016) ("[T]he se deficiencies at most show a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct. But this does not equate to gender bias because sexual-assault

Mr. Doe also claims that PSU was under external social and political pressure to successfully prosecute on-campus sexual assault, alleging that its federal funding was in jeopardy subsequent to the Department of Education's "Dear Colleague" letter and comments by Catherine Lhamon, former Assistant Secretary of that department;[72] that PSU had been subject to a "compliance review" by the Department of Education because of a "dramatic increase in the number of forcible sex offenses occurring on campus as reported by the university itself";[73] and that PSU had been fined $2.4 million due to its mishandling of sexual misconduct incidents.[74] A host of other federal district courts have grappled with similar cases involving federal pressure to crack down on on-campus sexual assault;[75] a majority, however have held that its mere existence does not supply the

---

victims can be both male and female."); *Doe v. Univ. of Co., Boulder*, 255 F.Supp.3d 1064, 1079 (D. Colo. 2017) ("the inference of pro-victim bias is an obvious alternative explanation"); *Doe v. Univ. of Cincinnati*, 173 F.Supp.3d 586, 607 (S.D. Ohio 2016) ("Rather, at worst UC's actions were biased in favor of alleged victims of sexual assault and against students accused of sexual assault. However, this is not the same as gender bias because sexual assault victims can be either male or female."); *Sahm v. Miami Univ.*, 110 F.Supp.3d 774, 778 (D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students.")

[72] ECF No. 1 ¶¶ 36-46. This letter was published on April 4, 2011, by the Department of Education's Office of Civil Right.

[73] *Id.* ¶ 172.

[74] *Id.* ¶ 173.

[75] *See, e.g.*, *Rolph v. Hobart and William Smith Colleges*, ___ F.Supp.3d ___, 2017 WL 4174933, at *11 (W.D.N.Y. 2017), *Doe v. Amherst College*, 238 F.Supp.3d 195, 204-05 (D. Mass. 2017), *Collick v. William Paterson Univ.*, 2016 WL 6824374, at *12 (D.N.J. 2016).

necessary inference of gender bias.[76] This Court agrees with that majority of courts: federal pressure to prosecute sexual assault, like accusations of a bias in favor of the accuser, supply an inference of, at most, a pro-victim bias only.

Finally, however, Mr. Doe claims that "all students that have been suspended or expelled from [PSU] for sexual misconduct have been male" and that "[m]ale respondents in sexual misconduct cases at [PSU] . . . are invariably found guilty, regardless of the evidence[] or lack thereof."[77] Although these allegations do not, in any sense, raise to the level of blatant and obvious gender bias made in similar cases in federal district courts in this state,[78] they are sufficient to allow this Court to infer that PSU's disciplinary process is tainted by anti-male bias.[79] Therefore, Count II against PSU survives.

---

[76] *See, e.g.*, *Doe v. Univ. of St. Thomas*, 240 F.Supp.3d 984, 992 (D. Minn. 2017) ("[T]his Court joins the majority of federal courts in finding a general reference to federal pressure, by itself, is insufficient to show gender bias."); *Doe v. College of Wooster*, 243 F.Supp.3d 875, 887 (N.D. Ohio 2017); *Doe v. Univ. of Chicago*, 2017 WL 4163960, at *5 (N.D. Ill. 2017).

[77] *Id.* ¶¶ 192-93.

[78] *See, e.g.*, *Saravanan v. Drexel Univ.*, 2017 WL 5659821 at * 4 (E.D. Pa. 2017) (holding that plaintiff adequately pled gender bias when he alleged that the university distributed a document "provid[ing] 'Advice for Women' to avoid rape while providing 'Advice for Men' to 'think about whether you really want to have sex with a wom[a]n who does not want to have sex with you."); *Harris v. St. Joseph's Univ.*, 2014 WL 12618076, at *2 n.3 (E.D. Pa. 2014) (holding that a plaintiff adequately pled gender bias when he alleged that a university official admitted that the university "adopted a policy favoring female accusers as [the university] was concerned about 'Title IX' charges by female students.").

[79] *See, e.g.*, *Yusuf v. Vassar College*, 35 F.3d 709, 716 (2d Cir. 1994). In that case, the Second Circuit, after noting that "[a] plaintiff alleging . . . gender discrimination by a university . . . must specifically allege . . . circumstances giving rise to a plausible inference of [gender-based] discriminatory intent," held that the plaintiff met that burden by alleging "that males accused of sexual harassment at [the defendant university] are 'historically and

It goes without saying, however, that Mr. Doe's allegations are *just that*—allegations—and that Mr. Doe's claim of gender bias will ultimately need to be supported by evidence in order to survive. The memorandum opinion issued today stands only for the proposition that Mr. Doe has sufficiently *alleged* that bias, and should not be read to imply that such bias actually exists.

**F. Whether Pennsylvania Law Supports a Claim for Breach of the Covenant of Good Faith and Fair Dealing**

Defendants additionally argue that there is no independent cause of action under Pennsylvania law for breach of the implied covenant of good faith and fair dealing, and that this claim should merge with Mr. Doe's breach of contract claim. Mr. Doe concedes this point.[80] Therefore, Count IV will be dismissed.

**G. Whether Mr. Doe Has Adequately Alleged a Claim for Promissory Estoppel**

Defendants also argue that Mr. Doe has not adequately alleged his claim for estoppel and reliance—*i.e.*, his claim for promissory estoppel.[81] To state a claim for promissory estoppel under Pennsylvania law, a plaintiff must allege that

---

systematically' and invariably found guilty, regardless of the evidence, or lack thereof.'" *Id.* at 713, 716.

[80] ECF No. 53 at 27-28.

[81] In his Opposition to Defendant's Motion to Dismiss, Mr. Doe repeatedly—and incorrectly—characterizes this claim as a "quasi-contract claim." *See* ECF No. 63 at 28-31. Promissory estoppel and quasi-contract claims, however, are not the same causes of action. *See Sevast v. Kakouras*, 591 Pa. 44, 53 n.7 ("An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law.")

(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promise; (2) the promise actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.[82]

Here, Mr. Doe alleged that PSU's "various policies"—including, presumably, the Code of Conduct—"constitute representations and promises that [PSU] should have reasonably expected to induce action or forbearance by" Mr. Doe.[83] Mr. Doe also alleges that he "relied to his detriment on these express and implied promises and representations made by" PSU.[84] These "threadbare recitals of [the] cause of action's elements, supported by mere conclusory statements," are insufficient to allow this Court to "draw the reasonable inference that the defendant[s are] liable for the misconduct alleged"[85]—*i.e.*, liable under a promissory estoppel theory. Mr. Doe does not, for example, allege that he specifically chose PSU (over, perhaps, other universities) because of its "various policies," or allege that any of his specific actions during the investigation or hearing were based on his reading of the Code of Conduct. Therefore, Count V will be dismissed. Mr. Doe, however, may amend his complaint to cure this deficiency.

---

[82] *Crouse v. Cyclops Industries*, 560 Pa. 394, 403 (2000).

[83] ECF No. 1 ¶ 67.

[84] *Id.* ¶ 20.

[85] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. CONCLUSION

For the reasons stated above, Count I will be dismissed as to The Pennsylvania State University Board of Trustees in their official and individual capacities, Eric J. Barron in his official and individual capacities, Paul Apicella in his official capacity, Karen Feldbaum in her official capacity, and Katarina Matic in her official capacity. Count I survives against The Pennsylvania State University, Paul Apicella in his individual capacity, Karen Feldbaum in her official capacity, and Katarina Matic in her official capacity. Count II survives, as does Count III (which was not challenged in this motion to dismiss). Counts IV and V will be dismissed.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge